IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

MARVIN C. THOMPSON,       )
         )
       Petitioner,      )
         )
  vs.        )
         )   **Civil No. 3:07cv915-ID**
UNITED STATES OF AMERICA,   )
         )
       Respondent.    )

## UNITED STATES' RESPONSE TO § 2255 MOTION

COMES NOW the United States of America, by and through its attorney, Leura G. Canary, United States Attorney, and, in compliance with this Court's order, responds to Defendant/Movant Marvin C. Thompson's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, Or Correct Sentence By a Person In Federal Custody, as follows:

## I.  PROCEDURAL HISTORY AND RELEVANT FACTS

On May 14, 1992, a grand jury for the Middle District of Alabama returned an indictment against Defendant/Movant Marvin C. Thompson ("Thompson") and several co-defendants.  See Exhibit A, the indictment.  Count 1 charged Thompson with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846, and thirteen separate counts of distribution of cocaine, all in violation of 21 U.S.C. § 841(a)(1).  Exhibit A.  On October 8, 1992, Thompson entered a guilty plea to conspiracy to distribute cocaine base, as charged in Count 1 of the indictment.  (Doc. 213, plea agreement, under seal).  The remaining counts 37 through 49 were dismissed on an oral motion of the government.

A judgment of conviction and sentence was entered against Thompson on January 22, 1993.  Exhibit B, the judgment.  The district court judge sentenced Thompson to 137 months in

the Federal Bureau of Prisons and five years supervised release upon release from custody.  Id. The conditions of supervised release were included in the judgment of conviction.  Exhibit B. Conditions of Thompson's supervised release included the following: that he should not commit another federal, state or local crime; he should not illegally possess a controlled substance; and he was prohibited from owning or possessing a firearm or destructive device.[1]  Thompson was released from prison in 2001 and began his term of supervised release.

The United States initiated proceedings for revocation of Thompson's supervised release after he was arrested for a violation of state law.  Exhibit C, the petition to revoke. The district court conducted a hearing and found that Thompson had violated the terms of his supervised release.  It then revoked Thompson's supervised release and sentenced Thompson to serve 46 months in prison.  Judgment was entered in his case on April 11, 2006.  Thompson filed a timely notice of appeal of his revocation.

On January 12, 2007, the United States Court of Appeals issued a mandate affirming the district court's revocation and sentence of Thompson.  Thompson now files a motion under 28 U.S.C. § 2255 challenging the district court's order to revoke his supervised release and his sentence based upon ineffective assistance of counsel.

The findings of fact, conclusion of law and sentence have been previously litigated in Thompson's appeal to the Eleventh Circuit.  The Eleventh Circuit affirmed Thompson's revocation of supervised release.  To the extent that Thompson re-alleges new evidence and proffers the testimony of witnesses that he believes his defense counsel, Donnie Bethel, should

---

[1]       The conditions that Thompson not commit another federal, state, or local crime, and that he not unlawfully possess a controlled substance, are mandated under federal law.  See 18 U.S.C. § 3583(d).

have called during his revocation hearing, the United States will address the issues applying the pertinent facts outlined in the affidavit of Donnie W. Bethel (filed November 5, 2007, and Doc. 3, Bethel's Affidavit).

## II.  CLAIMS RAISED IN THE § 2255 MOTION

As far as the United States can discern, Thompson raises the following issues in his § 2255 motion:

1. Counsel was ineffective for (a) failure to request handwriting expert; (b) failure to present Sylvia Banks as a defense witness; (c) failure to present expert testimony regarding the reconstruction of the video/audio tape; (d) failure to object to continuance; (e) failure to move to suppress evidence; and (f) failure to move for discovery.

2. Counsel was ineffective based upon his failure to present evidence that Lt. Steven Wood retaliated against Thompson and planted the evidence used to revoke Thompson's supervised release.

3. The District Court Judge did not give Counsel an opportunity to object to the findings of fact or sentence before recessing court.

4. Counsel was ineffective in his failure to present testimony from witnesses to impeach the credibility of government witnesses.

## III.  RESPONSE TO CLAIMS FOR RELIEF

**A.    Thompson Has Met The One-Year Statute Of Limitations Deadline For The Filing of Claims Under 28 U.S.C. § 2255**.

The United States notes at the outset that Thompson has filed his motion in a timely manner under paragraph six of 28 U.S.C. § 2255 which provides a one-year period of time within which to file a motion under the rule.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A 1-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of:

3

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by government action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. 2255, ¶ 6.

The imposition of judgment based upon Thompson's revocation and sentence was entered on April 4, 2006. He appealed his revocation to the Eleventh Circuit Court of Appeals. His sentence became final when the mandate was issued on January 12, 2007. The Eleventh Circuit has held that a judgment of conviction becomes final for someone who appeals to an appellate court when the time for seeking certiorari review in the Supreme Court expires. See Kaufman v. United States, 282 F.3d 1336, 1337-39 (11th Cir. 2002). Thompson had 90 days from January 12, 2007, issuance of the mandate, to file a petition for a writ of certiorari to the Supreme Court. Sup. Ct. R. 13. Thompson's judgment of sentence, therefore, became final on April 13, 2007, the first business day occurring after April 12, 2007. Therefore, under § 2255, Thompson had until April 13, 2008, to file his motion. His filing of this § 2255 motion on October 8, 2007, is within one year of April 13, 2007, and his motion is therefore timely.[2]

---

[2]    Thompson signed is petition on October 8, 2007, and it was "received" in the Middle District of Alabama on October 11, 2007. Under the "mailbox rule," a *pro se* inmate's petition is deemed filed the date it is delivered to prison officials for mailing, presumptively the date it is signed by the petitioner. Houston v. Lack, 487 U.S. 266, 271-272 (1988); Adams v. United States, 173 F.3d 1339, 1340-1341 (11th Cir. 1999).

4

**B.    Thompson's Ineffective Assistance of Counsel Claims Should Be Rejected Because They Are Without Any Merit.**

Thompson  presents four claims in the form of addendums.  First, Thompson contends that his counsel was ineffective because he (a) failed to request a handwriting expert, (b) failed to present Sylvia Banks as a defense witness, (c) failed to pursue testimony on the reconstruction of the video/audio tape, (d) failed to object to a continuance, (e) failed to move for suppression of the evidence, and (f) failed to move for discovery.  Second, Thompson contends that Lt. Steven Wood planted evidence.  Third, Thompson contends that new law supports that his counsel was not given an opportunity to object to the findings of law and his sentence.  Finally, Thompson contends that his counsel was ineffective for failure to present witnesses to impeach government witnesses.

The law is well settled that in order for a petitioner to succeed on a claim of ineffective assistance of counsel, a defendant must prove both that his counsel's performance was deficient and that the deficient performance prejudiced his case.  Strickland v. Washington, 466 U.S. 668, 694 (1984); see also Bell v. Cone, 535 U.S. 685, 697-98 (2002) (reaffirming the Strickland v. Washington standard for reviewing ineffective assistance of counsel claims); Caderno v. United States, 256 F.3d 1213, 1217 (11th Cir. 2001) (applying two-part test of Strickland v. Washington).  More specifically, Thompson must show that (1) identified acts or omissions of counsel fell below an objective standard of reasonableness, and (2) that his counsel's alleged errors or omissions resulted in prejudice to him to such an extent that, without counsel's alleged errors or omissions, there is a reasonable probability that the outcome of his trial would have been different.  Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990).

In analyzing counsel's performance under the performance prong of <u>Strickland</u>, this Court has held that the "proper measure of attorney performance is 'reasonableness under prevailing professional norms.'" <u>Brown v. United States</u>, 2007 WL 2900580 (C.A. 11 (Fla.)); <u>Yordan v. Dugger</u>, 909 F.2d at 477. A "[d]efendant must prove deficient performance by a preponderance of competent evidence." <u>Gallo-Chamorro v. United States</u>, 233 F.3d 1298, 1303-04 (11th Cir. 2000)(footnotes omitted). The Eleventh Circuit has described a defendant's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:
>
> > The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.
>
> > ... Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that *no competent counsel would have taken the action that his counsel did take.*...

<u>Grayson v. Thompson</u>, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted).

The Eleventh Circuit has described a defendant's burden in demonstrating that his counsel's deficient performance prejudiced him as a high burden, noting that "[i]t is not enough for the defendant to show that any errors had some conceivable effect on the outcome of the proceeding. <u>Robinson v. Moore</u>, 300 F.3d 1320, 1343-44 (11th Cir. 2002) (quoting <u>Strickland</u> 466 U.S. at 693). To succeed on the ineffective assistance of counsel claim, the defendant must show that, but for counsel's unprofessional errors, the outcome of the proceeding would have

been different.

As the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." <u>Bottoson v. Moore</u>, 234 F.3d 526, 532 (11th Cir. 2000); <u>accord</u>, <u>Robinson v. Moore</u>, 300 F.3d at 1343.  In raising ineffective assistance of counsel, Thompson has failed to plead facts sufficient to demonstrate that he was prejudiced by any of counsel's actions.  For that reason, his § 2255 motion should be summarily dismissed.

**C.   Counsel was not ineffective for failing to request a handwriting expert. (Addendum 1a).[3]**

On April 4, 2006, a revocation hearing was held before United States District Judge Ira DeMent to revoke the supervised release of Marvin C. Thompson. Exhibit D, revocation transcript.  Thompson's petition to revoke alleged that Thompson obstructed a governmental operation, that he unlawfully possessed a controlled substance, and that he possessed a firearm. One of the issues during the revocation hearing was whether or not Lt. Steven Woods actually issued Thompson the Uniform Traffic Citation for obstruction of a governmental operation on November 17, 2005.  Exhibit D, at 9.  The citation number was out of sequence among citations issued on dates immediately preceding November 17th.  On cross examination, Defense Counsel Donnie Bethel ("Bethel") questioned Lt. Woods extensively regarding the fact that Thompson's citation was not in sequence with two citations issued on October 23rd, and a citation issued on October 27th and on  November 12th, respectively. Bethel further questioned Lt. Woods about the

---

[3]     To establish consistency with the Petitioner's motion, the United States will reference the corresponding Addendum in Donnie Bethel's affidavit.

sequence in which the citations were filed in the court system, and the court case numbers

assigned to each citation. Exhibit D, at 31-40.  The United States concedes that the citation

issued to Thompson on November 17th was not in sequence with the citations noted above.

However, on redirect, Lt. Woods testified that sometimes he runs out of uniform traffic citations

when he is out on the road, and he uses other officer's ticket books.  Exhibit D, at 42.  Woods

also testified that there is no significance to the sequence numbers.  Id. at 43.  Woods stated that

"when [he] turns the citation in on a transmittal form, it then goes to [their] clerk who then places

it in a computer system.  She then forwards it to the circuit clerk's office in Lafayette, Alabama.

Once the citations reach the clerk's office, they are put into the computer system."  Id. D, at 41.

Woods testified that he had no control over the case number assigned to the citations.  Id. at 42.

Bethel asserts that he made a tactical decision that a handwriting expert was unnecessary.

Bethel asserts that he  "impeached Lt. Wood's testimony concerning whether [Thompson] signed

a ticket that he allegedly received at the time of this arrest," Doc. 3, at 2.  Since whether or not

Bethel impeached Lt. Woods was a credibility issue that the Court decided, it was irrelevant

whether or not Bethel believed he impeached Lt. Woods.  Because Bethel believed he impeached

Lt. Woods' testimony, Bethel believed there was no need to use a handwriting expert.    The

question before this Court is whether Bethel's failure to utilize a handwriting expert amounted to

ineffective assistance of counsel. In Grayson, the Eleventh Circuit held that "the test has nothing

to do with what the best lawyers would have done.  Nor is the test even what most good lawyers

would have done."  It is whether Bethel's performance was so deficient that no "*no competent*

*counsel would have taken the action that [Bethel] did take.*"  Grayson, 257 F.3d at 1216.

8

In <u>Routly v. Singletary</u>, 33 F.3d 1279, 1287 (11th Cir. 1994), the Court held,

> The reviewing court "should presume effectiveness and should avoid second-guessing with the benefit of hindsight." <u>Horton v. Zant</u>, 941 F.2d 1449, 1460 (11th Cir. 1991), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 1517 (1992). Tactical decisions of counsel are entitled to broad deference. *See,*<u>Scott v. Dugger</u>, 891 F.2d 800 (11th Cir. 1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed 2d 179 (1990) (counsel not ineffective for failure to cross-examine and present impeaching evidence); <u>Jones v. Smith</u>, 772 F.2d 668 (11th Cir. 1985), *cert. denied,* (citation omitted) (counsel not ineffective where counsel made tactical choice not to make opening argument). In order to establish prejudice, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland,</u> 466 U.S. at 694, 104 S.Ct at 2068.

<u>Singletary</u>, 33 at 1287.

Thompson has failed to establish that Bethel's tactical decision prejudiced him or but for Bethel's tactical decision, the outcome of his case would have been different. Bethel was not ineffective based upon his decision not to utilize a handwriting expert. Moreover, this issue is akin to a sufficiency of the evidence claim, and should have been raised on direct appeal. A motion under § 2255 cannot be used as a substitute for appeal, <u>Burke v. United States</u>, 152 F.3d 1329, 1331 (11th Cir. 1998), and claims not raised on direct appeal that could have been raised are generally barred from review in § 2255 proceedings. <u>McCoy v. United States</u>, 266, F.3d 1245, 1258 (11th Cir. 2001).

**D.    Counsel was not ineffective in his failure to present perjured testimony from Sylvia Banks. (Addendum 1b).**

Counsel stated in his affidavit that Sylvia Banks' ("Banks") testimony would not have been helpful because his investigator learned that Thompson had instructed Banks to lie on his behalf. Doc. 3, at 2. Since knowingly presenting Banks perjured testimony would have been unethical, Bethel's decision not to do so can unlikely be described as ineffective. In addition,

Banks' truthful testimony would have supported Lt. Woods's testimony that the fanny pack was in the car and was not "planted" as Thompson now claims .  Defense counsel's decision not to present Bank's perjured testimony did not amount to ineffective assistance of counsel under Strickland. Thompson's ineffective assistance of counsel in this regard is simply frivolous.

**E.    Counsel was not ineffective in his failure to reconstruct the video tape from Lt. Woods' patrol car.  (Addendum 1c).**

Lt. Woods testified that the "clamshell, which is what [they] call the electronic device that plays [the] tape, need[ed] cleaning" therefore the images on the video were not visible. Exhibit D, at 27-29.  Since the video tape did not properly record the stop of Thompson, there was nothing on the video that could have been reconstructed.  It is clear from Woods' testimony that the stop was not recorded versus recorded and later damaged.  Id.  Therefore, reconstructive efforts would not have benefitted Thompson's case.

**F.    Counsel's failure to object to a continuance was ineffective assistance of counsel. (Addendum 1d)**.

The first evidentiary hearing for revocation was set on December 21, 2005.  (Doc. 409). On December 23, 2005, the court granted defendant's oral motion to continue (Doc. 418), continuing the revocation hearing to January 17, 2006.  *Sua sponte*, the Court rescheduled the hearing to January 26, 2006.  (Doc. 426).  Thereafter, Bethel filed the defendant's second motion to continue the hearing, which was reset to February 15, 2006. (Docs. 429, 430).  On February 14, 2006, one day before the scheduled hearing, Bethel filed the defendant's third motion to

continue, which was granted, and the hearing was reset on February 15, 2006.[4] (Docs. 439, 440).

The record entry on February 15, 2006, reflects that the Defendant's motion to continue was

referred to Judge Thompson, and that the hearing was terminated (after parties reported). (Doc.

439). The next and final hearing was reset on April 4, 2006. If there is a mistake in the record

and the request for a continuance was made by the United States, the defendant has not

demonstrated how his lawyer's failure to object to the final continuance prejudiced him.

Moreover, the revocation hearing had been delayed for approximately three months at the request

of the defendant. Also, the defendant's motions for continuances were filed unopposed by the

government. Thompson's claim has no merit and should be denied.

**G.** **Counsel's failure to file a motion to suppress and a motion for discovery was not ineffective assistance of counsel. (Addendum 1e and 1f).**

Bethel's affidavit adequately provides his explanation to Thompson's challenges to the

rules of evidence and the different standards of proof in an evidentiary proceeding and a trial

before a jury. Thompson does not contend that Bethel never discussed his case with him.

Rather, Thompson, in hindsight, is second guessing Bethel's representation. In addition, Bethel

stated in his affidavit, that to file for an analysis of the crack cocaine would have been in

opposition to their strategy that the contents of the fanny pack did not belong to Thompson. As

previously stated, tactical decisions of Bethel are entitled to broad deference. Therefore, these

claims should be denied since they are no more than hindsight second guessing, and are without

merit.

---

[4]    The docket sheet indicates that the motion to continue was filed on February 15, 2006. The Court's order stated that no further continuances would be granted.

**H.    Counsel was not ineffective for not presenting testimony regarding unsupported allegations of "planted" evidence. (Addendum 2).**

Thompson next alleges that Lt. Woods planted drug evidence in his car.  Thompson further alleges that Woods' later termination supports his allegation.  This allegation is simply untrue.  First, Bethel has stated earlier in his affidavit that his investigator learned that Ms. Banks confirmed that the fanny pack was in Thompson's car.  Moreover, the investigator learned that Thompson had instructed Ms. Banks to lie about her testimony.  These facts alone contradict Thompson's allegation that evidence was "planted" in his car.  Therefore, whether or not Woods was terminated from his job was irrelevant, especially since one of Thompson's would be witnesses confirms where the fanny pack was found.  Bethel states that Thompson never disputed that the bag was in the car.  Thompson only denied ownership and provided an explanation that the bag may have been left in the car by an "unnamed man who used his car earlier in the day."  Doc. 3 at 4.  This is another argument which is akin to a sufficiency of the evidence and should have been raised on direct appeal.  Thompson's claim of  "planted" evidence should be barred for failure to raise it on direct appeal.

**I.    Counsel was not given an opportunity to object to the findings and sentence of the Court. (Addendum 3).**

Thompson argues that the district court failed to elicit objections after imposing sentence as required by United States v. Campbell, 473 F.3d 1345 (11th Cir. 2006).  In Campbell, at 1347, the Eleventh Circuit cites its holding in United States v. Jones, 899 F.2d 1097, 1102 (11th Cir. 1990), wherein the Court, using its supervisory powers over the district courts, and held that  "the district courts [are] to elicit fully articulated objections, following imposition of sentence, to the court's

ultimate findings of fact and conclusions of law."  The Court further stated that the "district court should also elicit from counsel an articulation of the grounds on which the objection is based."  <u>Jones</u> at 1102.  The objective in <u>Jones</u> was to "ensure ... that all objections are raised in the trial court and that the ground for each objection is clearly stated" which will "aid the district court in correcting any error, tell the appellate court precisely which objections have been preserved and which have been waived, and enable the appellate court to apply the proper standard of review to those preserved."  <u>Jones</u> 899 at 1102-1103.

It has been established  that the analysis of the revocation proceedings relating to probation and supervised release are "essentially the same" applying 18 U.S.C. § 3565(a) and 18 U.S.C. 3583(g), "one applying to probation and the other to supervised release."  <u>See</u> <u>United States v. Almand</u>, 992 F.2d 316, 318 n.5 (11th Cir. 1993).  Accordingly, <u>Campbell</u> recently held that <u>Jones</u> must be followed in supervised release violation proceedings.  <u>Campbell</u> at 348.  Moreover, the sentence will be vacated and remanded to the district court when <u>Jones</u> is not followed, unless "the record on appeal is sufficient to enable review."  <u>See</u> <u>United States v. Cruz</u>, 946 F.2d 122, 124 n.1 (11th Cir. 1994).

Although Thompson argues that the district court committed a <u>Jones</u> error, the underlying objections that Thompson asserts are that (1) the district court failed to consider the advisory sentencing guidelines in imposing his sentence, (2) his sentence was unreasonable, and (3) his defense counsel failed to argue on his behalf for a lower sentence.

The district court made its findings that Thompson was guilty of possessing a controlled substance and possessing a firearm.  Exhibit D, at 116.  The district court revoked Thompson's term

of supervised release and elicited input from the parties on the sentence to be imposed.  <u>Id.</u>

Thereafter, the United States Probation Officer recommended a sentence of 46 months, which was

the high end of the range between 37 to 46 months.  <u>Id.</u> at 117.  The court's clerk advised the court

that the statutory maximum sentence was five years (60 months).  Defense counsel argued

persistently that Thompson had made positive adjustments while on supervision, that he was "a

model citizen," and that other persons have received far lower sentences in far worse scenarios.  The

probation officer argued for the higher sentence because of the nature of the violations.  The

government did not make a recommendation on sentence.  <u>Id.</u> at 118-119.   The district court

summarized the facts surrounding Thompson's violations as being "very very serious offense[s]" and

imposed a sentence of 46 months in the Bureau of Prisons.  Thompson's sentence was within the

advisory guidelines range, although the top of the range.

Although the district court did not follow <u>Jones</u>, in the instant case, a remand is unnecessary

since the record is sufficient for review.  It is abundantly clear from the record that the defense

counsel protested the reasonableness of Thompson's sentence several times.  Moreover, defense

raised a reasonableness issue on direct appeal.  The revocation and sentence were affirmed.  Exhibit

E, Thompson's unpublished opinion.  Notwithstanding, should a recommendation be issued granting

Thompson's § 2255 petition, it should be limited to the <u>Jones</u> omission and Thompson should not

be permitted to raise issues that should have been raised or were already raised on direct appeal.

**J.     Defense Counsel was not ineffective for failure to call witness who had no relevant information in Thompson's revocation hearing. (Addendum 4).**

Defense counsel responds that he used tactical decisions not to call some witnesses and other

witnesses could not have provided any meaningful testimony during the revocation hearing on behalf

14

of Thompson.    According to defense counsel, Barbara Thompson and Tony Malone had no
knowledge of the traffic stop or the bag found in Thompson's possession.  Defense counsel states
the testimony of Officers Larry Clark and Cox would have corroborated the testimony of Lt. Wood,
the government's witness.   In addition, Tony Malone's testimony would have been more harmful
than helpful since Malone would have been an unwilling, hostile witness.  Defense counsel reviewed
the preliminary hearing transcript, discussed it with Jim Ingram, and concluded that Ingram's
testimony would not have added any support to Thompson.   Since tactical decision of defense
counsel are entitled to broad deference, Thompson's claims for ineffective assistance of counsel
based upon his counsel's failure to call certain witnesses, should be denied.  <u>Dugger</u>, 891 F.2d at
800.  Moreover, Thompson has not shown that "there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>,
466 U.S. at 694.

## V.  CONCLUSION

For the above reasons, Defendant/Movant Marvin C. Thompson has failed to demonstrate
that he is entitled to any relief from this Court, and his § 2255 motion should be denied without an
evidentiary hearing.

Respectfully submitted this 19th day of November, 2007.

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Tommie Brown Hardwick
TOMMIE BROWN HARDWICK
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Telephone: (334) 223-7280
FAX: (334) 223-7135
E-mail: tommie.hardwick@usdoj.gov

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **MARVIN C. THOMPSON,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | ) |
| | )    **Civil No. 3:07cv915-ID** |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 19, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participant: Marvin C. Thompson 84302-020, FCI Yazoo City Low, P.O. Box 5000/Dorm 1BL, Yazoo City, MS 39194.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Tommie Brown Hardwick
TOMMIE BROWN HARDWICK
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Telephone: (334) 223-7280
FAX: (334) 223-7135
E-mail: tommie.hardwick@usdoj.gov

17

FILED

MAY 1 4 1992

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA THOMAS C. CAVER, CLERK
EASTERN DIVISION                              BY _____
                                                        DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. $92-162-E$ |
| | ) | [21 USC 846; |
| | ) | 21 USC 841(a)(1)] |
| SPENCER JOHNSON, | ) | |
| LEMANUEL BARNARD WARE, | ) | |
| CLARENCE BARNES, | ) | |
| MARCUS MAYFIELD, | ) | |
| MARVIN C. THOMPSON, | ) | |
| DANNY HOLLOWAY and | ) | |
| EGLIN OGLETREE | ) | |
| a/k/a EGLAND OGLETREE | ) | |

```
┌─────────────────────────┐
│   GOVERNMENT            │
│   EXHIBIT              │
│                        │
│ CASE                   │
│ NO. 3:07cv915-ID       │
│                        │
│ EXHIBIT                 │
│ NO.      A             │
└─────────────────────────┘
```

INDICTMENT

The Grand Jury charges:

## COUNT 1

That beginning on or about the 1st day of July, 1991, and continuing up to and including the date of this indictment, in Chambers County, within the Middle District of Alabama, and elsewhere, the defendants,

SPENCER JOHNSON,
LEMANUEL BARNARD WARE,
CLARENCE BARNES,
MARCUS MAYFIELD,
MARVIN C. THOMPSON,
DANNY HOLLOWAY and
EGLIN OGLETREE a/k/a EGLAND OGLETREE,

did knowingly and intentionally combine, conspire, confederate and agree together with each other and with divers other persons known and unknown to the Grand Jury to possess with intent to distribute and distribute cocaine base, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

ATTEST: A True Copy.
Certified to _____ 7/25, 20 06
Clerk, U.S. District Court,
Middle District of Alabama

BY _Jolanda Williams_
          Deputy Clerk

## COUNT 2

That on or about the 10th day of January, 1992, in Chambers County, within the Middle District of Alabama, the defendants,

SPENCER JOHNSON and
LAMANUEL BARNARD WARE,

did knowingly and intentionally possess with intent to distribute cocaine base, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNTS 3-26

That beginning on or about the 19th day of July, 1991, and continuing up to and including on or about the 6th day of December, 1991, in Chambers County, within the Middle District of Alabama, the defendant,

CLARENCE BARNES,

did knowingly and intentionally distribute cocaine base, a Schedule II Controlled Substance, as follows:

| COUNT | DATE | APPROXIMATE QUANTITY (grams) |
|---|---|---|
| 3 | 7/19/91 | .214 |
| 4 | 7/26/91 | .142 |
| 5 | 7/26/91 | .133 |
| 6 | 7/26/91 | .278 |
| 7 | 7/26/91 | .146 |
| 8 | 8/8/91 | .125 |
| 9 | 8/22/91 | .147 |
| 10 | 8/22/91 | .169 |
| 11 | 8/23/91 | .147 |
| 12 | 8/23/91 | .156 |
| 13 | 8/29/91 | .158 |
| 14 | 8/29/91 | .141 |
| 15 | 9/5/91 | .177 |
| 16 | 10/11/91 | .155 |
| 17 | 11/1/91 | .714 |
| 18 | 11/8/91 | .203 |
| 19 | 11/8/91 | .533 |
| 20 | 11/14/91 | .160 |
| 21 | 11/21/91 | .862 |

```
          22              11/21/91         .500
          23              11/25/91         .074
          24              11/25/91         .072
          25              12/5/91          .728
          26              12/6/91          .268
```

all in violation of Title 21, United States Code, Section

841(a)(1).

### COUNTS 27-36

That beginning on or about the 1st day of August, 1991,

and continuing up to and including on or about the 14th day of

November, 1991, in Chambers County, within the Middle District of

Alabama, the defendant,

MARCUS MAYFIELD,

did knowingly and intentionally distribute cocaine base, a Schedule

II Controlled Substance, as follows:

| COUNT | DATE | APPROXIMATE QUANTITY (grams) |
|-------|------|------------------------------|
| 27 | 8/1/91 | .126 |
| 28 | 8/1/91 | .127 |
| 29 | 8/8/91 | .153 |
| 30 | 8/23/91 | .249 |
| 31 | 10/24/91 | .379 |
| 32 | 10/24/91 | .194 |
| 33 | 10/24/91 | .116 |
| 34 | 10/24/91 | .020 |
| 35 | 10/29/91 | 1.449 |
| 36 | 11/14/91 | .321 |

all in violation of Title 21, United States Code, Section

841(a)(1).

### COUNTS 37-49

That beginning on or about the 30th day of August, 1991, and

continuing up to and including on or about the 29th day of October,

1991, in Chambers County, within the Middle District of Alabama,

the defendant,

MARVIN THOMPSON,

did knowingly and intentionally distribute cocaine base, a Schedule
II Controlled Substance, as follows:

| COUNT | DATE | APPROXIMATE QUANTITY (grams) |
|-------|------|------------------------------|
| 37 | 8/30/91 | .191 |
| 38 | 9/30/91 | .176 |
| 39 | 9/5/91 | .271 |
| 40 | 10/4/91 | .123 |
| 41 | 10/4/91 | .083 |
| 42 | 10/4/91 | .066 |
| 43 | 10/4/91 | .075 |
| 44 | 10/4/91 | .481 |
| 45 | 10/10/91 | .094 |
| 46 | 10/10/91 | .119 |
| 47 | 10/11/91 | .893 |
| 48 | 10/25/91 | 1.195 |
| 49 | 10/29/91 | 1.694 |

all in violation of Title 21, United States Code, Section
841(a)(1).

### COUNTS 50-60

That beginning on or about the 3rd day of October, 1991, and
continuing up to and including on or about the 6th day of December,
1991, in Chambers County, within the Middle District of Alabama,
the defendant,

### DANNY HOLLOWAY,

did knowingly and intentionally distribute cocaine base, a Schedule
II Controlled Substance, as follows:

| COUNT | DATE | APPROXIMATE QUANTITY (grams) |
|-------|------|------------------------------|
| 50 | 10/3/91 | .129 |
| 51 | 10/3/91 | .165 |
| 52 | 10/24/91 | .100 |
| 53 | 10/24/91 | .094 |
| 54 | 10/24/91 | .217 |
| 55 | 11/15/91 | .631 |
| 56 | 11/15/91 | .665 |
| 57 | 11/21/91 | .569 |
| 58 | 12/5/91 | .444 |
| 59 | 12/5/91 | .390 |
| 60 | 12/6/91 | 1.070 |

all in violation of Title 21, United States Code, Section 841(a)(1).

A TRUE BILL:

_Louis Franata_

**Foreperson**

_D. Broward Segrest_

**D. BROWARD SEGREST**
**Acting United States Attorney**

_Steven M. Reynolds_

**STEVEN M. REYNOLDS**
**Assistant U. S. Attorney**

AO 245 S (Rev. 4/90)(M.D.Ala. rev.) Sheet 1 - Judgment in a Criminal Case

**FILED**

# UNITED STATES DISTRICT COURT
## Middle District of Alabama
### Eastern Division

JAN 22 093

CLERK
U. S. DISTRICT COURT
ODLE DIST. OF ALA.

UNITED STATES OF AMERICA

v.                                    Case Number CR 92-00162-E-005

MARVIN C. THOMPSON

    Defendant.

GOVERNMENT
EXHIBIT

CASE
NO. 3:07cv915-ID

EXHIBIT
NO.     B

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, MARVIN C. THOMPSON, was represented by JEAN M. SEAY.

On motion of the United States the court has dismissed Counts thirty-seven (37) through forty-nine (49).

The defendant pleaded guilty to Count 1.  Accordingly, the defendant is adjudged guilty of such count, involving the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 USC 846 | Conspiracy to Distribute Cocaine Base; | 05/24/92 | 1 |

As pronounced on January 19, 1993, the defendant is sentenced as provided in pages 2 through 4 of this Judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay to the Clerk of the United States District Court a special assessment of $ 50.00 for Count 1, which shall be due immediately.

It is further ordered that the defendant shall notify the United States Attorney for this district within thirty (30) days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid.

Signed this the 22nd day of January, 19 93.

_____
United States District Judge

Defendant's SSAN: 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
Defendant's Date of Birth:  11/12/60
Defendant's address:  2268 15th Avenue, S.W., Lanett, Alabama  36863

EOD  1-25-93

AO 245 S (Rev. 4/90)(M.D.Ala. rev.) Sheet 2 - Imprisonment

Judgment--Page 2 of 4 Pages

Defendant: MARVIN C. THOMPSON
Case Number: CR 92-00162-E-005

### IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of one hundred thirty-seven (137) months.

The defendant is to stand committed for service of this sentence this date.

### RETURN

I have executed this Judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____
at _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

AO 245 S (Rev. 4/90)(M.D.Ala. rev.) Sheet 3 - Supervised Release

Judgment--Page 3 of 4 Pages_

Defendant: MARVIN C. THOMPSON
Case Number: CR 92-00162-E-005

### SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of five (5) years.

While on supervised release, the defendant shall not commit another federal, state, or local crime; shall not illegally possess a controlled substance; shall comply with the standard conditions that have been adopted by this court (set forth below); and shall comply with the following additional conditions:

1.  If ordered to the custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which the defendant is released within seventy-two (72) hours of release from the custody of the Bureau of Prisons.

2.  If this judgment imposes a fine, special assessment, costs, or restitution obligation, it shall be a condition of supervised release that the defendant pay as ordered any such fine, assessments, costs, and restitution that remain unpaid at the commencement of the term of supervised release.

3.  The defendant shall not own or possess a firearm or destructive device.

4.  The defendant shall submit to a drug test when ordered to do so by the Probation Officer. If determined necessary by the Probation Officer, the defendant shall participate in a substance abuse treatment program as directed by the Probation Officer.

### STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this Judgment:

1)  The defendant shall not leave the judicial district without the permission of the court or probation officer.
2)  The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month.
3)  The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
4)  The defendant shall support his or her dependents and meet other family responsibilities.
5)  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
6)  The defendant shall notify the probation officer within seventy-two hours of any change in residence or employment.
7)  The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances.
8)  The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.
9)  The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245 S (Rev. 4/90)(M.D.Ala. rev.) Sheet 7 - Statement of Reasons

Judgment--Page 4 of 4 Pages

Defendant:  MARVIN C. THOMPSON
Case Number:  CR 92-00162-E-005

## STATEMENT OF REASONS

The court adopts the factual findings and guideline application in the presentence report, except as follows:

### Paragraph 6:

The Court sustained the objection to the inclusion of two (2) points for the Attempted Theft of Property, II Degree, charge originating in the Valley Municipal Court of Chambers County, Alabama (VDC 88-93). With the deletion of these two (2) points, the total of the criminal history points is Seven (7). According to the Sentencing Table (Chapter 5, Part A), seven (7) criminal history points establish a Criminal History Category of IV.

It is noted that the Criminal History Category of IV, as stated in the initial report, has not changed.

**Guideline Range Determined by the Court:**

| | |
|---|---|
| Total Offense Level: | 28 |
| Criminal History Category: | IV |
| Imprisonment Range: | 120 to 137 months |
| Supervised Release Range: | 5 Years |
| Fine Range: | $12,500 to $4,000,000.00 |
| Restitution: | $   -0- |

The fine is waived or is below the guideline range because of the defendant's inability to pay.

Restitution is not ordered for the following reason: The Court finds that 18 U.S.C. §3663 does not apply in this case; therefore, an order of restitution is not entered.

The sentence is imposed at one hundred thirty-seven (137) months, which is the maximum allowable sentence. This sentence is within the applicable guideline range and is deemed to be necessary to address the sentencing objectives of punishment, incapacitation, general deterrence and overall protection of the public from further crimes of the defendant.

The Court finds that the sentence imposed is consistent with the factors stated at 18 U.S.C. § 3553(a) to be considered in imposing a sentence.

PROB 12C
(7/93)

GOVERNMENT
EXHIBIT

CASE
NO. 3:07cv915-ID

EXHIBIT
NO.    C

# UNITED STATES DISTRICT COURT

for the

## MIDDLE DISTRICT OF ALABAMA
### RECEIVED

Amended Petition for Warrant or Summons for Offender Under Supervision

Name of Offender: Marvin C. Thompson    2005 DEC 15 P 4:57    Case Number: CR 92-00162-E-005

Name of Sentencing Judicial Officer: The Honorable Ira DeMent, Sr. United States District Judge
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Date of Original Sentence: January 22, 1993

Original Offense: Conspiracy to Distribute Cocaine Base

Original Sentence: 137 months custody of Bureau of Prisons followed by 5 years of supervised release.

Type of Supervision: Supervised Release    Date Supervision Commenced: December 7, 2001

Assistant U.S. Attorney: Tommie Brown Hardwick    Defense Attorney: Don Bethel

## PETITIONING THE COURT

[ ]    To issue a warrant
[ ]    To issue a summons
[X]    To amend the petition filed on November 18, 2005

The probation officer believes that the offender has violated the following condition(s) of supervision:

Violation Number    Nature of Noncompliance

Viol. 1- Mandatory Condition: "The defendant shall not commit another federal, state, or local crime."

On November 17, 2005, Marvin C. Thompson was arrested by the Lanett, Alabama Police Department on a misdemeanor charge of Obstructing a Governmental Operation.

Viol. 2 - Mandatory Condition: "The defendant shall not commit another federal, state, or local crime."

On November 17, 2005, Marvin C. Thompson was arrested by the Lanett, Alabama Police Department on a felony charge of Unlawful Possession of a Controlled Substance, Cocaine.



RECEIVED
DEC 19 2005
U.S. PROBATION OFFICE
MONTGOMERY, ALABAMA

PROB 12C
(7/93)

2

Viol. 3 - Mandatory
Condition: "The
defendant shall not
own or possess a
firearm or destructive
device."

At the time that Thompson was arrested on November 17, 2005, officers
recovered a Hi Point 9mm firearm containing a magazine with five rounds of
ammunition.

U.S. Probation Officer Recommendation:

[X]    The term of supervision should be
       [X ]    revoked.
       [ ]     extended for _ years, for a total term of _ years.

[ ]    The conditions of supervision should be modified as follows:

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___November 21, 2005_____

James Chappell
United States Probation Officer

Reviewed and approved: _____
Supervisory U.S. Probation Officer

THE COURT ORDERS:

[ ]    No Action
[ ]    The Issuance of a Warrant
[ ]    The Issuance of a Summons
[√]    Other (The amendment of the original petition.)

Signature of Judicial Officer

12/16/2005
Date

Page 3

```
 1              IN THE UNITED STATES DISTRICT COURT FOR
 2                  THE MIDDLE DISTRICT OF ALABAMA
 3                         NORTHERN DIVISION
 4
 5
 6   UNITED STATES OF AMERICA
 7
 8        Vs.                  CR. NO. 92-162-IDM
 9
10   MARVIN C. THOMPSON
11
12        *    *    *    *    *    *    *    *
13                     REVOCATION HEARING
14        *    *    *    *    *    *    *    *
15        Before Hon. Ira DeMent, U.S. District
16        Judge, at Montgomery, Alabama, Commencing
17        on April 4, 2006
18        *    *    *    *    *    *    *    *
19
20
21   APPEARANCES: For the Government: Tommie Brown Hardwick
22                                    Assistant U.S. Attorney
23               For the Defendant:  Donnie W. Bethel,
24                                    Federal Defender
25
```

1  (The above case coming on for hearing at Montgomery,
2  Alabama, April 4, 2006, before Honorable Ira DeMent, Judge,
3  the following proceedings were had commencing at 1:00 p.m.:)
4  THE COURT: All right. Calling for hearing on
5  revocation of supervised release the United States versus
6  Marvin Thompson. Violation of supervised release. Is the
7  Defendant --
8  THE MARSHAL: The Defendant is not here, Judge.
9  THE COURT: The Defendant is not here?
10  MR. BETHEL: I just saw him on the way up. He was
11  here earlier and he was told to return at 1:00 o'clock. I
12  know he is in the building.
13  MS. HARDWICK: Your Honor, if we could proceed on
14  another matter that I don't think the Defendant needs to be
15  present to hear.
16  THE COURT: You are going to have to speak up.
17  MS. HARDWICK: Your Honor, if we could proceed --
18  there is a matter that I would like to bring to the attention
19  of the Court before we begin the proceeding and taking of
20  testimony, if the Court will permit.
21  THE COURT: All right.
22  MS. HARDWICK: Your Honor, the government received
23  notice that a subpoena was issued to acquire the personnel
24  file of one of the officers who will testify before the Court
25  today who was present when the alleged offense was committed.

Page 2

```
 1              INDEX OF WITNESSES
 2              Dir. Crs. Red. Rec. Red. Rec.
 3   Government's Witnesses:
 4   Steven Woods        11   19   40   44
 5   James Chappell      47   49   52   53
 6   James Chappell      101  103
 7   John Anthony        104  106
 8
 9   Defendant's Witnesses:
10   Ernest Lyman        59   66
11   Marvin C. Thompson  72   92   98
12
13   Reporter's Certificate:          122
14
15
16
17
18
19
20
21
22
23
24
25
```

GOVERNMENT
EXHIBIT

CASE
NO. 3:07cv915-ID

EXHIBIT
NO.   D

Page 4

1  The government would like to address the Court on that issue
2  to ask that no references be made to the personnel file of
3  Steven Woods because they have no relevancy or direct bearing
4  on proceedings that are before the Court today.
5  THE COURT: Was it produced?
6  MS. HARDWICK: It was produced. It's my
7  understanding that it was produced to the defense based on a
8  conversation that I had. And the reason being, Your Honor, we
9  have also received information from the officers themselves
10  that a civil action has been filed in Federal Court. And we
11  are certain that the Court is aware of the procedures that a
12  person has to go through for discovery in a civil matter, and
13  the government would just ask that this proceeding not be
14  used to acquire discovery for a civil matter or testimony
15  from the officers that could be used against them in a civil
16  action. And for that reason we would ask that being that most
17  of the incidents or things that happened in the course of his
18  employment as a police officer will not have a direct bearing
19  on these proceedings we would ask that no reference be made
20  to any documents or any items in his personnel file.
21  THE COURT: All right. What is the action in civil
22  court?
23  MS. HARDWICK: I have been told, Your Honor, it's a
24  civil action alleging discrimination, alleging that he
25  injured -- that the officers or officer injured his hand

Page 5

1 during an arrest, and some other issues. I have not read the
2 proceedings because I just learned of the civil action today.
3     THE COURT: U.S. District Court?
4     MS. HARDWICK: I am not certain. I am told that it
5 is, that it is in Federal Court, Your Honor.
6     THE COURT: All right. We will hear from the
7 Defendant.
8     MR. BETHEL: Your Honor, we did, in fact, have a
9 subpoena issued by the District Court for those personnel
10 records. We have obtained those records from Lanett. They
11 provided them to us. I beg to differ with Ms. Hardwick when
12 she says they have no relevance to this hearing today. Some
13 portions of those we believe certainly do have some
14 relevance.
15     THE COURT: Under 404(b)?
16     MR. BETHEL: Yes, Your Honor.
17     THE COURT: Well, if you meet the elements of 404(b)
18 I will rule on them one at a time.
19     MR. BETHEL: And in addition to 404 -- we will take
20 it up at that time, Your Honor.
21     THE COURT: That's the whole picture, isn't it,
22 whether or not they are relevant under 404(b), prior similar
23 acts?
24     MR. BETHEL: Yes, Your Honor.
25     THE COURT: How is that relevant to violation of

Page 6

1 supervised release where the whole basis is the possession
2 and distribution of cocaine?
3     MR. BETHEL: Well, Your Honor, we believe it goes to
4 the credibility of the arresting officer in this case who is
5 the gentleman who found the cocaine and the gun allegedly in
6 Mr. Thompson's car. And that would be Lieutenant Steven
7 Woods.
8     THE COURT: Pistol, not gun.
9     MR. BETHEL: Pistol, Your Honor.
10     THE COURT: You know better than that, don't you.
11     MR. BETHEL: Excuse me, Your Honor.
12     THE COURT: All right. Well, I will rule on them as
13 they occur. As a matter of relevance focused on credibility.
14 And that's for the Court; am I correct?
15     MR. BETHEL: Pardon me, Your Honor?
16     THE COURT: That's a matter for the Court.
17     MR. BETHEL: Absolutely, Your Honor. I would also
18 simply state just so there's no question, I have not provided
19 any of that discovery, what we obtained under subpoena, to
20 Mr. Thompson's attorney who is representing him in the civil
21 matter. I have explained to both my client and to his
22 attorney that if they wish to acquire those records they will
23 have to do it on their own through the civil case. So I have
24 not shared those records obtained under subpoena with anyone
25 outside our office.

Page 7

1     THE COURT: All right. That's well that you did so.
2     MR. BETHEL: Thank you, Your Honor.
3     THE COURT: Thank you. Ms. Hardwick, do you wish to
4 rebut?
5     MS. HARDWICK: Yes, sir, Your Honor. In reference
6 to him saying that they would be admissible under 404(b),
7 404(b) specifically speaks to other crimes, wrongs or acts.
8 Anything within that personnel file, the government would
9 submit, has not been established as a crime, or a wrong, in
10 particular to this Defendant, or any acts. And for that
11 reason, Your Honor, most of them are allegations and to
12 present them here would be just to cloud the issues that are
13 before the Court on whether there is probable cause by a
14 preponderance of the evidence that Mr. Thompson had a firearm
15 and/or controlled substances on him on November 17th, 2005,
16 which is the subject of this revocation hearing.
17     THE COURT: Well, as I understand the law of
18 evidence, which is not applicable in this matter, is that
19 agreed?
20     MS. HARDWICK: It is, Your Honor.
21     MR. BETHEL: That's agreed, Your Honor.
22     THE COURT: All right. And the burden is on the
23 government by a preponderance, is that agreed?
24     MS. HARDWICK: It is, Your Honor.
25     MR. BETHEL: Yes, Your Honor.

Page 8

1     THE COURT: That becomes the law of the case then,
2 does it not?
3     MS. HARDWICK: It does, Your Honor.
4     MR. BETHEL: Yes, Your Honor.
5     THE COURT: Okay. Now, as I understand 404(b) if
6 there are any prior similar acts which when taken and used as
7 the basis for inference against the Defendant's
8 credibility -- or rather against the prosecution witness'
9 credibility, and I will have to hear the evidence, but if the
10 witness says no, it didn't happen, that's as far as it may be
11 pursued. That's my understanding of the law of evidence on
12 404(b) evidence; am I correct?
13     MR. BETHEL: Yes, Your Honor.
14     MS. HARDWICK: Yes, Your Honor.
15     THE COURT: All right. That becomes the law of the
16 case. Now, what else, Ms. Hardwick?
17     MS. HARDWICK: That is all the government has on
18 that issue, Your Honor.
19     THE COURT: Are we ready? Where is the Defendant?
20     MR. BETHEL: He is present, Your Honor.
21     THE COURT: You want to put him at counsel table?
22     MR. BETHEL: He is here, Your Honor.
23     THE COURT: Oh, all right. Good. Thank you. Okay. I
24 will ask the government to summarize the three violations.
25 And the Defendant is present, the Assistant United States

Page 9

1  Attorney is present, probation officers are present. Before
2  the government summarizes the violations in the petition you
3  may allow the probation officer to do so, Ms. Hardwick, if
4  you so choose.
5       MS. HARDWICK: Your Honor, I do have the petitions.
6  The first violation alleges that the Defendant violated the
7  condition that states mandatory condition, the Defendant
8  shall not commit another federal, state or local crime. In
9  reference to that particular violation the petition alleges
10  that on November 17th, 2005 that Mr. Thompson, Mr. Marvin C.
11  Thompson was arrested by the Lanett, Alabama police
12  department on a misdemeanor charge for obstruction of
13  governmental operations. The next violation that is alleged
14  is that -- a mandatory condition which states that the
15  Defendant shall not commit other federal, state or local
16  crime. It is alleged that on November 17, 2005 that Mr.
17  Thompson was arrested for unlawful possession of a controlled
18  substance, cocaine. The next violation is that the Defendant
19  shall not own or possess a firearm or destructive device. The
20  allegation is that at the time that the Defendant was
21  arrested on November 17, 2005 the officers found a Hi Point
22  nine millimeter firearm containing a magazine with five
23  rounds of ammunition.
24       THE COURT: All right. Are those the three charges?
25       MS. HARDWICK: Yes, sir.

Page 10

1       THE COURT: Mr. Thompson, you understand that
2  revocation is mandatory if the Court finds that the
3  Defendant, that's you, possessed cocaine base and/or a
4  firearm under 18 U.S.C. 3583, parenthesis lower case G, close
5  parenthesis, you understand that if you are convicted
6  revocation is mandatory under the statute in the United
7  States Code, do you not?
8       THE DEFENDANT: Yes, sir.
9       THE COURT: Does he understand that, counsel?
10       MR. BETHEL: Yes, Your Honor.
11       THE DEFENDANT: Yes, sir.
12       THE COURT: All right. Mr. Thompson, to the three
13  charges in the probation report, how do you plead?
14       THE DEFENDANT: Not guilty.
15       THE COURT: Not guilty. All right. The clerk will
16  swear the Defendant.
17       THE CLERK: Raise your right hand. Do you solemnly
18  swear or affirm that the testimony you are about to give in
19  this cause is the truth, the whole truth, and nothing but the
20  truth, so help you God?
21       THE DEFENDANT: I do.
22       THE COURT: All right. Is the government ready?
23       MS. HARDWICK: Yes, Your Honor.
24       THE COURT: The Defendant ready?
25       MR. BETHEL: Yes, Your Honor.

Page 11

1       THE COURT: Call your first witness or address the
2  Court on the three charges if you wish to make an opening
3  statement.
4       MS. HARDWICK: No, Your Honor, the government would
5  call its first witness as Officer Steven Woods.
6       THE CLERK: Raise your right hand. Do you solemnly
7  swear or affirm that the testimony you are about to give in
8  this cause is the truth, the whole truth, and nothing but the
9  truth, so help you God?
10       THE WITNESS: I do.
11       THE COURT: Mr. Woods, I notice you have some
12  materials with you, if you use them in the presentation of
13  your testimony the Defendant will be entitled to see them,
14  you understand that?
15       THE DEFENDANT: Yes, sir.
16       THE COURT: If you don't use them he will not be
17  entitled to see them; do you understand?
18       THE WITNESS: Yes, sir.
19       STEVEN WOODS, witness for the Government, having
20  been duly sworn or affirmed, testified as follows:
21       DIRECT EXAMINATION
22  BY MS. HARDWICK:
23  Q. Would you state your name, please, sir, and your
24  employment.
25  A. Steven Woods, I am a lieutenant for the Lanett police

Page 12

1  department.
2  Q. Officer Woods, how long have you been employed by the
3  Lanett police department?
4  A. Eight years this May.
5  Q. And prior to coming to the Lanett police department were
6  you in law enforcement in any other area?
7  A. No, ma'am.
8  Q. During the eight years you have been working in the
9  Lanett police department were you on duty, particularly on
10  November the 17th, 2005?
11  A. Yes, ma'am.
12  Q. And I direct your attention to in the evening hours. Did
13  you have an occasion to see Mr. Marvin Thompson?
14  A. Yes, ma'am.
15  Q. And where did you see him?
16  A. 16th Court Southwest, at the intersection of 24th Avenue
17  Southwest.
18  Q. And was that in Lanett, Alabama?
19  A. Yes, ma'am.
20  Q. When you saw him would you describe what you first
21  observed?
22  A. When I first saw Mr. Thompson's car, it was the vehicle
23  I noticed to begin with, it was parked illegally at the
24  intersection of 16th Court Southwest and 24th Avenue
25  Southwest.

Page 13

1 Q. When you say it was parked illegally, what was the
2 violation? How was it parked illegally?
3 A. It was parked within 30 feet of an intersection stop
4 sign.
5 Q. And do you know the area that Mr. Thompson's car was in?
6 A. Yes, ma'am.
7 Q. Would you describe what kind of area that is to the
8 Court.
9 A. It's a high drug crime area.
10 Q. And what, if anything, did you observe Mr. Thompson do?
11 A. I observed Mr. Thompson, who I didn't know at the time,
12 standing beside the driver's side door of the vehicle. Also
13 noticed another person standing in front of Mr. Lyman -- I
14 mean Mr. Thompson who was Ernest Lyman. He is also a known
15 drug user. I noticed some money in his hand. I activated my
16 blue lights and pulled up in front of Mr. Thompson's vehicle,
17 and I exited the driver's side of my vehicle and Officer
18 Clark exited the passenger side. I went to speak with Mr.
19 Lyman, and that's when I determined it was a $20 bill with
20 some other currency folded up in his hand which was later
21 determined to be 23 dollars.
22 Q. You stated you knew Mr. Lyman before this day, before
23 November 17th, 2005.
24 A. Yes, ma'am.
25 Q. Okay. Now, after you observed that and you approached

Page 14

1 them did you tell Mr. Thompson why you had approached them?
2 A. I was speaking with Ernest Lyman at the time, Officer
3 Clark was speaking with Mr. Thompson.
4 Q. And after you observed the currency in his hand could
5 you tell the Court why you approached Mr. Lyman with the
6 currency in his hand?
7 A. Again, that's a high drug crime area. Mr. Lyman is a
8 known drug user, he smokes crack cocaine. With them parked
9 the way they were in the roadway, as I walked up to Mr. Lyman
10 he started acting very nervous. I walked up to speak with
11 him and to check warrants on him through our dispatch center.
12 Q. When you walked up to him did you do anything for your
13 safety?
14 A. Yes, ma'am. We performed a Terry frisk on Mr. Lyman.
15 Q. So basically what did you do?
16 A. Just patted him down for weapons.
17 Q. Did you find anything on him, any weapons on him, Mr.
18 Lyman, that is?
19 A. No, ma'am, I didn't find any weapons.
20 Q. Did you find anything else on him?
21 A. I did locate a crack pipe that was in his toboggan which
22 was on the back side of his head.
23 Q. What happened with Mr. Lyman?
24 A. He was placed under arrest for possession of drug
25 paraphernalia under Alabama state law.

Page 15

1 Q. What happened to Mr. Marvin Thompson at the time?
2 A. At the time I made the arrest of Mr. Lyman?
3 Q. Yes. After you made the arrest of Mr. Lyman what was
4 happening with Mr. Thompson?
5 A. Mr. Thompson was standing towards the driver's side
6 front of his vehicle, that's when I started speaking to a
7 female subject that was in the car, first name Sylvia, I am
8 not sure of her last name.
9 Q. Would that have been Ms. Sylvia Lynch?
10 A. Yes, ma'am.
11 Q. When you started speaking with her tell the Court why
12 you approached the car where Ms. Lynch was.
13 A. I approached the car to see what they were doing parked
14 on the wrong side of the road.
15 Q. Was she in the passenger or driver's seat?
16 A. She was in the passenger seat.
17 Q. Did you determine who had been driving the car?
18 A. She stated they were just riding around and Mr. Thompson
19 stopped to talk to his cousin, which is Ernest Lyman.
20 Q. After you determined that he was the driver what
21 happened or did anything happen between you and Mr. Thompson
22 during the time you were approaching Ms. Lynch?
23 A. Yes. As I was speaking with Ms. Lynch and asked her to
24 roll the window down and as she was rolling the window down
25 to step out of the car Mr. Thompson walked towards me on the

Page 16

1 passenger side of the car telling her not to get out, not to
2 do what I said. I instructed Mr. Thompson to go back to the
3 front of the car and not to come back and tell her not to do
4 as I asked.
5 Q. What did -- did he go back as you instructed him to?
6 A. Yes, ma'am.
7 Q. And what happened after that?
8 A. I started talking back to Ms. Lynch again, asking her to
9 step out of the car for me. As soon as I got that -- the
10 words out of my mouth Mr. Thompson came back towards me to
11 the passenger side of the car telling her not to get out of
12 the car again. I informed Mr. Thompson if he didn't go to the
13 front side of his car I was going to place him under arrest
14 for obstructing a governmental operation.
15 Q. Did he go back to the front of the car?
16 A. He did go back for the second time.
17 Q. Did you continue your approach to talk with Ms. Lynch?
18 A. Yes, ma'am.
19 Q. What happened then?
20 A. Again Mr. Thompson came back towards me. I advised
21 Officer Clark and Officer Cox to place him under arrest for
22 obstruction of governmental operation.
23 Q. The car that was present there, what did you do with the
24 car?
25 A. The car was subsequently towed to a local impound lot.

Page 17

1   Q. What happened to Ms. Lynch, Ms. Sylvia Lynch?
2   A. During the course of the time that we were out there on
3   the scene Ms. Lynch asked if she could walk home which was
4   approximately two blocks away.
5   Q. She didn't ask to take custody of the car?
6   A. No, ma'am.
7   Q. And after she asked if she could walk home did y'all
8   tell her that she could?
9   A. Yes, ma'am.
10  Q. So the only person that was left on the scene at this
11  time was Mr. Thompson.
12  A. And Mr. Lyman.
13  Q. And Mr. Lyman had already been taken into custody.
14  A. Yes, ma'am.
15  Q. When you got ready to tow the car because it was parked
16  improperly, is there a procedure that you use before you tow
17  a vehicle?
18  A. Yes, ma'am, we always inventory the car that we tow.
19  Q. And what did you do in this case?
20  A. I inventoried the car.
21  Q. When you were inventorying the car did you find anything
22  in the car that you later determined to be illegal?
23  A. Yes, ma'am. As I went to inventory the car I opened the
24  driver's side door and there was a black fanny pack, for lack
25  of a better word, in the driver's seat. And I reached and

Page 18

1   grabbed the black fanny pack, that's when I felt --
2       THE COURT: That's what they are called, isn't it?
3       THE WITNESS: I believe so, sir.
4       THE COURT: Proceed.
5   A. I observed or felt a firearm inside the fanny pack. When
6   I unzipped -- there were three to five zippers on the black
7   fanny pack. I opened one of the zippers to try to locate the
8   firearm and that's when I located the crack cocaine and the
9   scales in one of the zippers.
10      THE COURT: How did you locate the firearm?
11      THE WITNESS: When I reached and grabbed the black
12  fanny pack, sir, out of the driver's seat, I felt it, felt
13  the firearm.
14      THE COURT: All right.
15  Q. And in looking for the firearm you said that there were
16  approximately how many zippers to it?
17  A. Three to five zippers.
18  Q. And when you opened the first one you saw the crack
19  cocaine.
20  A. Yes, ma'am.
21  Q. Did you find -- did you unzip one that revealed a
22  firearm?
23  A. Yes, ma'am.
24  Q. What kind of firearm was it?
25  A. It was a Hi Point nine millimeter firearm with a

Page 19

1   magazine. I took the magazine out and it had five rounds of
2   ammunition in there.
3   Q. So it was in there.
4   A. Yes, ma'am.
5   Q. Was Mr. Thompson arrested?
6   A. Yes, ma'am. He was already under arrest for the
7   obstruction of governmental operation, and once I located the
8   firearm and the crack cocaine I walked back to the car where
9   he was at and advised him he was under arrest for unlawful
10  possession of a controlled substance, and then I asked him if
11  he had a pistol permit for the firearm.
12  Q. Did he have a pistol permit?
13  A. No, ma'am, he didn't.
14      MS. HARDWICK: Those are all my questions for this
15  witness, Your Honor.
16      THE COURT: Cross-examination.
17      MR. BETHEL: If I could have just one moment, Your
18  Honor.
19      THE COURT: Yes.
20              CROSS-EXAMINATION
21  BY MR. BETHEL:
22  Q. Good afternoon, Lieutenant Woods.
23  A. Good afternoon.
24  Q. Now, you identified this area as a high drug crime area;
25  is that right?

Page 20

1   A. That's correct.
2   Q. Now, this was also a residential neighborhood; correct?
3   A. Correct.
4   Q. So there are a number of people who simply live in this
5   neighborhood that aren't involved with the sale of illegal
6   drugs in any way, as far as you know; isn't that true?
7   A. I am not sure.
8   Q. Well, there's a substantial number of houses in this
9   neighborhood; correct?
10  A. Correct.
11  Q. You certainly haven't arrested somebody from every one
12  of the houses on that street for drug trafficking, have you?
13  A. Not for drug trafficking.
14  Q. Well, have you arrested everybody on that street for
15  drug use or any kind of drug activity?
16  A. Yes.
17  Q. Every single person on the street in every single house?
18  A. There's two apartments and one house on that street.
19      MR. BETHEL: Your Honor, may I approach the witness?
20      THE COURT: You may.
21  Q. Lieutenant Woods, I am going to hand you what is marked
22  as Defendant's Exhibit 14 --
23  A. Yes, sir.
24  Q. -- and ask you if you recognize that?
25  A. I do.

Page 21

1  Q. And what is that?
2  A. It's 16th Court Southwest at the intersection of 24th
3  Avenue Southwest.
4  Q. Is that where Mr. Thompson's car was parked on the 17th
5  of November of last year?
6  A. At that intersection, yes.
7  Q. Yes. I am retrieving Defendant's Exhibit 14. Well, just
8  looking at the picture, Lieutenant Woods, there are certainly
9  more than three buildings on that street between this corner
10  and the other end of the street, aren't they?
11  A. Yes, sir. You said houses, not buildings.
12  Q. You identified houses and apartments so clearly you were
13  talking about buildings there; correct?
14  A. Correct, residences.
15  Q. And you are saying that that is where the car was parked
16  in the wrong direction on that street; is that correct?
17  A. At that intersection, that's correct.
18  Q. Now, when you first pulled up that evening you said your
19  blue lights were on; correct?
20  A. I activated my blue lights as I pulled in front of the
21  car, yes, sir.
22  Q. You didn't mention but you also drew your gun when you
23  got out of the car, didn't you?
24  A. I don't recall.
25  Q. Drew your pistol.

Page 22

1      MR. BETHEL: Your Honor, I'm sorry.
2      THE COURT: You know the difference between a pistol
3  and a gun.
4      MR. BETHEL: Yes, Your Honor. A pistol certainly is
5  a type of gun. There are lots of guns, long guns, short guns.
6      THE COURT: You use that term except for shotguns,
7  machine guns, and there's a profound difference between a gun
8  and a rifle; am I correct?
9      MR. BETHEL: Yes, sir. I have several rifles and
10  pistols at home, and I certainly know the difference. From
11  now on I will be sure to use the term pistol rather than gun.
12      THE COURT: I spent 20 years in the infantry, that's
13  where that comes from.
14      MR. BETHEL: Yes, Your Honor. I appreciate that.
15  Q. You had your gun drawn, your service weapon; is that
16  true?
17  A. I do not recall.
18  Q. So you remember all the details of what happened but you
19  don't remember whether you had your service weapon drawn or
20  not?
21  A. I made notes.
22  Q. So you don't have -- today as you testify, you don't
23  have any independent recollection whether your service weapon
24  was drawn or not.
25  A. That's correct.

Page 23

1  Q. Now, the reason that you pulled over was not because the
2  car was parked in the wrong direction, right?
3  A. Excuse me?
4  Q. I said you did not pull over to talk to Mr. Lyman and
5  Mr. Thompson because Mr. Thompson's car was parked in the
6  wrong direction, right?
7  A. Yes, sir, that's one of the reasons.
8  Q. Well, isn't the primary reason that you pulled over is
9  because you recognized Mr. Ernest Lyman as a known crack
10  addict?
11  A. No, that's not the primary reason.
12  Q. Well, tell me, Lieutenant Woods, do you always pull over
13  with your lights on and perhaps your service weapon drawn
14  since you can't remember simply because a car is parked in
15  the wrong direction on the side of the road?
16  A. It's a violation of state law.
17  Q. I understand that, Lieutenant Woods, but that's not the
18  question I asked you. Let me put it another way. It is not
19  normal practice for you to pull over with your lights on and
20  your service weapon drawn merely because someone is parked in
21  the wrong direction on the side of the road, is it?
22  A. Yes, it's normal practice for me to pull over with my
23  lights on when somebody is violating state law, parked the
24  wrong way in the roadway.
25  Q. But as you said you recognized Mr. Ernest Lyman because

Page 24

1  you know he is a known crack addict; is that correct?
2  A. As I walked up to him, yes, I did know it.
3  Q. Are you saying you didn't recognize Mr. Lyman before you
4  pulled up that evening?
5  A. No, sir.
6  Q. You said -- even though you couldn't recognize Mr. Lyman
7  you recognized as you pulled over he had money in his hand.
8  A. I said as I walked up towards him.
9  Q. Now, on the particular evening in question Mr. Thompson
10  never told you that that fanny pack belonged to him, did he?
11  A. No, he did not.
12  Q. He never told you that the coke -- the crack cocaine in
13  that fanny pack belonged to him, did he?
14  A. No, sir, he did not.
15  Q. He never told you that the gun in that fanny pack
16  belonged to him, did he?
17  A. No, sir, he did not.
18  Q. You didn't have that gun fingerprinted, did you?
19  A. No, sir, I did not.
20  Q. So you don't have any evidence other than the gun was in
21  Mr. Thompson's car that Mr. Thompson ever handled that gun or
22  that fanny pack.
23  A. Not at this time, I don't.
24  Q. And because you didn't fingerprint the fanny pack
25  either, did you?

Page 25

1  A. No, sir, I did not.
2  Q. Now, as you said, there was another passenger in that
3  car that evening; correct?
4  A. Correct.
5  Q. You didn't ask her, did you, if that fanny back belonged
6  to her.
7  A. She had already left the scene, sir.
8  Q. Well, you spoke with her before she left the scene,
9  right?
10  A. Yes, sir.
11  Q. You saw the fanny back as soon as you came over to the
12  driver's side of that car, right?
13  A. Sir, I was on the passenger side of the vehicle.
14  Q. Well, she was still there when you first spotted that
15  fanny pack, wasn't she?
16  A. No, sir, she was not. I was being distracted by Mr.
17  Thompson when I was speaking with her.
18  Q. So you never made any effort to track her down and find
19  her and ask her if that bag belonged to her, right?
20  A. No, sir, I did not. I put her down as a witness on my
21  paper work.
22  Q. Did you ever follow up and go talk to her and see if she
23  had any information about that fanny pack?
24  A. No, sir, I did not.
25  Q. So you never followed up to see if she had any

Page 26

1  information about that gun.
2  A. No, sir, I did not.
3  Q. So you never followed up to see if she had any
4  information about that crack cocaine.
5  A. No.
6  Q. So as far as you know it's possible that that bag
7  belonged to Ms. Lynch, isn't it?
8  A. I am not sure.
9  Q. Well, there were two occupants in that car when you
10  stopped the car; correct?
11  A. The car was already stopped.
12  Q. I'm sorry, when the car was already stopped on the side
13  of the road. At the time that you engaged the occupants in
14  conversation there were Mr. Thompson, Mr. Lyman and Ms.
15  Lynch; correct?
16  A. In the area of the vehicle.
17  Q. In the area of the vehicle.
18  A. Correct.
19  Q. Actually the only person inside the vehicle at the time
20  that you pulled up was Ms. Lynch; isn't that true?
21  A. Correct.
22  Q. So the only person who had that fanny pack within arm's
23  reach when you pulled up was not Mr. Thompson but Ms. Lynch,
24  a passenger in that car; isn't that true?
25  A. No.

Page 27

1  Q. Who else had that fanny pack within arm's reach when you
2  pulled up?
3  A. Mr. Thompson.
4  Q. You said Mr. Thompson wasn't in the car.
5  A. He was standing beside the driver's door.
6  Q. When you pulled up did you see Mr. Thompson throw that
7  fanny pack into the car?
8  A. No, I did not.
9  Q. Did you see Mr. Thompson put anything into the car as
10  you pulled up?
11  A. No, I did not.
12  Q. So as far as what you observed when you pulled up that
13  fanny pack was inside that car already; isn't that true?
14  A. From what I observed that's correct.
15  Q. And at the time you pulled up the only person inside
16  that car with the fanny pack was Ms. Lynch; isn't that true?
17  A. True.
18  Q. Now, Mr. -- Lieutenant Woods, Mr. Thompson is going to
19  testify that things happened a little bit differently than
20  you say they happened so one way to resolve this dispute is
21  to play a video tape or an audio tape of what happened that
22  evening. Do you have a video tape or an audio tape of what
23  happened that evening?
24  A. I do.
25  Q. Are we going to see that today in this courtroom?

Page 28

1  A. If you wish to.
2  Q. And will it tell us anything at all, Lieutenant Woods?
3  A. I am not sure if it will or not. My lieutenant that
4  covers evidence stated that our clamshell, which is what we
5  call the electronic device that plays our tape, needs
6  cleaning, I am not sure if you will be able to view the tape
7  or not.
8  Q. In other words we don't have -- and this has been
9  provided to the defense previously; correct?
10  A. I am not sure.
11  Q. Well, aren't you aware that Ms. Hardwick provided a copy
12  to the defense?
13  A. I am not sure if she did or not.
14  Q. Aren't you aware at the last hearing that Ms. Hardwick
15  told the Court, Judge Thompson, that there was nothing
16  viewable on that video tape? You were there that day,
17  weren't you?
18  A. Yes, I was.
19  Q. Didn't you hear Ms. Hardwick tell the Court that there
20  was no evidentiary value to that tape because it did not
21  record properly?
22  A. I am not sure what she told the Court. I remember her
23  telling the Court it wasn't viewable. Again, as I said
24  earlier, the electronic device that plays the tape needs to
25  be cleaned according to Lieutenant Carter who is over the

## Page 29

1 evidence in my police department.
2 Q. All right. Well, Lieutenant Woods, this isn't the first
3 time you have had trouble with not recording properly
4 something that happened at the scene of an arrest; isn't that
5 true?
6 A. Clarify.
7 Q. Well, have you ever had problems previously in properly
8 recording for instance the audio that occurred during an
9 arrest?
10 A. Yes, technical equipment does mess up from time to time.
11 Q. Well, I am not talking about technical equipment messing
12 up, Lieutenant Woods, I am talking about have you ever had
13 problems properly recording what happened at an arrest that
14 resulted in some disciplinary action against you?
15 A. Let's see, I have been there eight years --
16        MS. HARDWICK: Your Honor, we will object to the
17 form of the question unless there's a reference to date and
18 time, but a generic question such as he is asking him,
19 there's no way he can properly answer it.
20        THE COURT: Well, what did you say when you
21 attempted to answer it, Woods?
22        THE WITNESS: Sir, I stated that me being there
23 eight years I don't remember getting disciplined as he stated
24 for not having audio. I may have.
25        THE COURT: The objection is sustained.

## Page 30

1 Q. Let me be more specific then, Lieutenant Woods. Do you
2 recall on the 29th of July receiving a notice from your
3 supervisor, Chief Ricky Billingsley, and that is -- says the
4 following: Officer Steven Woods often fails to engage the
5 body microphone for his video patrol camera on traffic stops
6 and police action which causes a failure to record the
7 dialogue between himself and the suspects or other persons.
8 Do you remember specifically receiving that back in 2002?
9 A. I don't remember receiving it.
10 Q. Is it possible that you in fact did receive --
11        THE COURT: Sustained.
12        MR. BETHEL: Your Honor, I am simply asking him if
13 it's possible that he received that.
14        THE COURT: Well, I simply sustained the objection.
15 Q. Now, Lieutenant Woods, there's a very good reason for
16 recording traffic stops, right?
17 A. Yes, sir.
18 Q. In fact, department rules and regulations in Lanett
19 require you to record those traffic stops, do they not?
20 A. That's correct.
21 Q. And some of the reasons, for instance, that they should
22 be recorded is that it makes sure that if there's a dispute,
23 for instance, between you and someone who were to file a
24 complaint against you based on a traffic stop that we would
25 have some evidence about what actually happened at that

## Page 31

1 traffic stop; isn't that true?
2 A. I am sure that's one of them.
3 Q. Now, Lieutenant Woods, after the 17th of November when
4 was the next time that you ran into Mr. Thompson?
5 A. I couldn't specify the date.
6 Q. Could it have been on the 3rd day of February of 2006?
7 A. Could have been.
8 Q. Isn't it true that on the 3rd day of February in 2006
9 that you happened to pull Mr. Thompson over for failure to
10 use his turn signal when he made a turn?
11 A. I did pull him over, but there again I can't specify
12 what date I pulled him over for.
13        MR. BETHEL: Your Honor, may I approach the witness?
14        THE COURT: You may.
15 Q. Lieutenant Woods, I am going to hand you what is marked
16 as Defendant's Exhibit 2 and ask you to take a look at that.
17 Do you recognize that?
18 A. I do. It's an Alabama Uniform Traffic Citation.
19 Q. And who issued that citation?
20 A. I did.
21 Q. And what was the date that it was issued?
22 A. February 3rd, 2006.
23 Q. And to whom was it issued?
24 A. Marvin Crawford Thompson.
25 Q. And what was it for?

## Page 32

1 A. Signal required.
2 Q. Signal required. I am retrieving Defendant's Exhibit 2
3 from Lieutenant Woods. In fact, barely a week later on the
4 11th of February you pulled him over again, didn't you,
5 Lieutenant Woods?
6 A. Pulled him over sometime after that, yes, I did.
7        MR. BETHEL: Your Honor, may I approach the witness?
8        THE COURT: You may.
9 Q. I am going to hand you Defendant's Exhibit 3, do you
10 recognize that?
11 A. I do.
12 Q. And what is that?
13 A. It's a traffic citation, two of them.
14 Q. And who issued that citation?
15 A. Which one? There's two of them on here.
16 Q. The one on the 11th of February.
17 A. That would be me, Lieutenant Woods.
18 Q. And to whom did you issue that?
19 A. Marvin Crawford Thompson.
20 Q. And what was that for?
21 A. Child restraint violation.
22 Q. All right. I am retrieving Defendant's Exhibit 3. Now,
23 let's talk about the first one.
24        THE COURT: Are you offering your exhibits?
25        MR. BETHEL: I was going to offer them together at

Page 33

1  the conclusion of the testimony, Your Honor.
2      THE COURT: That's fine.
3  Q. Now, the stop on the 3rd of February, when you pulled
4  him over and stopped him on --
5      MS. HARDWICK: Your Honor, at this time the
6  government would object to any testimony regarding the stop
7  on February the 3rd and the stop on February the 11th.
8  Neither one of those citations are the subject of this
9  petition that has been filed before the Court. This is
10  sometime later. The petition references November and these
11  are several months later that he is questioning him about.
12      THE COURT: You mean after the conduct in this
13  matter?
14      MS. HARDWICK: Yes, sir. The conduct, Your Honor,
15  happened on November the 17th, 2005. We are now going into
16  tickets that were issued in February of 2006 that are not
17  been made a part of this and we object, there's no relevancy
18  to them, and that those matters are still pending in District
19  Court.
20      THE COURT: Counsel?
21      MR. BETHEL: Your Honor, it is the contention and
22  position of the defense that Lieutenant Woods after this
23  incident in November was harassing Mr. Thompson.
24      THE COURT: How does that affect the November?
25      MR. BETHEL: It goes to his bias and therefore it

Page 34

1  goes to his credibility about what he is testifying to today,
2  Your Honor. And furthermore, I am not finished yet exploring
3  what happened on the 3rd of February because what you are
4  going to hear is that Lieutenant Woods arrested Mr. Thompson
5  on a failure to appear for the November ticket.
6      THE COURT: What else are you going to elicit?
7      MR. BETHEL: That is primarily it, Your Honor, as
8  far as the incidents on the 3rd and the 11th of February.
9      THE COURT: All right. It's admitted for whatever
10  it's worth. The objection is overruled. Move along, counsel,
11  please.
12      MR. BETHEL: Yes, Your Honor.
13      THE COURT: This is not a trial.
14      MR. BETHEL: I understand, Your Honor.
15      THE COURT: All right.
16  Q. In addition to the ticket that you issued on the 3rd of
17  February didn't you arrest Mr. Thompson for failure to appear
18  at that time?
19  A. One of the times I stopped him he was arrested for
20  failure to appear on a traffic citation.
21  Q. And that was one of the times being either the 3rd or
22  the 11th of February; is that correct?
23  A. I believe it was the same time I stopped him for signal
24  required.
25  Q. Which would have been the 3rd of February; correct?

Page 35

1  A. Yes.
2  Q. And the failure to appear allegedly was he failed to
3  appear in January to answer for the ticket that you wrote him
4  in November; is that correct?
5  A. I believe so.
6  Q. All right.
7  A. Issued by the clerk's office.
8      MR. BETHEL: Your Honor, may I approach the witness?
9      THE COURT: You may.
10      MR. BETHEL: And Your Honor, I have not yet marked
11  this as a Defendant's exhibit because it was to be used for
12  impeachment of this witness. I will be happy to mark it
13  after the testimony is concluded, Your Honor.
14      THE COURT: All right.
15      MR. BETHEL: Your Honor, may I approach the witness?
16      THE COURT: You may.
17  Q. Lieutenant Woods, I am going to show you a UTC
18  transmittal form, it's from the State of Alabama, Unified
19  Judicial System, it has a list of tickets on it. I would like
20  you to take a look at that, please. (complies) Lieutenant
21  Woods, isn't it true that you issued all of the citations
22  that are listed on that document?
23  A. That's correct.
24      THE COURT: How many are there?
25      THE WITNESS: Six citations, sir.

Page 36

1      THE COURT: All right.
2  Q. All right. Lieutenant Woods, could you tell the Court,
3  please, the date on which the first citation was issued?
4      MS. HARDWICK: Your Honor, again we'd object unless
5  it has direct bearing on Mr. Thompson. Who else and when he
6  issued a citation is irrelevant to this proceeding.
7      THE COURT: Well, he is going to say that it -- they
8  are prior or subsequent similar acts. Does not the prior
9  similar acts statute, 404(b), extend to acts on behalf of a
10  witness?
11      MS. HARDWICK: No, Your Honor, I don't believe what
12  he is asking him now would at all fall under 404(b) in
13  reference to this Defendant. Those citations are issued for
14  various other reasons for different violations of law and he
15  is trying to connect them to what happened on November 17th.
16      THE COURT: He is trying to show that Lieutenant
17  Woods acted in a biased and prejudiced manner towards his
18  client is what he is doing; am I correct?
19      MR. BETHEL: Yes, Your Honor.
20      MS. HARDWICK: Your Honor, without knowing more
21  about who he issued those citations to, the race or ethnicity
22  of those persons, or whether they are in a similar situation .
23  there's no way we can make that comparison or draw any
24  conclusion.
25      MR. BETHEL: Your Honor, I think I can make this

Page 37

1 clear for the Court. The only thing I am interested in is
2 the number of the tickets that were issued on those
3 particular dates, and after I have elicited that testimony
4 from this witness I think it will be very clear the point I
5 am trying to make for the Court about this witness'
6 credibility.
7     THE COURT: Proceed.
8 Q. Lieutenant Woods, what was the date that the first
9 ticket was issued on that list?
10 A. October 23rd.
11 Q. And what is the ticket number of that ticket?
12 A. 7951065.
13 Q. So the last four digits are 1065?
14 A. On this form, correct.
15 Q. And the next ticket, what date was it issued?
16 A. October 23rd.
17 Q. And what was the last four digits of that ticket number?
18 A. 1066.
19 Q. The next ticket, when was it issued?
20 A. October 27th.
21 Q. And what were the last four digits of that ticket
22 number?
23 A. 1067.
24 Q. When was the next ticket issued?
25 A. November 12th, 2005.

Page 38

1 Q. So November 12th, 2005?
2 A. 2006. It says 2005 but it was 2006 when it was issued.
3 Q. Well, it couldn't have been issued in November of 2006,
4 we haven't gotten there yet.
5 A. That is a true statement.
6 Q. So on November 12th, five days before the 17th, the
7 ticket number was what?
8 A. 1068.
9 Q. And the next ticket that's listed on that list, what is
10 the date?
11 A. November 27th.
12 Q. So it's five days after you stopped Mr. Thompson. What
13 are the last four digits of the ticket number on that ticket?
14 A. 1069.
15 Q. 1069. Now, the ticket you issued to Mr. Thompson which
16 is last on that list, what is the ticket number on that
17 ticket?
18 A. The last four?
19 Q. Last four.
20 A. 0774.
21 Q. 0774.
22     MR. BETHEL: Your Honor, I am going to retrieve that
23 from Lieutenant Woods.
24 Q. So, in other words, the ticket that you issued
25 immediately prior to the ticket to Mr. Thompson was 1068 on

Page 39

1 the 12th of November; correct?
2 A. I believe so.
3 Q. And the ticket you issued immediately after the ticket
4 you issued Mr. Thompson was 1069, the next ticket in order on
5 the 22nd of November; correct?
6 A. Yes, the next ticket which is 1069 on the 22nd of
7 November.
8 Q. So Lieutenant Woods, isn't it true that all of the
9 tickets that you issued from the 23rd of October until the
10 22nd of November were in sequential order, 1065, 1066, 1067,
11 1068, 1069, with the exception of the ticket you issued to
12 Mr. Thompson which was 774?
13 A. That's correct.
14 Q. So the only ticket that happened to be out of order is
15 the one you allegedly issued to Mr. Thompson on the 17th of
16 November; isn't that true?
17 A. That's true.
18 Q. In fact, you didn't even file that ticket until the 8th
19 of December; isn't that true?
20 A. I'm not sure when the ticket was filed.
21 Q. Would you agree it was several weeks later before you
22 actually filed the ticket that you allegedly wrote Mr.
23 Thompson on the 17th of November?
24 A. I am not sure when I filed the ticket.
25     MR. BETHEL: Your Honor, if I may have just one

Page 40

1 moment?
2 Q. Lieutenant Woods, I am going to show you what has been
3 marked as Defendant's Exhibit 4. Now, it's a little hard to
4 read, it's a little dim, but I would ask you to take a look
5 at the highlighted portions of that exhibit. Does that
6 indicate when that ticket was filed?
7 A. It indicates when it was put into the computer system,
8 that's correct.
9 Q. When was it put into the computer system?
10 A. On December 5th, 2005.
11 Q. December 5th, 2005. So nearly three weeks later;
12 correct?
13 A. Something like that.
14 Q. Now, do you know what the disposition was of the failure
15 to appear that you picked Mr. Thompson up on?
16 A. No, I am not.
17     MR. BETHEL: No further questions at this time, Your
18 Honor.
19     THE COURT: Cross-examination. Or rather redirect,
20 excuse me.
21     REDIRECT EXAMINATION
22 BY MS. HARDWICK:
23 Q. Officer Woods, whose car was it that was -- that you
24 were towing on November the 17th?
25 A. Marvin Thompson.

Page 41

1  Q. Who did it belong to?
2  A. Marvin Thompson.
3  Q. Was there any indication at all that Ms. Lynch owned
4  that car?
5  A. No, ma'am.
6  Q. In reference to recording the citations, who dockets a
7  citation once you turn it in?
8  A. We turn the citation in on a transmittal form, it then
9  goes to our clerk who then places it in a computer system.
10  She then forwards it to the circuit clerk's office in
11  Lafayette, Alabama. Once it gets there they put it into the
12  computer system.
13  THE COURT: Lafayette is the county seat?
14  THE WITNESS: Yes, sir.
15  THE COURT: You have a city-county contact,
16  cooperation in the use of the computer?
17  THE WITNESS: No, sir, we do not.
18  THE COURT: How come you send it back to Lanett, or
19  rather -- where did you send it to get it filed?
20  THE WITNESS: Lafayette.
21  THE COURT: Say it again.
22  THE WITNESS: Lafayette, Alabama.
23  THE COURT: All right. The county runs the
24  computer?
25  THE WITNESS: Yes, sir.

Page 42

1  THE COURT: And allows the city to use it too?
2  THE WITNESS: No, sir. We have a separate computer
3  which the transmittal form, that's what we use for the court
4  system and she keeps up with our ticket numbers and stuff in
5  a personal computer.
6  THE COURT: All right.
7  Q. So the docketing, the exhibit that Mr. Bethel showed
8  you, his Defendant's Exhibit 4, with the docket entry sheet
9  showing the filing of the ticket, so you are not the person
10  who puts that in.
11  A. No, ma'am.
12  Q. Do you have any control over when it is entered?
13  A. No, ma'am.
14  Q. The sequence order of the tickets, the numbers that are
15  issued, do they have to be in sequential order?
16  A. No, ma'am, they do not.
17  Q. And why is that?
18  A. Sometimes we run out of uniform traffic citations when
19  we are out on the road or out in the field, we use another
20  officer's ticket book to write a citation with if we do not
21  have our ticket book with us.
22  Q. And if a ticket runs out of a particular number could
23  you conceivably start another set of tickets with a totally
24  different set of numbers?
25  A. Yes, ma'am.

Page 43

1  Q. Is there ever a time that you start a ticket with
2  numbers that are in between?
3  A. That are --
4  Q. In other words numbers that are not sequential. If you
5  get another ticket book to issue a ticket is it conceivable
6  that you could pick up a ticket book that starts not at a
7  beginning sequential number that you were previously writing
8  on?
9  A. Yes, ma'am.
10  Q. So is there really any significance to the number of the
11  ticket, number other than for purposes of recording them in
12  the court?
13  A. No, ma'am.
14  Q. And does the Court rely on those ticket numbers for
15  filing and entering them for the transmittal forms?
16  A. No, ma'am, they -- the tickets are given a separate
17  traffic case number in District Court.
18  Q. So there's not even any significance to the ticket
19  number once you get into court.
20  A. No, ma'am. I believe they use those for auditing by the
21  state department.
22  MS. HARDWICK: Those are all my questions, Your
23  Honor.
24  THE COURT: Redirect -- or recross, excuse me.
25  MR. BETHEL: Yes, Your Honor.

Page 44

1  RECROSS-EXAMINATION
2  BY MR. BETHEL:
3  Q. Let's talk about those case numbers.
4  MR. BETHEL: Your Honor, may I approach the witness
5  again?
6  THE COURT: Yes.
7  Q. Lieutenant Woods, I am going to show you that exhibit
8  again. The case numbers for those tickets are listed right
9  on that transmittal form, are they not?
10  A. Yes.
11  Q. And what was the case number for the ticket that was
12  issued in October, October 23rd?
13  A. 718.
14  Q. And what was the case number for the ticket that was
15  issued also on that date, the other ticket on that date?
16  A. 717.
17  Q. And what was the ticket number for the ticket that was
18  issued -- what was the next date for the ticket?
19  A. October 27th.
20  Q. What was the case number for that ticket?
21  A. 719.
22  Q. And what was the case number for the ticket you issued
23  on the 12th of November?
24  A. 720.
25  Q. And what was the case number for the ticket you issued

Page 45

1 on the 22nd of November?
2 A. 721.
3 Q. And what was the ticket number for the ticket that you
4 issued on the 17th of November, five days prior to the 22nd?
5 A. 722. All the tickets were filed together on the same
6 date with this document.
7 Q. All the tickets were filed together on the same date but
8 coincidentally the only ticket that's out of order as to the
9 case number is the ticket that you allegedly issued to Mr.
10 Thompson on the 17th of November; isn't that true?
11 A. Yes, we don't provide a case number, the clerk's office
12 does that.
13 Q. All the other case numbers are in order that the tickets
14 were issued, are they not?
15 A. No.
16 Q. Pardon me?
17 A. You said they are in order of the date they were issued.
18 Q. Other than Mr. Thompson's ticket all the other tickets
19 are in order by case number according to the date that the
20 ticket was issued, are they not?
21 A. No, they are ordered by the list they are on that paper.
22 Q. Lieutenant Woods, you are missing my point in the
23 question.
24    MS. HARDWICK: Your Honor, we object, it's
25 argumentative.

Page 46

1    THE COURT: I sustain it.
2    MS. HARDWICK: He asked his question.
3    THE COURT: I sustain it.
4 Q. Once again, Lieutenant Woods, just to confirm, the only
5 case number -- the only ticket case number that's out of
6 order is Mr. Thompson's ticket; isn't that true?
7 A. No, it's not.
8    MS. HARDWICK: We object.
9    THE COURT: I sustain it.
10    MR. BETHEL: No further questions, Your Honor.
11    THE COURT: Redirect?
12    MS. HARDWICK: Nothing further from this witness,
13 Your Honor.
14    THE COURT: All right. Lieutenant -- may this
15 witness be excused?
16    MR. BETHEL: We'd like the witness available
17 throughout the rest of this proceeding, Your Honor.
18    THE COURT: All right. Have a seat in the courtroom,
19 Mr. Woods.
20    THE WITNESS: May I use the restroom, Judge?
21    THE COURT: You may. Mr. Marshal -- Mr. Bailiff,
22 show him where the restroom is, please. Proceed.
23    MS. HARDWICK: Your Honor, the government calls Mr.
24 James Chappell.
25    THE COURT: All right. James Chappell.

Page 47

1    THE CLERK: Do you solemnly swear or affirm that the
2 testimony you are about to give in this cause is the truth,
3 the whole truth, and nothing but the truth, so help you God?
4    THE WITNESS: I do.
5    JAMES CHAPPELL, witness for the Government,
6 having been duly sworn or affirmed, testified as follows:
7    DIRECT EXAMINATION
8 BY MS. HARDWICK:
9 Q. Would you state your full name, please.
10 A. James Chappell.
11 Q. How are you employed?
12 A. A United States probation, Middle District of Alabama.
13 Q. Mr. Chappell, are you or were you assigned to supervise
14 Mr. Marvin C. Thompson?
15 A. Yes, ma'am, I was.
16 Q. And was that in case number 92-162?
17 A. Yes, ma'am.
18 Q. At the time that you began your supervision of Mr.
19 Thompson did you go over rules and regulations with him of
20 things that he should and should not do?
21 A. I did not go over them. I received supervision of the
22 case October of 2004 from another officer. He was placed on
23 supervision in 2001.
24 Q. And have you reviewed the things that he should and
25 should not do with him from time to time?

Page 48

1 A. Yes, I have.
2 Q. And you are aware of the petition and the three
3 violation offenses that are alleged in there, particularly
4 whether or not Mr. Thompson should have contact with law
5 enforcement officers. What is instructed to the probationer
6 regarding whether he has had any contact with a law
7 enforcement officer?
8 A. He is supposed to notify me within 72 hours of any
9 contact with law enforcement.
10 Q. Now, he is not filed with that as a violation but is he
11 given instructions as to whether or not he is to commit any
12 other state, local or federal offense?
13 A. That is a mandatory condition that he is advised of,
14 yes.
15 Q. And did you receive information regarding Mr. Thompson
16 having an offense -- incident offense report filed against
17 him for allegedly committing other state, local or federal
18 violations?
19 A. Yes, ma'am, I did.
20 Q. And when did you receive that information?
21 A. Approximately November the 18th, I believe it was. If
22 you will give me a minute to refresh. It was approximately
23 November the 18th.
24 Q. Mr. Chappell, do you all also have a way that you check
25 from time to time to see whether or not a person, one of your

Page 49

1  probationers has been arrested?
2  A. We do get what we call hit notices from the NCIC or
3  national crime computer that advises us of law enforcement
4  contact.
5  Q. In this case did you receive an incident offense report
6  regarding November the 17th alleging that offenses -- state
7  offenses had been committed by Mr. Thompson?
8  A. Yes, I did. I received them from Lanett police
9  department.
10 Q. And were those the subject of your petition that was
11 filed in this case?
12 A. Yes, ma'am.
13     MS. HARDWICK: Those are all the questions we have
14 of Mr. Chappell.
15     THE COURT: Cross-examination.
16         CROSS-EXAMINATION
17 BY MR. BETHEL:
18 Q. Good afternoon, Mr. Chappell.
19 A. Good afternoon.
20 Q. When did you begin supervising Mr. Thompson?
21 A. I would say approximately October of 2004.
22 Q. And who supervised him prior to that time?
23 A. United States -- former United States probation officer
24 Roselyn Auber.
25 Q. During the time you have supervised Ms. Thompson have

Page 50

1  you had -- other than the subject of this revocation hearing,
2  what happened back on November the 17th of November, have you
3  had any problems with Mr. Thompson during the course of that
4  supervision?
5  A. No, the records maintained he maintained employment and
6  submitted monthly reports as instructed.
7  Q. And does that include not only the time you supervised
8  him but the prior supervision as well?
9  A. Right, yes, sir.
10 Q. To the best of your knowledge has Mr. Thompson had any
11 problems while he has been under supervision since he was
12 released from prison, other than this incident?
13 A. Other than the arrest, no.
14 Q. Now, did Mr. Thompson promptly notify you about this
15 arrest?
16 A. He did.
17 Q. And what was the date when he notified you of this
18 arrest?
19 A. I want to say it was approximately two days after the
20 arrest.
21 Q. And if you recall wasn't he actually still in jail on --
22 after he had been picked up and arrested when he contacted
23 you?
24 A. Yes, he was.
25 Q. So he made every effort even while he was in jail to

Page 51

1  make sure you knew he had been picked up and arrested on the
2  17th of November.
3  A. Right.
4  Q. In other words he made every effort to make sure that he
5  complied with the terms of his supervision; correct?
6  A. Correct.
7  Q. At any time did Mr. Thompson admit to you that that
8  fanny pack belonged to him?
9  A. No, he didn't.
10 Q. At any time did he admit to you that the crack cocaine
11 in that fanny pack belonged to him?
12 A. No.
13 Q. At any time did he admit to you that the gun in that
14 fanny pack belonged to him?
15 A. No, he didn't.
16 Q. At any time did he deny that they belonged to him?
17 A. Yeah -- yes, he did.
18 Q. So he has never admitted that the fanny pack, the drugs,
19 the gun were his but he has, in fact, denied to you that they
20 belonged to him.
21 A. Yes, he denied it. And advised a couple of different
22 scenarios as to who they were.
23 Q. Well, in other words there were other people who
24 obviously, we have already heard testimony in this courtroom
25 goes, one person that we know that certainly was within the

Page 52

1  same area as that bag when it was found was the passenger in
2  Mr. Thompson car, for instance, you heard that testimony;
3  correct?
4  A. Yes, sir.
5  Q. So in other words it's certainly possible that there
6  might have been others depending on what the facts and
7  circumstances were; correct?
8  A. Well, yes, but he presented one specific name.
9  Q. All right.
10 A. One scenario -- actually two scenarios.
11 Q. All right. But he denied though that that bag, the gun
12 and the crack were his.
13 A. Right.
14 Q. Thank you.
15     MR. BETHEL: No further questions, Your Honor.
16     THE COURT: Redirect.
17         REDIRECT EXAMINATION
18 BY MS. HARDWICK:
19 Q. Mr. Chappell, what was the first scenario that he gave
20 you as to who the fanny pack belonged to?
21 A. Our first conversation he stated that his daughter drove
22 the vehicle and he did not know who of his daughter's friends
23 would have possession of the vehicle and could have put the
24 drugs or guns in there. And then later, this was
25 approximately a month later, he stated that he would, while

Page 53

1  he was working, hire other people to come over to the house
2  to sit with his mother and would allow them to drive the
3  vehicle to run errands so he didn't know then who -- again,
4  who could have had drugs.
5  Q. Did he ever advise you that it was in the car -- inside
6  of the car where he had just gotten out of driving?
7  A. He just kept saying he didn't know who put it in there.
8  Q. But he never denied that it was in there.
9  A. No, not to my recollection he didn't.
10  Q. Did he ever deny that it was his car?
11  A. No.
12      MS. HARDWICK: Nothing further.
13      THE COURT: Recross?
14      MR. BETHEL: Very briefly, Your Honor.
15         RECROSS-EXAMINATION
16  BY MR. BETHEL:
17  Q. So he never tried to pin this on anybody in particular,
18  did he, Mr. Chappell?
19  A. No.
20  Q. He just said that there were a couple of other
21  individuals who had driven his car and had access to his
22  vehicle; correct?
23  A. Correct.
24  Q. All right. He never tried to say well, my daughter did
25  it, and if you talk to her she'll tell you the gun and the

Page 54

1  crack belong to her, he never suggested a scenario like that,
2  did he?
3  A. No.
4      MR. BETHEL: No further questions, Your Honor.
5      THE COURT: Redirect?
6      MS. HARDWICK: Nothing further from this witness,
7  Your Honor.
8      THE COURT: Step down.
9      THE WITNESS: Thank you, Your Honor.
10      MS. HARDWICK: Your Honor, those are all the
11  government's witnesses.
12      THE COURT: Say again?
13      MS. HARDWICK: Those are all the government's
14  witnesses.
15      THE COURT: All right. I will hear from the
16  Defendant then. Do you have a motion to make prior?
17      MR. BETHEL: I do, Your Honor, I have a motion for a
18  finding in favor of the Defendant. At this point we have
19  heard no conclusive evidence what so ever that the gun or the
20  crack cocaine in that bag belonged to Mr. Thompson. Quite to
21  the contrary, we have heard evidence from the government's
22  own witness that the single person who was closest to that
23  bag and had the greatest opportunity to exercise control and
24  dominion over that bag with the crack cocaine and the gun was
25  a passenger in Mr. Thompson's car, because as Lieutenant

Page 55

1  Woods testified, at the time that he pulled up Mr. Thompson
2  was standing outside the car and put nothing into the car.
3  The only person inside that car at that time was a passenger
4  in Mr. Thompson's car. If anybody deserves the benefit of the
5  doubt here, Your Honor, it should be the Defendant, Mr.
6  Thompson.
7      I think we have already established pretty much
8  beyond a reasonable doubt that there is something very fishy
9  about the tickets that Lieutenant Woods issued in this case.
10  That's clear from both the ticket numbers and the case
11  numbers for those tickets. It's also clear that what really
12  happened that night, Your Honor, was that Lieutenant Woods
13  pulled up, saw somebody that he knew to be a crack addict and
14  that's why he pulled up with his lights on. And we will hear
15  testimony continued by the defense with his guns drawn
16  because he thought there was a crack deal going down.
17  Unfortunately for him neither Mr. Thompson or Mr. Lyman had
18  any crack cocaine on them. He needed an excuse to get in that
19  car and it turned out to be obstruction of governmental
20  operations. And even once he was in the car and found the
21  bag, nobody fingerprinted the gun, nobody fingerprinted the
22  bag. We know for an absolute fact that more than one person
23  had access to that bag, and there's absolutely no evidence
24  before this Court that the Court should conclude by a
25  preponderance of the evidence that it was Mr. Thompson and

Page 56

1  not the passenger in his car. So we should be finished with
2  this hearing right now, Your Honor.
3      THE COURT: Ms. Hardwick?
4      MS. HARDWICK: Your Honor, as Mr. Bethel has stated
5  the government's burden is by a preponderance of the evidence
6  under 3583.
7      THE COURT: More likely so than not likely so; am I
8  correct?
9      MS. HARDWICK: Yes, sir.
10      THE COURT: Am I correct?
11      MS. HARDWICK: Yes, sir, Your Honor.
12      THE COURT: More likely so than not.
13      MS. HARDWICK: Yes, sir, Your Honor.
14      THE COURT: Go ahead. Do you agree, counsel?
15      MR. BETHEL: Yes, Your Honor.
16      THE COURT: Law of the case. Go ahead.
17      MS. HARDWICK: Your Honor, even with the summary of
18  Mr. Bethel, Mr. Bethel's only admission would be even if Ms.
19  Lynch did possess the cocaine inside the car it is Mr.
20  Thompson's car. He is the person that's under supervision.
21  So, to pass the responsibility on that it may have been Ms.
22  Lynch's drugs and firearm they are still in his car, and he
23  is responsible for what is in his car. They are not -- the
24  officer did not testify that he found them in the trunk or
25  under the seat, he found it in the driver's seat, a fanny

Page 57

1 pack in the driver's seat. So, if Mr. Thompson has just
2 gotten out of that car if he is the only person that was
3 driving that car and that fanny pack is in the driver's seat,
4 the government feels that it has met its burden of a
5 preponderance of the evidence that it belonged to Mr.
6 Thompson.
7     MR. BETHEL: Your Honor, just briefly. Ms. Hardwick
8 I believe misstates the law. She suggests that merely because
9 the fanny pack was within Mr. Thompson's car he is therefore
10 legally responsible for that. That is not true, Your Honor.
11 He still must know that there's a gun and crack inside that
12 fanny pack. If he did not knowingly -- knowingly allow that
13 fanny pack to be in that car, even if it belonged to someone
14 else, he certainly couldn't be prosecuted under federal law
15 for felon in possession of a firearm or intent -- possession
16 of crack cocaine with intent to distribute because one of the
17 elements of those offenses is knowing. He has to know that
18 those are in there. And if someone got into his car with a
19 black fanny pack, i.e., his passenger, there's absolutely no
20 evidence that he would have necessarily asked what was in the
21 bag or inspected the bag. So she missed the --
22     THE COURT: Are you not arguing reasonable doubt,
23 counsel?
24     MR. BETHEL: No, I do not believe that's a
25 reasonable doubt argument, Your Honor. It's -- the burden

Page 58

1 again is upon the government. They would have to establish
2 that element if they were prosecuting and I believe they also
3 have to establish that element, all be it by a preponderance
4 of the evidence at this hearing. So I continue to maintain it
5 is insufficient to simply say because the bag was in his car
6 that Mr. Thompson is responsible for its contents. It still
7 requires him to know what was in that bag. Whether the
8 standard is beyond a reasonable doubt or by a preponderance
9 of the evidence, there's still that requirement, Your Honor.
10     THE COURT: All right. The case is with the
11 Defendant. Are you going to call witnesses?
12     MR. BETHEL: Yes, Your Honor. Are you denying the
13 defense motion?
14     THE COURT: I am taking it under advisement.
15     MR. BETHEL: Thank you, Your Honor. Yes, we are
16 going to call witnesses.
17     THE COURT: So you won't have to reargue all those
18 points at the conclusion of all the evidence.
19     MR. BETHEL: I'm sorry?
20     THE COURT: So that you won't have to reargue all
21 those points at the conclusion of the evidence, the Court
22 will carry it with the case.
23     MR. BETHEL: Thank you, Your Honor. At this time we
24 call Mr. Ernest Lyman to the stand.
25     THE CLERK: Stand, raise your right hand. Do you

Page 59

1 solemnly swear or affirm that the testimony you are about to
2 give in this cause is the truth, the whole truth, and nothing
3 but the truth, so help you God?
4     THE WITNESS: Yes, ma'am.
5     THE COURT: Proceed.
6     ERNEST LYMAN, witness for the Defendant, having
7 been duly sworn or affirmed, testified as follows:
8     DIRECT EXAMINATION
9 BY MR. BETHEL:
10 Q. Mr. Lyman, would you please state your full name and
11 spell your last name.
12 A. Full name is Ernest Lyman. Last name spelled L-Y-M-A-N,
13 Lyman.
14 Q. Mr. Lyman, where do you live?
15 A. Lanett, Alabama, Chambers County.
16 Q. How long have you lived there?
17 A. Approximately 20 something years.
18 Q. Mr. Lyman, where specifically in Lanett do you live?
19 A. 2924 East Street, Lanett.
20 Q. Mr. Lyman, do you know Mr. Marvin Thompson?
21 A. Yes, sir.
22 Q. How do you know Mr. Thompson?
23 A. From years back, and he is related.
24 Q. You said you are related?
25 A. Yes, sir.

Page 60

1 Q. How are you related?
2 A. Somewhere about third or fourth cousins down the line.
3 Q. If you see Mr. Thompson in the courtroom would you point
4 to him and call him by name, please?
5 A. Yes, sir, Mr. Marvin.
6     MR. BETHEL: The witness has correctly identified
7 Mr. Thompson.
8     THE COURT: All right.
9 Q. Mr. Lyman, were you with Mr. Thompson on the 17th of
10 November when he was arrested?
11 A. Yes, sir.
12 Q. Were you also arrested on that day?
13 A. Yes, sir.
14 Q. Where were you arrested?
15 A. In Lanett, Alabama.
16 Q. And what location within Lanett?
17 A. West Shawna.
18 Q. What were you doing at the time that the police car
19 pulled up to where you were standing at that time?
20 A. Borrowing money from Mr. Thompson.
21 Q. What were you doing?
22 A. Borrowing money.
23 Q. Were you buying crack cocaine from Mr. Thompson?
24 A. No, sir.
25 Q. Have you ever purchased crack cocaine from Mr. Thompson?

## Page 61

1  A. No, sir.

2  Q. You are aware that Mr. Thompson went to prison back in

3  the early 90s for dealing in cocaine.

4  A. Yes, sir.

5  Q. Did he ever sell you cocaine back then?

6  A. No, sir, because he --

7  Q. Why would he not even sell you cocaine back when he was

8  dealing cocaine?

9  A. Because he is my cousin, he would never sell me no

10  drugs.

11  Q. So what were you doing with Mr. Thompson that evening on

12  the 17th?

13  A. I had asked Mr. Thompson to loan me $25 where I could

14  get some gas, cigarettes, buy my lunch.  At that time I was

15  working at Electric Carburetion on Fob James Drive.

16  Q. Now, a police car pulled up with the lights on, right?

17  A. Yes.

18  Q. Now, how many officers got out of that car?

19  A. Two.

20  Q. Did they or did they not have their weapons drawn when

21  they got out of their car?

22  A. They was in the process of pulling their weapons.

23  Q. Did they pull the weapons as they got out of the car?

24  A. I know they had their hand on it, I don't know if they

25  had it unholstered, I don't know whether it was cleared the

## Page 62

1  holster or not.

2  Q. Did you recognize either of those officers?

3  A. Yes, sir, I recognized both of them.

4  Q. Did you recognize Lieutenant Steven Woods specifically?

5  A. Yes, sir.

6  Q. How did you recognize him?

7  A. From the past.

8  Q. And what was that, that had happened in the past?

9  A. In the past he had busted me several times for the

10  possession of drug paraphernalia.

11  Q. So he knew who you were?

12  A. Yes, sir.

13  Q. What happened when the officers approached you that

14  evening?

15  A. Well, at that time they approached and told us to put

16  our hands up in the air. And at that time Mr. Woods, Steven

17  Woods approached me and taken me to the back of a vehicle --

18  back of Mr. Thompson's vehicle -- car. Car. And at that time

19  the other officer approached Mr. Thompson. And at that time I

20  asked Mr. Woods what the cause for just them taking

21  possession of me, holding me. And he said that I was going --

22  he was going to conduct some type of field search or patdown

23  or something like that. So he conducted a search. And at that

24  time Mr. -- the other officer had Mr. Thompson holding him,

25  you know, holding him by his hand or arm or something like

## Page 63

1  that. And I think the officer told Mr. Thompson's wife or

2  fiance to get out of the vehicle.

3  Q. Wait, now let's take this a piece at a time. When

4  Lieutenant Woods searched you did he find anything?

5  A. Yes, sir.

6  Q. What did he find?

7  A. He found a glass pipe.

8  Q. Did he find any drugs on you?

9  A. No, sir.

10  Q. Did he tell you at that time that you were under arrest?

11  A. Yes, sir.

12  Q. And what was that for?

13  A. For possession of drug paraphernalia.

14  Q. All right.  Now, where was Mr. Thompson during this

15  time?

16  A. He was back -- well, over in front of the officer's car.

17  Q. Now, did you hear Lieutenant Woods during the course of

18  this stop tell Mr. Thompson that he was under arrest for

19  obstructing governmental operations?

20  A. No, sir, I didn't hear him say that.

21  Q. Did you ever see them place Mr. Thompson under arrest?

22  A. Yes, sir.

23  Q. All right. Between the time that the officers pulled up

24  and the time they placed Mr. Thompson under arrest, did Mr.

25  Thompson ever walk towards Lieutenant Woods?

## Page 64

1  A. No, sir, not to my knowing, I don't.

2  Q. Did you ever see Mr. Thompson do anything in a

3  threatening manner towards Lieutenant Woods?

4  A. No, sir.

5  Q. Did you ever see him do anything except stand right

6  where he was when the cops pulled up?

7  MS. HARDWICK:  Your Honor, I am going to object to

8  the leading, he is testifying.

9  THE COURT:  Sustained.

10  Q. Did you ever see him move at all other than stand where

11  he was?

12  A. No, sir.

13  Q. Now, to the best of your knowledge did anybody find any

14  drugs on Mr. Thompson that you could see?

15  A. At that time, sir, no, sir. They found no drugs on me,

16  no drugs on Mr. Thompson.

17  Q. Mr. Lyman, were you transported to the police station?

18  A. Yes, sir.

19  Q. Were you later charged with any other crimes?

20  A. Yes, sir. At that time when I -- they placed me in the

21  cell and I asked Mr. Steven Woods to allow me to make a phone

22  call to call my fiance and my family and let them know what

23  was happening with me and he denied me a phone call.

24  MS. HARDWICK:  Your Honor, we object to this line of

25  question, it doesn't have anything to do with Mr. Thompson.

| Page 65 | Page 67 |
|---|---|

Page 65

1    THE COURT: I sustain.

2    MR. BETHEL: Your Honor, if I may, I would also

3    argue this also goes to the bias of Lieutenant Woods.

4    THE COURT: All right. Go ahead. Overruled.

5    Q. So were you being a little bit loud?

6    A. Yes, sir.

7    Q. And as a result of that what happened?

8    A. He told Mr. Thompson that he is going to charge me with

9    buying a controlled substance because of my mouth. That was

10    for my mouth.

11    Q. Did he charge you with that when he picked you up at the

12    scene?

13    A. No, sir.

14    Q. So that was at the station.

15    A. Yes, sir.

16    Q. After you had been loud.

17    A. Yes, sir.

18    Q. Did you actually get charged with that?

19    A. Yes, sir.

20    Q. And that was based only on what happened when you were

21    arrested at the scene that night.

22    A. Based on what I said at the police station.

23    Q. All right. But it dealt with what happened on the 17th

24    of November.

25    A. Yes, sir.

Page 66

1    MR. BETHEL: No further questions, Your Honor.

2    THE COURT: Cross.

3    CROSS-EXAMINATION

4    BY MS. HARDWICK:

5    Q. Mr. Lyman, you said that a pipe, glass pipe was found on

6    you, right?

7    A. Yes, ma'am.

8    Q. What do you use the glass pipe for?

9    A. What do I use the glass pipe for?

10    Q. Yes, sir.

11    A. They say -- I would like to take the Fifth Amendment,

12    because that's criminal, I still have a case pending.

13    THE COURT: Overruled -- well, you still have a case

14    pending?

15    THE WITNESS: Yes, sir.

16    THE COURT: I won't make him answer it. I will

17    sustain it. Go ahead.

18    MS. HARDWICK: Your Honor, he is coming in

19    testifying, subjecting himself by taking the oath and getting

20    on the stand but testifying partially to what happened. The

21    government feels if he is going to take the stand and testify

22    he should be required to testify to everything.

23    MR. BETHEL: Your Honor, I find it very curious the

24    government would like to shield Lieutenant Woods from

25    testifying about a particular incident because he's facing a

Page 67

1    civil case but they don't want to afford the same courtesy to

2    someone who is facing a criminal case.

3    THE COURT: All right. I sustain it. Let's don't go

4    into the criminal case.

5    Q. Mr. Lyman, a pipe was found on you; is that correct?

6    A. A glass --

7    Q. You testified earlier that a glass pipe was found on

8    you.

9    A. Yes, ma'am.

10    THE COURT: And you were charged with that?

11    THE WITNESS: Yes, sir.

12    THE COURT: Have you had a preliminary trial?

13    THE WITNESS: Yes, sir.

14    THE COURT: What happened?

15    THE WITNESS: They bound me over for the grand jury.

16    THE COURT: When does the grand jury meet?

17    THE WITNESS: They met one time, they meet again in

18    August.

19    THE COURT: What happened when they met?

20    THE WITNESS: They didn't -- they haven't looked at

21    it. It didn't get indicted at that term so they are looking

22    at it still for the next term which will be in August.

23    THE COURT: What is that suit you have on now?

24    THE WITNESS: It's an orange jumpsuit.

25    THE COURT: Is that a prison suit?

Page 68

1    THE WITNESS: Yes, sir.

2    THE COURT: From what prison?

3    THE WITNESS: For the federal prison. Federal

4    inmates being contained over there at the city jail, sir.

5    THE COURT: All right. And that's over the pipe

6    charge?

7    THE WITNESS: No, that's not what I am over there

8    for, no, sir.

9    THE COURT: What are you over there for?

10    THE WITNESS: Just to be a witness for the

11    revocation here.

12    THE COURT: Where are you on the pipe charge?

13    THE WITNESS: I am back in the state penitentiary

14    because they violated my parole for that, sir.

15    THE COURT: All right. I sustain the objection.

16    Q. Mr. Lyman, while you were out there you said that to

17    your knowledge, and he says not as I know of it. When he

18    asked you whether or not they found anything on Mr. Thompson,

19    your response was, not as I know of.

20    A. Yes, ma'am.

21    Q. So you really don't know whether they found anything or

22    not, do you?

23    A. No, ma'am. I was placed in the back seat of the car.

24    Q. And you don't know what else happened regarding Mr.

25    Thompson, do you?

Page 69

1 A. I know that they brought some drugs and put it in the
2 car and said they found it in his car.
3 Q. You say they brought some drugs and put it in the car?
4 A. Well, in the same vehicle I was in. I was in the back
5 seat and he brought it in the front seat and said that that's
6 what he had found in his -- in Mr. Thompson's car.
7 Q. So you are not telling the Court the officers brought
8 some drugs, you are saying they brought some drugs and
9 brought them to the police car from Mr. Thompson's car.
10 A. Right.
11 Q. And placed them in the police car and saying they had
12 found those in Mr. Thompson's car.
13 A. That's what Mr. Steven Woods said.
14 Q. And do you recall on that day calling Mr. Woods over to
15 the car?
16 A. Yes, ma'am.
17 Q. And when you called him over to the car do you recall
18 asking him to make a deal?
19 A. No, ma'am.
20 Q. You don't recall asking him to make a deal?
21 A. No, ma'am.
22 Q. That you didn't have any crack?
23 A. No, ma'am, I never --
24 Q. And you don't recall calling him over to the car telling
25 him that you smoke crack?

Page 70

1 A. No, ma'am, he already knew I smoke crack.
2 Q. You don't recall calling him over to the car and saying
3 that you were trying to buy some crack and that's why you had
4 the money in your hand when he pulled up?
5 A. Them are his words, ma'am.
6 Q. Those are just words?
7 A. His words.
8 Q. His words, okay. So you don't recall saying that?
9 A. No, ma'am.
10 Q. Okay. Do you recall having a parole hearing?
11 A. Yes, ma'am.
12 Q. At your parole hearing was Mr. Anthony present?
13 A. Yes, ma'am.
14 Q. Do you recall being there when you told them that you
15 had borrowed some money not to get gas, cigarettes and lunch,
16 but to buy some drugs with?
17 A. No, ma'am.
18 Q. You didn't say that at your parole hearing?
19 A. I don't remember saying that, ma'am.
20 Q. So if Mr. Anthony should testify here today that that's
21 what you said at your parole hearing, that you had borrowed
22 the money from Mr. Thompson to buy drugs with, he would not
23 be telling the truth.
24 A. No, ma'am, I did not say that.
25 Q. You did not say that at your parole hearing?

Page 71

1 A. I don't remember saying that.
2 Q. So you told them at your parole hearing that you
3 borrowed $25 for gas, cigarettes and lunch?
4 A. Yes, ma'am.
5 Q. And anything else they wouldn't be telling the truth.
6 A. Yes, ma'am.
7 Q. During the time that you were out there you did have
8 money in your hand, didn't you?
9 A. Yes, ma'am.
10 Q. And Officer Woods knew you to be a person who used
11 drugs.
12 A. Yes, ma'am.
13 Q. And that was an area where drugs were sold.
14 A. Yes, ma'am.
15 Q. And you had a glass pipe on you at the time.
16 A. Yes, ma'am.
17 Q. And you really don't know what has happened to Mr.
18 Thompson after you were placed under arrest.
19 A. No, ma'am, no more than they took us to the police
20 station, locked me up and that's all I know. I mean until
21 they took us to the federal.
22       MS. HARDWICK: Those are all my questions, Your
23 Honor.
24       THE COURT: All right. Redirect?
25       MR. BETHEL: No, Your Honor.

Page 72

1       THE COURT: All right. Call your next witness.
2       MR. BETHEL: Your Honor, we call Mr. Marvin
3 Thompson.
4       THE CLERK: Raise your right hand. Do you solemnly
5 swear or affirm that the testimony you are about to give in
6 this cause is the truth, the whole truth, and nothing but the
7 truth, so help you God?
8       THE WITNESS: I do.
9       MARVIN C. THOMPSON, the Defendant, having been
10 duly sworn or affirmed, testified as follows:
11           DIRECT EXAMINATION
12 BY MR. BETHEL:
13 Q. Mr. Thompson, are you the Defendant in this case?
14 A. Yes, sir, I am.
15 Q. Where do you live?
16 A. I live at 2268 15th Avenue Southwest, Lanett, Alabama.
17 Q. Who do you live with, or who lives with you there?
18 A. My mom.
19 Q. How old is your mother?
20 A. My mom is 84 years old.
21 Q. Who provides the primary care for her?
22 A. Myself and my sister, Barbara Thompson.
23 Q. Does she also live with you, your sister?
24 A. No, she has her own residence.
25 Q. Sir, how many caretakers for your mother live at that

| | Page 73 |
|---|---|

1 address?
2 A. Just myself.
3 Q. Does your mother have any health problems?
4 A. Yes, she does.
5 Q. What are those?
6 A. She has maybe third or fourth stage Alzheimers and she
7 is about 80 percent blind.
8 Q. Mr. Thompson, at the time that you were arrested on the
9 17th of November were you employed?
10 A. Yes, sir.
11 Q. Where did you work?
12 A. I was employed at MBM Trucking Company in Lagrange,
13 Georgia.
14 Q. How long have you worked there?
15 A. I had worked there a little over two years, right at two
16 years.
17 Q. Had you filed income tax returns for the time that you
18 worked at that trucking company?
19 A. Yes, sir, I had.
20 Q. Now, on the 17th of November you were arrested; correct?
21 A. Yes, sir.
22 Q. Please tell the Court how it is you came to be at that
23 location on that day.
24 A. Well, myself and my fiance were headed to get some food
25 and we came -- we live the street over from there so we came

| | Page 74 |
|---|---|

1 around that block and around that street on 16th Court where
2 I observed Mr. Lyman, saw Mr. Lyman.
3 Q. Do you know anybody who lives on that street?
4 A. Yes, I do, I also have another cousin who lives on that
5 street right at the location where I stopped.
6 Q. Now, you said you saw Mr. Lyman, what did he do?
7 A. He stopped me.
8 Q. He stopped you?
9 A. Yes, sir.
10 Q. How?
11 A. Basically glanced.
12 Q. When he did that, what did you do?
13 A. I pulled over.
14 Q. Why?
15 A. To see what he wanted.
16 Q. Are you related to Mr. Lyman?
17 A. Yes, sir.
18 Q. How?
19 A. Through my -- my dad says something like third or fourth
20 cousin on my grandfather's side.
21 Q. After you pulled the car over did you get out of the
22 car?
23 A. Yes, sir, I did.
24 Q. And what did you discuss with Mr. Lyman?
25 A. I was asking him what was going on, what did he want,

| | Page 75 |
|---|---|

1 and he was telling me he needed to get some money for some
2 things that he needed. He didn't actually go into the details
3 about what it was.
4 Q. Did you loan him some money?
5 A. Yes, sir, I did. I didn't have what he asked for, I had
6 a 20 and a few ones and I just reached in my pocket and
7 grabbed those and gave those to him.
8 Q. Were you there to sell crack cocaine to Mr. Ernest
9 Lyman?
10 A. No, sir, I don't sell crack cocaine.
11 Q. Have you ever sold crack cocaine since you were released
12 from prison?
13 A. No, sir.
14 Q. Since you were released from prison have you ever been
15 involved with illegal drugs in any way?
16 A. No, sir.
17 Q. On this particular night did Mr. Lyman ask to buy drugs
18 from you?
19 A. No, sir, he did not.
20 Q. All right. Now, as you loaned some money to Mr. Lyman
21 what happened?
22 A. Well, we were standing there for a few more minutes
23 right after that talking when we observed car lights coming
24 towards us from down towards Ram's, I guess that's 16th
25 Street. And while we were standing there the car kept coming

| | Page 76 |
|---|---|

1 towards us and I looked over to Lyman and I said looks like
2 the police coming up. He said oh, yeah.  I said yeah, we are
3 not doing anything but standing here anyway.
4 Q. Did Mr. Lyman attempt to run when you told him there was
5 a police car coming?
6 A. No, sir, neither one of us did.
7 Q. So what happened when the car pulled up?
8 A. When the car pulled up they jumped out of the car and
9 said don't move.
10       THE COURT: What time of day was this?
11       THE WITNESS: This was at night, sir, this was
12 roughly around 10:30 or 11:00 o'clock.
13       THE COURT: All right. Go ahead.
14 Q. Did they have their guns drawn?
15 A. Yes, sir, they did. And they told us not to move, put
16 our hands where they could see them.
17 Q. What did you do?
18 A. I did what they instructed, I put my hands where they
19 could see them, I put them on my car.
20 Q. Where were you standing relative to your car?
21 A. I was standing right on the opposite end where the door
22 opens on the driver's side door.  Mr. Lyman was standing on
23 the opposite side.
24 Q. So what happened next?
25 A. They came up to us. Officer Clark came over to where I

|  | Page 77 |
|---|---|

1  was and Lieutenant Woods went around to the back of the car
2  where Ernest Lyman was.
3  Q. And did they give you any instructions at that point?
4  A. Nothing other than they told us don't move, to stand
5  there and not to move.
6  Q. All right.
7  A. And I asked the question, what have we done wrong? I
8  said what did we do wrong? The reason y'all come up on us
9  like that, jump out of your cars with your gun drawn. I said
10  we haven't done anything wrong.
11  Q. What was the response?
12  A. The response was yes, you did, you parked here on the
13  wrong side of the road facing the wrong direction.
14  Q. What did they do next?
15  A. I asked them, I said isn't that a ticketing offense? I
16  said don't you write a ticket for that or give a warning for
17  something like that? I said I would be more than happy to
18  move on if you will let me. He said no, we are going to call
19  in the drug dog.
20  Q. Did they?
21  A. No, sir, he did not.
22  Q. Okay. Did they ask you to move anywhere?
23  A. After he was having an altercation at the back of the
24  car, which I couldn't quite see with Mr. Lyman, Officer Clark
25  and he -- Officer Clark began to walk back to where he was at

|  | Page 78 |
|---|---|

1  at the back of the car. He told him no, you stay up here with
2  him, and he did. So they continued to kind of wrestle around
3  there at the back of the car. At that time he told me to walk
4  over to the front of their squad car, which was in front of
5  where the camera was on the squad car, and I stood there
6  facing towards where he and Mr. Lyman were and Officer Clark
7  was standing right there with me.
8  Q. What happened next?
9  A. The next thing that happened was another officer came up
10  in a car behind and parked behind the squad car, got out and
11  walked back to where Lieutenant Woods was with Mr. Lyman. He
12  then told him, you stay back here with him. And he did. And
13  he walked around to the passenger side of my car and looked
14  like -- began to say something to my fiance. And I could
15  notice -- I noticed he was saying like get out of the car or
16  would you step out of the car or something to that effect.
17  And at that time that's when I looked at her and she looked
18  at me and she was like what do I do. That was the expression
19  that she had on her face.
20  Q. Did you advance, walk towards Officer Woods in any way
21  at that time?
22  A. No, sir. I never would have done that because Officer
23  Clark was still standing right there beside me and still had
24  his gun out.
25  Q. So did you say anything?

|  | Page 79 |
|---|---|

1  A. Yes, sir.
2  Q. What did you say?
3  A. I told my fiance to give her some information, baby you
4  don't have to get out of the car. I said you haven't done
5  anything wrong.
6  Q. What happened after that?
7  A. Lieutenant Woods shouted at me and said what you must be
8  some kind of lawyer or something. I said no, sir, I said I
9  just feel that I know my rights and I was just instructing
10  her she doesn't have to get out of the car. He said you just
11  need to shut up then. So he then again asked her to get out
12  of the car. She looked at me and I said baby, you don't have
13  to get out of the car if you don't want to. That's when he
14  placed me under arrest for obstruction of government
15  operation. I never moved from the front of that car.
16  Q. How did they place you under arrest?
17  A. At that time he instructed Officer Clark to place me
18  under arrest. He said something about now you are under
19  arrest. Put me in handcuffs, walked me back to the back of
20  the car and put me in the second police car, the one behind
21  the one I was standing in front of.
22  Q. Where did they take you?
23  A. Well, before they took me anywhere they had me sitting
24  in the car, and while I was sitting there in the car one of
25  the officers came back there, the one I guess that was

|  | Page 80 |
|---|---|

1  driving. They put Mr. Lyman in the car in front of me. So
2  at that time that officer came back there and sat down in the
3  car where I was at and I was saying what is going on? You
4  know, what are they going to do with my girlfriend? Can
5  y'all at least give my girlfriend my car.
6  Q. What happened then?
7  A. At that time he got out of the car and went back to
8  where Lieutenant Woods was. And then in a few minutes
9  Lieutenant Woods came back and asked me could he search my
10  car.
11  Q. And what did you say?
12  A. I said no, sir. I said I haven't done anything to give
13  you reason to want to search my car or anything like that.
14  Q. What happened after that?
15  A. That's when -- the next thing I saw they had my
16  girlfriend sitting in front of the car -- in the squad car in
17  front of me. She got out and seemingly left the scene. I
18  didn't see her any more. And so a few minutes later I seen
19  Officer Woods come back to the car in front of me and get
20  something out of the trunk I believe. And he went back to my
21  car and what he seemed to pull out was something like a jimmy
22  kit and he went back to my driver's side and jimmied my lock
23  and unlocked my car and went in my car. And in a few minutes
24  later he came back over to the police car with a bag saying
25  look what I found.

Page 81

1 Q. Did you lock your car, is that why it was locked?

2 A. No, sir. But what I understand happened, my girlfriend

3 when she got out she locked my car by mistake trying to press

4 the window button for the window to roll up.

5 Q. So after that were you transported to the police

6 station?

7 A. A little bit after that, yes, sir.

8 Q. Okay. While you were at the police station did you hear

9 Mr. Lyman making a commotion?

10 A. Yes, sir. He was asking for permission to make a phone

11 call so they could get his brother or his girlfriend down

12 there to get his keys and get word to his job and everything.

13 Q. And was he doing this in a peaceable way or was he a

14 little worked up?

15 A. He was a little worked up, he was upset.

16 Q. And what was Lieutenant Woods' response?

17 A. Lieutenant Woods' response was you need to shut up, keep

18 down all the noise back there. That went on for a little

19 while. Then out of the clear blue sky he come up with this.

20 He told Officer Clark go back there and tell Mr. Lyman, say

21 we are charging him. We are going to charge him with an

22 additional charge. We are going to charge him with

23 attempting to possess crack cocaine and see how he likes

24 that.

25 Q. Did he say anything about why that was important,

Page 82

1 about -- let me ask, is he talking about a felony,

2 misdemeanor, anything along those lines?

3      MS. HARDWICK: We object to leading the witness.

4      THE COURT: I sustain it.

5 Q. Did he say anything at all about why that was important?

6 A. No, sir.

7 Q. Prior do that time had you heard Lieutenant Woods say

8 anything about charging Mr. Lyman with attempting to possess

9 crack?

10 A. No, sir, prior to that time I did not. The only thing

11 that I do remember that he did say a little bit before that,

12 he had charged me -- he had initially charged me with

13 distribution of crack cocaine. And I believe it was Officer

14 Clark had came in or it was another officer that came in, I

15 think it was Officer Clark that looked at what he had typed

16 in and told him that's not going to fly, you are going to

17 be able to charge him with distribution. And he said today

18 is your lucky day, we are going to change this, and he

19 changed it to possession.

20 Q. Now, let's talk about the 3rd of February. Did

21 Lieutenant Woods pull you over on that day?

22 A. Yes, sir, he did.

23 Q. And what was that for?

24 A. He said he pulled me over for failure to use a turn

25 signal.

Page 83

1 Q. Did you fail to use your turn signal that day?

2 A. No, sir, I did not.

3 Q. What happened when you got pulled over that day?

4 A. When I got pulled over that day, my girlfriend and I had

5 been over to her daughter's house. We had seen three or four

6 police officers and a little small SUV come past us and go

7 around the block where 16th Court is. And she looked at me

8 and I looked at her, and I said they are doing what they

9 always do, harassing people. Let's go around here to her

10 daughter's boyfriend's granddaddy's house which is on the

11 same little street, it's a little side driveway. So when we

12 come to the stop sign I put on my signal. My signal light

13 has a problem with it, it doesn't work when you just flip it

14 up, you have to just kind of push it up and down, so I pushed

15 it up one or two times. I am on a dead end street. Pushed

16 it up one or two times and come on out. When I got to the

17 driveway and got ready to turn in I had noticed that they had

18 come up behind me so, of course, I put my signal on again and

19 turned in the driveway. When I pulled in the driveway, that's

20 when he turned the blue lights on me, Lieutenant Woods.

21 Q. Did you pull over?

22 A. I did.

23 Q. What happened when you pulled over?

24 A. He walked up to my driver's side window and it wouldn't

25 let down so I opened the door. He said let's see your

Page 84

1 driver's license, please. I let him see my driver's

2 license. He said can you step out of the vehicle? So I said

3 yes, sir. I stepped out of the vehicle. He said I am going to

4 perform a patdown search on you, check for weapons. So I said

5 all right. He did that. So he said step to the back of the

6 car. I stepped to the back of the car. He told Officer Clark

7 to watch me. He went to his vehicle and called in my

8 driver's license and in a few minutes later it came over the

9 radio I had an FTA for a traffic citation. So when he came

10 back to me he said put your hands behind your back, you are

11 under arrest. I put my hands behind my back. I said what are

12 you arresting me for? He said failure to appear for that

13 traffic ticket that I wrote you on November the 17th.

14 Q. What did you say?

15 A. I said you didn't write me no traffic citation that

16 night. I said that was the first thing I asked you about when

17 you pulled up, and you said I was parked here and parked in

18 the wrong direction. He said yes, I did, you signed it.

19 Pretty much left it at that and told the other officers to

20 take me and put me in the squad car that was parked up the

21 street.

22      MR. BETHEL: Your Honor, may I approach the witness?

23      THE COURT: You may.

24 Q. Mr. Thompson, I am going to show you what is marked as

25 Defendant's Exhibit 1.

| Page 85 | Page 87 |
|---|---|
| 1 A. Yes, sir. | 1 seat of the police car in pain. |
| 2 Q. (complies) That's a traffic ticket that was issued on | 2 Q. What happened after they finished with the search? |
| 3 the 17th of November, traffic ticket number 774. | 3 A. After they finished with the search they turned the |
| 4 A. Yes, sir. | 4 vehicle over to my girlfriend and told the officer to take me |
| 5 Q. There's a name that's on the signature block there, it | 5 on down. They did not come with the officer at that time, the |
| 6 says Marvin Thompson. Is that your signature? | 6 officer took me on down to the police department. |
| 7 A. No, sir, it is not. | 7 Q. Did you ever tell them there was a problem with the |
| 8 Q. Did you sign that ticket? | 8 handcuffs that you had on? |
| 9 A. No, sir, I did not. | 9 A. Yes, sir, I did, from the time that the officer got -- |
| 10 Q. Did you ever see that ticket on the 17th of November? | 10     MS. HARDWICK: Your Honor, we object to this |
| 11 A. No, sir, I did not. | 11 testimony. We are far beyond what happened on November 17th, |
| 12 Q. Retrieving Defendant's Exhibit 1. Now, did you sign for | 12 2005. |
| 13 the ticket that you got on the 3rd of February? | 13     THE COURT: I sustain. Move along, counsel. |
| 14 A. Yes, sir, I did. | 14     MR. BETHEL: All right, Your Honor. |
| 15 Q. Now, what else happened on the 3rd of February when you | 15 Q. When you were taken to the police station what happened |
| 16 were stopped? Did he arrest you? | 16 there? |
| 17 A. Yes, sir. He arrested me and he had the other officer | 17     MS. HARDWICK: Again, Your Honor, we object. We are |
| 18 to take me up to one of his vehicles or their vehicles and | 18 beyond the November 17th, 2005 offense. |
| 19 put me in their vehicle. Handcuffed me behind my back, | 19     THE COURT: I sustain it. |
| 20 Lieutenant Woods did, placed me in their vehicle. And -- | 20     MR. BETHEL: Your Honor, all I am simply trying to |
| 21 well, excuse me, sir, prior to that he asked me could he | 21 establish is that Mr. Thompson, after speaking with the |
| 22 search my car. | 22 Judge, had the failure to appear thrown out on the ticket |
| 23 Q. And what did you say? | 23 from November the 17th, and that there was never any further |
| 24 A. I told him no, sir, you couldn't. My girlfriend was at | 24 problems with his supposed problems with failure to appear. |
| 25 that time in the car with me as well. He asked me could he | 25     THE COURT: Is that correct, Mr. Thompson? |

| Page 86 | Page 88 |
|---|---|
| 1 search my car, I told him no. | 1     THE DEFENDANT: Yes, sir, that's correct. |
| 2 Q. And what did they do? | 2     THE COURT: Go ahead. |
| 3 A. That's when they put me in the police car with my | 3 Q. Now, did Lieutenant Woods pull you over on the 19th of |
| 4 handcuffs behind my back and then they commenced to searching | 4 February? |
| 5 my vehicle. | 5 A. Yes, sir, he did. |
| 6 Q. Did they find anything of interest? | 6 Q. How did that happen? |
| 7 A. They seemed to find some things of interest but it just | 7 A. My girlfriend, I -- her two daughters and grandson were |
| 8 didn't seem like it was anything that they were looking for. | 8 going to the movies. We came out on to what is called Highway |
| 9 Q. Did they find any guns or drugs? | 9 29. They, the officer, Officer Woods and I didn't know at the |
| 10 A. No, sir. | 10 time but Officer Woods -- Lieutenant Woods and Officer Clark |
| 11 Q. After they searched your car what did they do with the | 11 were parked over at the -- I believe Belcher's Jewelry, Coin |
| 12 car? | 12 and Jewelry, and they had a car going up on the back of a |
| 13 A. They gave it to my girl. | 13 wrecker. So at that time we were passing by. Turned on to 29, |
| 14 Q. To do what? | 14 going on down, passed on by where they were. So right as we |
| 15 A. To take home or to drive home so she would have a way | 15 get down where there's an Auto Zone about two or three blocks |
| 16 home. | 16 down from where they were at I look in my rearview mirror and |
| 17 Q. So did they impound your car on this particular | 17 I see a vehicle come out from where they were at coming |
| 18 occasion? | 18 behind me, and I put my signal on and got down by the |
| 19 A. No, sir, they did not. | 19 interstate. |
| 20 Q. They let your girlfriend drive your car home? | 20     MS. HARDWICK: Your Honor, we object. |
| 21 A. Yes, sir, they did. | 21     THE COURT: I sustain the objection. Move along, |
| 22 Q. How long did you sit in that police car with your hands | 22 counsel, to something else. |
| 23 cuffed behind you? | 23     MR. BETHEL: Your Honor, I am simply trying to |
| 24 A. It took them roughly about 35 to 45 minutes to search my | 24 establish this is another traffic stop close in time with |
| 25 vehicle and all during that time I was sitting in the back | 25 really no basis to establish the harassment of Mr. Thompson |

Page 89

1 by Lieutenant Woods, which I believe goes to bias and
2 directly to his credibility.
3       THE COURT: All right. Well, hurry it up if you
4 will. Overruled.
5 Q. Did Lieutenant Woods pull you over?
6 A. Yes, sir, he did.
7 Q. Did he tell you why?
8 A. No, sir, he did not.
9 Q. What did he do?
10 A. He asked me to see my driver's license.
11 Q. Did you say anything to him?
12 A. Yes, sir, I asked him why did he stop me.
13 Q. What did he say?
14 A. He didn't say anything, he just went on back to his car
15 with the driver's license to call it in.
16 Q. What happened while he went back to the car?
17 A. While he went back to the car I guess my girlfriend's
18 grandchildren -- children let the grandbaby aloose from the
19 car seat so the grandbaby stood up and was standing up and
20 waving back towards Lieutenant Woods and Officer Clark.
21 Q. What happened when Lieutenant Woods returned to your
22 car?
23 A. He had a citation.
24 Q. What was that for?
25 A. That was for failure to use child restraint.

Page 90

1 Q. Was that child restrained when you drove by Lieutenant
2 Woods?
3 A. Yes, sir.
4 Q. Was he taken out of the seat only as you were waiting on
5 the side of the road?
6 A. Yes, sir, parked.
7 Q. Did you get a citation for anything else?
8 A. No, sir.
9 Q. Speeding, failure to use your turn signal?
10 A. No, sir.
11 Q. Running a stop sign?
12 A. No, sir.
13 Q. Anything other than failure to use child restraint seat?
14 A. No, sir.
15 Q. Okay. Mr. Thompson --
16 A. Yes, sir.
17 Q. -- on the night that you were arrested on the 17th of
18 November, we have already heard testimony there was a
19 passenger in your car.
20 A. Yes, sir.
21 Q. Was anybody else in your car on that particular day,
22 earlier in the day?
23 A. Yes, sir, there had been a couple of people in my car.
24 Q. Who was in your car earlier that day?
25 A. There was several people. My daughter, she had drove my

Page 91

1 car that day, and then there was another friend of mine who
2 had come by who had cut grass and done yard work for us that
3 day, he went to the store in my car.
4 Q. Are you he trying to tell us that your daughter is
5 responsible for the drugs and gun in that car?
6 A. No, sir.
7 Q. Are you saying it was the other gentleman who drove your
8 car?
9 A. No, sir.
10 Q. Are you saying that you know for certain who was
11 responsible for the drugs and the gun in that car?
12 A. No, sir.
13 Q. Were you responsible for the drugs and the gun in that
14 car?
15 A. No, sir, I had no reason.
16 Q. Was that your fanny pack?
17 A. No, sir.
18 Q. Was it your crack cocaine?
19 A. No, sir.
20 Q. Was it your gun?
21 A. No, sir.
22 Q. If that gun had been fingerprinted would anybody have
23 found your fingerprints on that gun?
24       MS. HARDWICK: Your Honor, we object to the leading
25 of this witness, Mr. Bethel is simply testifying.

Page 92

1       THE COURT: I sustain. Do not lead.
2 Q. Mr. Thompson, are you guilty of the violations in the
3 petition?
4 A. No, sir.
5       MR. BETHEL: No further questions, Your Honor.
6       THE COURT: Cross. Let's move along, Ms. Hardwick,
7 this is not a first degree murder case.
8       MS. HARDWICK: Yes, Your Honor.
9            CROSS-EXAMINATION
10 BY MS. HARDWICK:
11 Q. Mr. Thompson, when you testified that you got into the
12 car after two other people had driven the car --
13 A. Yes, ma'am.
14 Q. -- you didn't see the officers go in the trunk and get
15 anything out, did you?
16 A. No, ma'am.
17 Q. You didn't see them go in the back seat and get anything
18 out, did you?
19 A. No, ma'am, I couldn't see.
20 Q. So the fanny pack is on the front seat, you get in the
21 car after two people have driven your car, you don't look at
22 it and you know it's not yours.
23 A. Could you ask that question again?
24 Q. You are testifying that the fanny pack was not yours; is
25 that correct?

| Page 93 | Page 95 |
|---|---|
| 1 A. That's correct. | 1 Number 1? |
| 2 Q. And you got into your car and it's in your car in the | 2 A. Yes, ma'am. |
| 3 front seat area; is that correct? | 3 Q. Would you read the part at the bottom of that ticket, |
| 4 A. I have no idea, ma'am. | 4 that same ticket, would you read that for the record, please. |
| 5 Q. It was gotten out of your car. | 5 A. Case transferred to Circuit Court, something, be -- |
| 6 A. There was nothing in my front seat, ma'am, so I can't | 6 can't really make out what it's saying, of pending felony |
| 7 say that it was. | 7 charge, and then something Judge Melford. |
| 8 Q. So are you saying you saw them go to the patrol car and | 8 Q. Is that the Judge that you went before? |
| 9 get something and put it in your car? | 9 A. Yes, ma'am. That's the Judge that I have been before, |
| 10 A. I couldn't see them because I was in the back of the | 10 yes, ma'am. |
| 11 squad car, in the second car behind the car in front of me, I | 11 Q. Did you go before him on this ticket? |
| 12 couldn't even see my car. | 12 A. No, ma'am. |
| 13 Q. So the explanation that you have given the Court is you | 13 Q. Do you see the transfer here of case transferred to |
| 14 don't know how it got in there but there were two other | 14 Circuit Court to be disposed of with pending felony charges? |
| 15 people that drove your car? | 15 A. Yes, ma'am. |
| 16 A. Yes, ma'am. | 16 Q. Do you see that on there? |
| 17 Q. Wouldn't it be common sense that if you find something | 17 A. Yes, ma'am. |
| 18 in your car you would look in it and try to find out what it | 18 Q. Signed by the Judge? |
| 19 is? | 19 A. Yes, ma'am. |
| 20 A. Would it be common sense? | 20 Q. Those ticket numbers are the same, aren't they? |
| 21 Q. Yes. | 21 A. Yes, ma'am. |
| 22 A. I don't understand the question. | 22 Q. And they are the same as your Defendant's Exhibit Number |
| 23 Q. You see something in your car that you didn't put there | 23 1. |
| 24 and you don't know how it got there, wouldn't it be a natural | 24 A. Yes, ma'am. |
| 25 response for the person to look in it and see what is in it? | 25 Q. So wouldn't it be a fair statement to say, Mr. Thompson, |

| Page 94 | Page 96 |
|---|---|
| 1 A. Yes, ma'am, it would. | 1 that that ticket has not been disposed of? |
| 2 Q. So, and you didn't see them put anything in your car. | 2 A. Yes, ma'am. |
| 3 A. No, ma'am, I didn't. | 3 Q. It's disposed of in the traffic court but the Judge |
| 4 Q. Now, I am going to show you -- when you go in to the | 4 referred it to be considered with your pending felony charge, |
| 5 probation officer you are required to sign a report showing | 5 didn't he? |
| 6 that you are reporting in; is that correct? | 6 A. He did after I was arrested for it. |
| 7 A. Yes, ma'am. | 7 Q. Exactly. |
| 8    MS. HARDWICK: May I approach, Your Honor? | 8 A. Yes, ma'am. |
| 9    THE COURT: Yes. | 9 Q. So it wasn't thrown out and disposed of as Mr. Bethel |
| 10 Q. (complies) This is a probation report that you signed on | 10 asked you earlier here today. |
| 11 November the 2nd, 2005; is that your signature? | 11 A. He didn't ask me was it thrown out. |
| 12 A. Yes, ma'am. | 12 Q. He stated -- he asked you whether or not that case was |
| 13 Q. Okay. I want you to compare this ticket which is | 13 over with and that you had heard nothing else regarding that |
| 14 7950774, is that an exact copy of the same ticket that is | 14 case. |
| 15 your Defendant's Number 1? | 15    MR. BETHEL: Your Honor, what I asked him was if the |
| 16 A. Is this and this the same ticket? | 16 failure to appear had been resolved, not if the ticket itself |
| 17 Q. Yes. | 17 had been resolved. |
| 18 A. Yes, ma'am. | 18    THE DEFENDANT: Right. |
| 19 Q. The numbers are the same. | 19    MR. BETHEL: I asked him if the failure to appear |
| 20 A. Yes, ma'am. | 20 had been resolved and that's what he answered, not what Ms. |
| 21 Q. Would you look at the second part of that ticket, and | 21 Hardwick is asking. |
| 22 compare those numbers. | 22 Q. So the case had been resolved because the Court |
| 23 A. 7950774. | 23 transferred your case regarding that ticket that you were |
| 24 Q. Is that the same number that is your Defendant's | 24 given on November 17th to be disposed of with your pending |
| 25 Exhibit -- that is admitted by your counsel, Defendant's | 25 felony case. |

Page 97

1   A. No, ma'am, the failure to appear was disposed of because
2   I was arrested wrongfully for failing to appear for something
3   that should have been bound over with my felony charges as my
4   attorney had requested previously.
5   Q. Okay. We understand that, Mr. Thompson.
6   A. Yes, ma'am.
7   Q. The point is, the ticket that you were issued, you were
8   issued a ticket for November the 17th, 2005.
9   A. It wasn't given to me to sign. It wasn't issued to me.
10  Q. It was written for that day. You want to look at the
11  date again?
12  A. Yes, ma'am. He might have written it for that date but I
13  never signed it on that date. I never saw it on that date
14  nor was I given it on that date.
15  Q. So that ticket is still pending, isn't it?
16  A. Yes, ma'am.
17  Q. So there is a ticket of record for prohibited stopping
18  on November the 17th, 2005.
19  A. There is now.
20  Q. There is and has been since it was filed and bound over
21  to the Circuit Court, hasn't it?
22  A. I don't know, ma'am. I don't know how long, I can't
23  speculate that. But I do know I went to the clerk's office to
24  check and inquire as to when that ticket was turned in and
25  they informed me that that ticket hadn't been turned in until

Page 98

1   like around the 5th of December, weeks and weeks after they
2   were supposedly issued.
3   Q. And when you were arrested on November 17th, 2005 and
4   taken into custody you are saying that your girlfriend
5   accidentally locked the car.
6   A. I am saying that that's what Lieutenant Woods said.
7   That's what he told me, I didn't know what happened.
8   Q. And she didn't ask to leave.
9   A. She didn't ask to leave?
10  Q. I am asking you, did you hear her ask to leave?
11  A. I wasn't there, I was in the police car.
12          MS. HARDWICK: Just one moment. Okay. Those are all
13  the questions I have for this witness.
14          THE COURT: Redirect?
15                REDIRECT EXAMINATION
16  BY MR. BETHEL:
17  Q. Mr. Thompson, since Ms. Hardwick was determined to ask
18  you about the failure to appear, can you explain to this
19  Court, please, how you resolved the problem with your failure
20  to appear?
21  A. Yes, sir.
22  Q. What happened?
23  A. After I come from the hospital having my hand examined I
24  went to the courthouse to check to find out about this ticket
25  that I supposedly had been written on the 17th that I knew

Page 99

1   nothing about. I went to the clerk's office. While going up
2   the ramp to the clerk's office I joined Judge Milford coming
3   up the hallway and I asked him could I speak with him and he
4   said yes. I said sir, I have a ticket here that I was
5   supposedly written on the 17th that I know absolutely nothing
6   about, that I did not sign. I said my attorney supposedly had
7   everything bound over with this ticket. He stopped me before
8   I could even continue to speak. He said so that must have
9   slipped through the cracks then. He said even if you are
10  saying that --
11          MS. HARDWICK: Your Honor, we object to all this
12  hearsay that I won't have an opportunity to cross-examine
13  what Judge said this. Other documents that I presented
14  before him is something in writing, he could tell us anything
15  here today.
16          THE COURT: Overruled. Go ahead.
17  Q. Please continue.
18  A. So at that time he said that this must have slipped
19  through the cracks or I don't know what happened with the
20  ticket. But what I will do is have you to go into my
21  chambers, go into the courtroom where my clerk is, have her
22  to call Montgomery, tell them to reinstate your driving
23  privileges because my driving privileges had been suspended
24  because I had supposedly failed to appear. And said have her
25  to do that, call and contact the Lanett police department

Page 100

1   where they have your driver's license, because I had told him
2   they had my driver's license, tell them to hold your driver's
3   license, do not send your driver's license in and you will be
4   down there to pick them up and we will get this matter
5   resolved.
6   Q. Did you get your driver's license returned?
7   A. Yes, sir.
8   Q. Were your driving privileges reinstated?
9   A. Yes, sir.
10          MR. BETHEL: That's all.
11          THE COURT: Any further questions?
12          MS. HARDWICK: No, sir.
13          THE COURT: Call your next witness.
14          MR. BETHEL: No further questions. Your Honor, the
15  defense rests.
16          THE COURT: Any argument the Court needs to hear?
17          MS. HARDWICK: Your Honor, there's no further
18  argument but there's further testimony that the government
19  would like to obtain from Mr. James Chappell. And it's brief.
20          MR. BETHEL: Your Honor, may the Defendant step down
21  from the stand?
22          THE COURT: You may step down.
23          THE WITNESS: Thank you.
24
25

Page 101

1    JAMES CHAPPELL, witness for the Government,
2  having been previously duly sworn or affirmed, testified as
3  follows:
4              DIRECT EXAMINATION
5  BY MS. HARDWICK:
6      MS. HARDWICK: May I approach, Your Honor?
7      THE COURT: Yes.
8  Q. Mr. Chappell, I am going to hand you what has been
9  admitted as Defendant's Exhibit 1, which is a copy of a
10 traffic citation issued to Mr. Thompson. Do you see the
11 signature at the bottom?
12 A. Yes, ma'am, the defendant's signature next to it.
13 Q. Have you had reports submitted to you by the Defendant
14 on a regular basis since you have been supervising him?
15 A. Yes, ma'am, I have. Monthly supervision report.
16 Q. And approximately how long have you been supervising Mr.
17 Thompson?
18 A. He has been submitting them since he has been on
19 supervision since '01, but I have had him since October of
20 '04.
21 Q. So approximately five, going on six years?
22 A. Almost five years.
23 Q. I am going to show you a copy which was also shown to
24 Mr. Thompson when he was on the stand and he admitted it was
25 his signature, a November, 2005 report that he signed and

Page 102

1  submitted in compliance with his probation. (complies) Are
2  you familiar with the signature of Mr. Marvin C. Thompson
3  based on the almost five years of him signing those
4  compliances?
5  A. Yes, ma'am.
6  Q. And do you recognize the report to be the signature of
7  Mr. Thompson?
8  A. Yes, ma'am, it is.
9  Q. Again, I refer you back to the citation that was issued
10 which is Defendant's Exhibit 1. Do you see a signature on the
11 citation for Defendant's Exhibit 1?
12 A. Yes, ma'am, I do.
13 Q. Would you compare or look at those signatures and can
14 you tell the Court whether you recognize that to be the same
15 signature that you have observed in your reports for almost
16 five years?
17 A. It looks very, very similar. The same signature.
18     MS. HARDWICK: Nothing further, Your Honor.
19     THE COURT: May I see it?
20     MS. HARDWICK: Yes, Your Honor.
21     THE COURT: You offer it into evidence? You offer
22 it?
23     MS. HARDWICK: May I substitute a copy, Your Honor?
24     THE COURT: You may later.
25     MS. HARDWICK: Thank you. Your Honor, this would be

Page 103

1  the report. May I tender it to the clerk? And it's already
2  admitted Defendant's Exhibit 1.
3      THE COURT: If it's admitted, I don't recall
4  admitting it. It is admitted. Come here and point out the two
5  signatures for me.
6      THE WITNESS: Your Honor, may I?
7      THE COURT: Yes.
8      THE WITNESS: This signature right here for Marvin
9  Thompson.
10     THE COURT: Speak up where everybody can hear you.
11     THE WITNESS: What I pointed out down here is the
12 signatures of Marvin Thompson submitted with his monthly
13 report, right here, Judge. And the signature on the ticket
14 to me is the same or identical.
15     THE COURT: In your opinion.
16     THE WITNESS: Yes, sir.
17     THE COURT: All right. Madam clerk. (complies)
18 Government's Exhibit 1 is admitted. All right. Cross.
19          CROSS-EXAMINATION
20 BY MR. BETHEL:
21 Q. Mr. Chappell, you are not a handwriting expert, are you?
22 A. No, sir.
23 Q. You have to admit, wouldn't you, it's only common sense
24 if somebody was trying to forge Mr. Thompson's signature they
25 would make it look as much like his signature as possible?

Page 104

1  A. If someone was trying to do that.
2  Q. That's only common sense, isn't it, Mr. Chappell?
3  A. Yes, sir.
4      MR. BETHEL: Thank you. No further questions, Your
5  Honor.
6      THE COURT: Any redirect?
7      MS. HARDWICK: No further questions, Your Honor.
8      THE COURT: Step down.
9      THE WITNESS: Thank you, Your Honor.
10     MS. HARDWICK: The government calls one other
11 witness, Your Honor, in rebuttal to the defense's testimony,
12 Mr. John Anthony.
13     THE COURT: John Anthony, take the stand. Stand and
14 be sworn first.
15     THE CLERK: Do you solemnly swear or affirm that the
16 testimony you are about to give in this cause is the truth,
17 the whole truth, and nothing but the truth, so help you God?
18     THE WITNESS: I do.
19     JOHN ANTHONY, witness for the Government, having
20 been duly sworn or affirmed, testified as follows:
21          DIRECT EXAMINATION
22 BY MS. HARDWICK:
23 Q. Would you state your name and your employment, please.
24 A. John Anthony, Alabama Board of Pardons and Paroles.
25 Q. Mr. Anthony, were you present during a parole hearing

| Page 105 | Page 107 |
|---|---|
| 1 that Mr. Lyman who testified here earlier participated in? | 1 Your Honor. |
| 2 A. I was. | 2 THE COURT: Step down. |
| 3 Q. During that time did Mr. Lyman give a statement or | 3 MS. HARDWICK: Your Honor, may this witness be |
| 4 testimony? | 4 excused? |
| 5 A. He did. | 5 THE COURT: Yes. If there's no objection from the |
| 6 Q. And did he give a statement or testimony regarding what | 6 defense. |
| 7 happened on November 17th, 2006 when he was arrested? | 7 MR. BETHEL: No objection, Your Honor. |
| 8 A. Yes. | 8 THE COURT: All right. |
| 9 Q. Was he posed questions regarding the money that he had | 9 MS. HARDWICK: Those are all the rebuttal witnesses, |
| 10 in his possession, approximately $20? | 10 Your Honor. |
| 11 A. Yes. He stated that -- he stated that he was in the | 11 THE COURT: All right. The defense has nothing |
| 12 area -- that he was a drug addict, that he was in the area to | 12 further? |
| 13 purchase drugs, and that he was in the area to borrow $20 I | 13 MR. BETHEL: Nothing further, Your Honor, sir. |
| 14 believe from Mr. Thompson to purchase drugs. | 14 THE COURT: The government? |
| 15 Q. And he didn't mention anything about getting the money | 15 MS. HARDWICK: No, Your Honor. |
| 16 for gas or lunch or anything as he has testified here today? | 16 THE COURT: You want to argue the matter further? |
| 17 A. No, he stated he was there to borrow the money to | 17 MS. HARDWICK: Nothing further, Your Honor, other |
| 18 purchase crack. | 18 than what the government has already submitted. |
| 19 MS. HARDWICK: Nothing further, Your Honor, from | 19 THE COURT: Now, I understand the defense's position |
| 20 this witness. | 20 to be that the officer in question, Lieutenant Wood or Woods? |
| 21 THE COURT: What is your occupation? | 21 THE WITNESS: Woods, sir. |
| 22 THE WITNESS: I am a parole officer, hearing officer | 22 THE COURT: Woods. Lieutenant Woods is biased and |
| 23 for pardons and paroles. | 23 prejudiced towards the Defendant, as demonstrated by the |
| 24 THE COURT: State of Alabama? | 24 evidence you have submitted, and that that carries over to |
| 25 THE WITNESS: Yes, sir. | 25 his credibility in this case. That's your defense, is it |

| Page 106 | Page 108 |
|---|---|
| 1 THE COURT: How long have you been so employed? | 1 not? |
| 2 THE WITNESS: 19 years. | 2 MR. BETHEL: That's part of it, yes, Your Honor. |
| 3 CROSS-EXAMINATION | 3 THE COURT: What is the remainder of it? |
| 4 BY MR. BETHEL: | 4 MR. BETHEL: Again, Mr. Thompson has testified under |
| 5 Q. Good afternoon, Mr. Anthony. | 5 oath, he has said that the gun, the crack did not belong to |
| 6 A. How you doing? | 6 him, he didn't know it was there. You heard Mr. Lyman testify |
| 7 Q. Was this particular hearing recorded verbatim? | 7 he was not attempting to purchase crack cocaine from Mr. |
| 8 A. No. | 8 Thompson, but only to borrow money. The parole officer who |
| 9 Q. So there's no transcript of this particular hearing. | 9 testified that's what Mr. Lyman testified at his parole |
| 10 A. No, sir, we just do a -- I complete a hearing report and | 10 hearing. |
| 11 send it to the parole board with a recommendation as to | 11 THE COURT: That's his credibility as to what |
| 12 revoke or reinstate the person to parole. | 12 happened. |
| 13 Q. So Mr. Lyman said the reason he was talking to Mr. | 13 MR. BETHEL: Yes, sir, Your Honor. That's in |
| 14 Thompson on that evening was to borrow money from Mr. | 14 addition to our arguments about Lieutenant Woods' |
| 15 Thompson; correct? | 15 credibility. And again I would just point out for the Court |
| 16 A. He stated he was there to borrow money from Mr. | 16 that the ticket numbers and case numbers, and I have marked |
| 17 Thompson. I think it was $20, I believe. | 17 some additional Defendant's exhibits, I had a total of -- |
| 18 Q. He never suggested that he was buying crack cocaine from | 18 Your Honor, at this time, of Defendant's exhibits, we had 14 |
| 19 Mr. Thompson, did he? | 19 previously marked that I had provided to Ms. Hardwick. I |
| 20 A. No, he specifically stated he was not purchasing crack | 20 have additionally marked Defendant's Exhibits 15, 16, 17 and |
| 21 cocaine from Mr. Thompson, he said he was only borrowing | 21 18, and I would ask to have those admitted at this time. I |
| 22 money from Mr. Thompson to purchase drugs. | 22 believe Ms. Hardwick will probably have an objection to |
| 23 MR. BETHEL: No further questions, Your Honor. | 23 Defendant's Exhibit 19. I am going to show those to her now. |
| 24 THE COURT: Redirect? | 24 That's 15. |
| 25 MS. HARDWICK: Nothing further from this witness, | 25 THE COURT: What is 19? |

| Page 109 | Page 111 |
|---|---|

**Page 109**

1   MR. BETHEL: One moment, Your Honor, as I finish

2   showing Ms. Hardwick these. (complies) 19 is a page from

3   Lieutenant Woods' personnel file, Your Honor.

4   MS. HARDWICK: Your Honor, the government has

5   objections not only to the 19, the government has objections

6   to Defendant's Exhibit 6 which was not offered during the

7   proceeding and it is a tax record. The tax records are not

8   in question here. We object to Defendant's Exhibit 6. We

9   object to Defendant's Exhibit 7 which is a newspaper article

10   that carries no bearing to this hearing. It did not involve

11   Mr. Thompson. We would object to Defendant's Exhibit I

12   believe 11, 12, 13, there's been no testimony regarding those

13   items. The only item that was admitted during that group was

14   Defendant's Exhibit 14.

15   MR. BETHEL: Your Honor, again, in an attempt --

16   this is not a court -- it's not a trial, the rules of

17   evidence don't apply.

18   THE COURT: I hope it's a court.

19   MR. BETHEL: I'm sorry, Your Honor, it's not a

20   trial. Excuse me, Your Honor, it's not a trial. The rules of

21   evidence don't apply. I was simply trying to save the Court

22   some time. If she really has an objection for instance to 11,

23   12 and 13, which are nothing more than additional pictures of

24   that particular intersection I would be happy to call Mr.

25   Woods back or Mr. Thompson and lay the foundation to those.

**Page 110**

1   It seems to me a silly exercise and a waste of the Court's

2   time. The tax records again I will be happy to call him to

3   the stand. We are simply trying to establish with those that

4   Mr. Thompson was gainfully employed and paying taxes and a

5   tax-paying citizen at the time this supposedly happened. If

6   she really has objections I will be happy to reopen the

7   defense case to lay the foundation.

8   MS. HARDWICK: Your Honor, my objection is not

9   whether he can lay the foundation, the objection is

10   relevancy, whether his tax records have anything to do with

11   what happened on November 17th.

12   THE COURT: Suppose I let them in for whatever they

13   are worth.

14   MS. HARDWICK: That's up to Your Honor.

15   THE COURT: I will let them all in for whatever they

16   are worth. Except the one about the officer's personnel

17   records?

18   MR. BETHEL: Could we be heard at side-bar so we

19   don't discuss that in open court, Your Honor?

20   THE COURT: No. Let me see it.

21   MR. BETHEL: (complies)

22   THE COURT: There's not room to get up here for a

23   side-bar is the reason I say that, with all this junk up

24   here.

25   MR. BETHEL: Yes, Your Honor.

**Page 111**

1   THE COURT: All right. This is a verbal reprimand

2   for failure to turn on your audio.

3   MS. HARDWICK: Your Honor, we do object to that

4   Exhibit 19.

5   THE COURT: The microphone, that's what it is,

6   that's the one the testimony came in.

7   MR. BETHEL: Yes, Your Honor.

8   THE COURT: All right. It will be admitted for

9   whatever it's worth. Madam clerk. (complies)

10   MR. BETHEL: And Your Honor, I will provide her with

11   Defendant's Exhibits additional 1 through 18 at this time.

12   THE COURT: All right. Let me see them. These are

13   the ones that have not been ruled on?

14   MR. BETHEL: Yes, Your Honor, those include the ones

15   Ms. Hardwick raised an objection to.

16   MS. HARDWICK: Your Honor, particularly we'd like to

17   reference the Court to Exhibit Number 7.

18   THE COURT: I am reading it right now.

19   (pause)

20   THE COURT: All right. It will be admitted for

21   whatever it's worth. Ms. Hardwick, do you object to 11, 12,

22   13?

23   MS. HARDWICK: Your Honor, we object to all of

24   those.

25   THE COURT: They are photographs of the scene.

**Page 112**

1   MS. HARDWICK: We do, to the additional

2   photographs. There was one that there was testimony

3   regarding.

4   THE COURT: Which is the one?

5   MS. HARDWICK: Which was number 14.

6   THE COURT: All right. Number 14 is admitted.

7   MR. BETHEL: Your Honor, as I said, if Ms. Hardwick

8   really has any questions about the authenticity or the

9   accuracy of those other photographs I am happy to call Mr.

10   Thompson or Lieutenant Woods back to the stand.

11   THE COURT: Doesn't Exhibit 14 show the same thing?

12   MR. BETHEL: Yes, Your Honor, just different views

13   of the same thing.

14   THE COURT: Then the Court finds that 14 is adequate

15   to bring all the facts before the Court.

16   MR. BETHEL: Very well, Your Honor.

17   THE COURT: And 14 will be admitted. The others,

18   11, 12, and 13 I sustain objection to those. Madam clerk.

19   (complies) All right. Now, anything else from the

20   government?

21   MS. HARDWICK: No, Your Honor.

22   THE COURT: Anything else from the Defendant?

23   MR. BETHEL: No, Your Honor.

24   THE COURT: Other than your argument made on your

25   motion which the Court took under advisement and carried with

Page 113

1 the case, do you have any other argument to make?
2 MR. BETHEL: Only, Your Honor, that I think that the
3 additional testimony that was elicited from Mr. Thompson
4 about the other traffic stops, being pulled over for not
5 using a turn signal, for having a child out of a child
6 restraint seat, I think that the manner in which those stops
7 were made, what was done at those stops make it clear that
8 Lieutenant Woods was on the lookout, he was looking out for
9 Mr. Thompson on those other occasions. The last occasion
10 refused to tell him why he pulled him over and didn't write
11 him a ticket for the child being out of the child restraint
12 until he noticed that the child was out of the seat and waved
13 to him. It clearly couldn't have been why he pulled him over,
14 because the child wasn't standing up when he drove by
15 Lieutenant Woods.
16 I think it's clear from the ticket numbers and the
17 case numbers he never wrote a ticket on the 17th of November
18 to Mr. Thompson. I think it's clear he saw what he thought
19 was a crack deal going down because he knew Mr. Lyman was a
20 crack addict and was disappointed to find that wasn't the
21 case so he needed an excuse to get in the car and the excuse
22 was this obstruction of governmental investigations.
23 And we still don't know by a preponderance of the
24 evidence to whom that bag belonged, to whom that crack
25 belonged, to whom that gun belonged. We do know there was a

Page 114

1 person in the car at the time the police pulled up and that
2 was a passenger and not Mr. Thompson. And I submit to this
3 Court based upon the testimony of Mr. Chappell about the
4 exemplary citizen he has been.
5 THE COURT: Does he contend that the young lady in
6 the car was the owner of the fanny pack?
7 MR. BETHEL: He does not. He does not know who the
8 owner of the fanny pack is and does not point the finger at
9 anybody. He has simply stated in addition to the passenger
10 in the car there were other people who had access to his car
11 and drove the car that day. The Court knows, Ms. Hardwick
12 knows that many times when we have folks in here who are
13 being prosecuted for instance for the distribution of illegal
14 drugs, they are not gainfully employed, they don't have other
15 jobs, other than selling crack cocaine or methamphetamine,
16 whatever the case may be. That's why they end up being
17 represented by our office as indigent Defendants. Mr.
18 Thompson is not as indigent as they are because he obviously
19 has been working for a living and was working for a living.
20 THE COURT: What is he doing with an appointed
21 lawyer?
22 MR. BETHEL: Because based upon his debt, the amount
23 of money he was making at the time, that was not -- that was
24 the Magistrate Judge who appointed us to represent Mr.
25 Thompson. But it's clear from the exhibits we have submitted

Page 115

1 he was working at the time. If anybody in this courtroom
2 deserves the benefit of the doubt that should be Mr. Marvin
3 Thompson. The government simply has not established by a
4 preponderance of the evidence who that bag belonged to, and
5 because of that, the benefit of the doubt should go to Mr.
6 Thompson, Your Honor.
7 THE COURT: All right. Ms. Hardwick?
8 MS. HARDWICK: Nothing further from the government,
9 Your Honor.
10 THE COURT: All right. Of course, counsel, you know
11 possession may be actual or constructive. That's United
12 States versus Riggins, 1977, 5th Circuit. Possession also
13 can be either joint or sole. Same case, Riggins. Actual
14 possession requires the Defendant either has physical
15 possession of it, has actual personal dominion over the thing
16 alleged possessed. United States versus DeRose, 74 F.3d,
17 1177, 1185, 11th Circuit, 1996. Constructive possession is
18 the knowing exercise of, or the knowing power or right to
19 exercise dominion and control over the proscribed substance.
20 Holmes versus Kucynda, K-U-C-Y-N-D-A, 321 F.3d 1069, 1079-80,
21 that's the 11th Circuit 2003. Constructive possession need
22 not be exclusive, and may be proven through circumstantial
23 evidence that shows ownership, dominion or control over the
24 drugs or the premises where the substance is located. Same
25 case, page 1080.

Page 116

1 Now, the Court will read the sentence and statement
2 of reasons which were proffered to the Court as a proposed
3 sentence and statement of reasons. The Court finds that the
4 violation constitutes a grade A violation as stated in 7B1.1
5 of the guidelines and that the Defendant's criminal history
6 category was determined at the time of sentencing to be
7 category IV.
8 The Court finds that you have been in possession of
9 a controlled substance. Pursuant to 18 U.S.C. 3583(g), the
10 term of supervised release shall be revoked and you shall be
11 required to serve a term of imprisonment.
12 The Court finds that you have been in possession of
13 a firearm as defined in 18 U.S.C. Section 921. Pursuant to 18
14 U.S.C. Section 3583(g), the term of supervised release shall
15 be revoked and you shall be required to serve a term of
16 imprisonment.
17 On the Court's finding of guilt as to violations
18 number one, two and three of the violation petition, the
19 counts one, two and three, it is ordered that the term of
20 supervised release imposed on January 22, 1993 is hereby
21 revoked. Pursuant to the Sentencing Reform Act, it's the
22 judgment of the Court that the Defendant is hereby committed
23 to the custody of the United States Bureau of Prisons, and I
24 will hear from both parties as to what the sentence ought to
25 be. The Defendant?

Page 117

1     MR. BETHEL: Your Honor, I believe that the
2 guideline range in this case is 37 to 46 months.
3     THE COURT: That's correct. Probation people
4 recommend 46 months.
5     MR. BETHEL: Your Honor, for the life of me --
6     THE COURT: statutes -- those are advisory only; am
7 I correct?
8     MR. BETHEL: Absolutely, Your Honor.
9     THE COURT: The statute is what, Madam law clerk?
10     LAW CLERK: Five years.
11     THE COURT: The statute has a limit of five years.
12     MR. BETHEL: Yes, Your Honor. For the life of me I
13 do not understand why probation has recommended the maximum
14 guideline range in this case.
15     THE COURT: we will ask them. We will ask them in a
16 minute.
17     MR. BETHEL: Because what we have here is a
18 Defendant as I said who has been a model citizen -- other
19 than this has been a model citizen since the time he was
20 released from prison. He has had no problems during the
21 course of his supervision. And to send him back to prison
22 for 46 months is -- to me just has no rhyme or reason to it
23 other than they picked that number right out of their hat. I
24 have been in a number of revocation hearings and I have been
25 in a number of revocation hearings where the Defendants had

Page 118

1 far more problems during the course of his supervision before
2 they were finally revoked, and did not receive the high end
3 of the guidelines range, much less something above that, and
4 for the life of me I cannot understand how it makes sense for
5 this Defendant, Your Honor.
6     THE COURT: Let's ask them. Let's hear from
7 probation.
8     PROBATION OFFICER: Your Honor, we recommend 46
9 months just due to the incident nature of the offense. The
10 Defendant is in possession of a weapon which could be another
11 federal charge, and allegedly possession of controlled
12 substance. Just the nature of the offense brings about a
13 recommendation for the high end of the guideline range.
14     THE COURT: How does this recommendation compare to
15 others of similar circumstances?
16     PROBATION OFFICER: Your Honor, my personal
17 recommendations if they are such an offense I always
18 recommend the high end of the guideline range.
19     THE COURT: If there's a firearm involved?
20     PROBATION OFFICER: Yes, sir. I take that very
21 serious in any community, if it's in Lanett or Montgomery or
22 Opelika, whatever, I think it's very serious.
23     THE COURT: All right. Mr. Supervisor, do you want
24 to make a statement?
25     SUPERVISING PROBATION OFFICER: No, sir, other than

Page 119

1 to confirm what Mr. Chappell has just said, when an offense
2 involves a weapon, a substantial amount of drugs, we tend to
3 go to the high end of the guidelines or even beyond the
4 guidelines.
5     THE COURT: You have gone beyond the guidelines?
6     SUPERVISING PROBATION OFFICER: Yes, sir, there have
7 been instances where we have gone to the statutory maximum in
8 cases such as this.
9     THE COURT: All right. You want to ask any
10 questions, counsel?
11     MR. BETHEL: No, Your Honor.
12     THE COURT: I will hear from the government.
13     MS. HARDWICK: The government defers to the Court,
14 Your Honor.
15     THE COURT: All right. The Defendant is hereby --
16 you want to say anything before I sentence you, Mr. Thompson?
17     THE DEFENDANT: Yes, Your Honor. I would ask Your
18 Honor that I be allowed to have 60 days to take care of the
19 care of my mom who will be left without any care, home care
20 for herself. My sister won't be able to do it by herself. I
21 would like to have some time to self-surrender and do so. As
22 has been spoken I have since the time you sentenced me back
23 in 1991 done nothing but the right thing. I have worked, I
24 have taken care of my family. I have reestablished relations
25 with my daughter, son and mother. I have done nothing but try

Page 120

1 to do right and work, sir, for a living, from the time I got
2 out in 2001 all the way up until today, sir.
3     THE COURT: Well, let me tell you what the evidence
4 looks like on the other side. Your lawyer has done a very
5 fine job of presenting it on your side.
6     THE DEFENDANT: Yes, sir.
7     THE COURT: Here you are in the late evening, 10:30
8 at night under a street light in a neighborhood that's a high
9 crime area. And there's your car with a fanny pack in the
10 front seat full of cocaine and a pistol. And you say you
11 don't know anything about it but you can't say to whom it
12 belongs. And you have care, custody and control of the car
13 and dominion over the car. And you have a female in the car
14 and you have your cousin who comes up and says he wants to
15 borrow money from you and has money in his hand, $20. It
16 just adds up against you, particularly by a preponderance of
17 the evidence, which means slightly more than likely. Somewhat
18 more than likely, as opposed to not likely. And I concur with
19 probation that possession of a firearm is a very, very
20 serious offense. If you don't believe it read the Montgomery
21 Advertiser, we have two or three shot every night. Anything
22 else?
23     THE DEFENDANT: Other than just to reestablish, to
24 ask that I be --
25     THE COURT: what does the government say and

Page 121

1  probation say to the request for time to report?
2         PROBATION OFFICER: Your Honor, we are recommending
3  that he be remanded today. This was our recommendation at the
4  initial appearance when he was first arrested. He was
5  released at that time by the Magistrate to allow him to get
6  his affairs in order, to take care of his mom and to help
7  establish some kind of care system just in case this
8  happened. He has been out since then, and has had extra time
9  to do so.
10         THE COURT: All right. The government have anything
11  further?
12         MS. HARDWICK: No, Your Honor.
13         THE COURT: All right. The Defendant is hereby
14  committed to the custody of the United States Bureau of
15  Prisons to be committed for a total term of 46 months. When
16  released from imprisonment you shall be on supervised release
17  for a term of one year and shall comply with the mandatory
18  and standard conditions of supervised release on file with
19  this Court. The Court also orders the following special
20  conditions: The Defendant shall participate in drug testing
21  and/or treatment at the direction of the probation officer.
22  The Defendant shall contribute to the cost of any treatment
23  based on ability to pay and availability of third-party
24  payments. The Defendant shall submit to a search of his
25  person, residence, office or vehicle pursuant to the search

Page 122

1  policy of this Court. The Defendant is hereby remanded to the
2  custody of the United States Marshal to begin serving the
3  sentence. You have a right to appeal. The right to appeal
4  runs for ten days. It will expire at midnight. If you want
5  to appeal, it starts running tonight at midnight, tomorrow is
6  the first day. You understand that?
7         THE DEFENDANT: Yes, sir.
8         THE COURT: All right. Stand in the hands of the
9  marshal.
10         THE CLERK: court is in recess.
11         (At which time, 3:23 p.m., the hearing was
12  adjourned.)
13                 *  *  *  *  *
14         I certify that the foregoing is a correct transcript
15  from the record of proceedings in the above-entitled matter.
16  This the 30th day of June, 2006.
17
18                 Official Court Reporter
19
20
21
22
23
24
25

GOVERNMENT
EXHIBIT

CASE
NO. 3:07cv915-ID

EXHIBIT
NO.    E

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 13, 2006
THOMAS K. KAHN
CLERK

No. 06-12309
Non-Argument Calendar

D. C. Docket No. 92-00162-CR-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARVIN C. THOMPSON,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Alabama

**(December 13, 2006)**

Before DUBINA, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Appellant Marvin C. Thompson appeals the district court's order revoking

his supervised release and imposing a 46-month imprisonment sentence. At the

revocation hearing, Lt. Steven Woods testified that, on November 17, 2005, he

discovered, in the driver's seat of Thompson's car, a fanny pack containing crack

cocaine and a firearm. During his cross examination, Lt. Woods acknowledged

that Thompson's ticket number from the November incident was out of sequential

order from other tickets that he had issued before and after the incident, and he had

pulled Thompson over for traffic violations twice, following the incident. The

district court revoked Thompson's supervised release, after finding that he had

possessed crack cocaine and a firearm.

On appeal, Thompson argues that the government failed to prove by a

preponderance of the evidence that he violated the conditions of his supervised

release because: (1) there was evidence that other people had opportunities to leave

the contraband in his car without his knowledge; and (2) there was no evidence

presented showing that he had actual or constructive possession of the contraband.

"A district court's revocation of supervised release is reviewed under an

abuse of discretion standard." *United States v. Frazier*, 26 F.3d 110, 112 (11th Cir.

1994). The revocation of supervised release is authorized when a court finds that a

defendant violated a term of his supervised release by a preponderance of the

evidence. 18 U.S.C. § 3583(e)(3); *see also Johnson v. United States*, 529 U.S. 694,

2

700, 120 S. Ct. 1795, 1800, 146 L. Ed. 2d 727 (2000).

Possession can be either actual or constructive. *United States v. Faust*, 456 F.3d 1342, 1345-46 (11th Cir. 2006) (controlled substance), *cert. denied*, ___ S. Ct. ___ (U.S. Nov. 13, 2006) (No. 06-7242); *United States v. Gunn*, 369 F.3d 1229, 1235 (11th Cir.) (firearm possession), *cert. denied, Cantillo v. U.S.*, 543 U.S. 937, 125 S. Ct. 324 (2004). Constructive possession need not be exclusive and "can be established by showing ownership or dominion and control over the drugs or over the premises on which the drugs are concealed." *United States v. Poole*, 878 F.2d 1389, 1392 (11th Cir. 1989) (holding evidence sufficient to prove constructive possession where, although defendant did not have exclusive control over house where substance was found, she owned, exercised dominion, and control over the house).

After reviewing the record, we conclude that the district court did not abuse its discretion by revoking Thompson's supervised release. The evidence showed that authorities discovered a fanny pack, containing crack cocaine, and a firearm, in the driver's seat of Thompson's vehicle, shortly after he had been driving it in circumstances suggesting that he may have been involved in a drug deal. This evidence established that, more likely than not, Thompson constructively possessed the contraband.

3

Thompson next argues that the district court failed to give adequate consideration to evidence showing that Lt. Woods's testimony was incredible and biased, as indicated by his testimony that he issued Thompson a ticket number out of sequence from his previous tickets, and evidence regarding Lt. Woods's harassment of Thompson via multiple traffic stops. He contends that the district court made an erroneous credibility determination because: (1) its factual findings mirrored Lt. Wood's testimony; and (2) it did not discuss whether Lt. Wood's rendition of the events was to be believed. Lastly, he argues that the record does not reflect that the court considered the government's lack of fingerprint evidence.

A person accused of violating a condition of supervised release is entitled to, *inter alia*, an opportunity to appear, present evidence, and question any adverse witness, and to make a statement and present evidence in mitigation. Fed.R.Crim.P. 32.1(b)(2). "The credibility of a witness is in the province of the factfinder and [we] will not ordinarily review the factfinder's determination of credibility." *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994).

Because the district court allowed Thompson to present his evidence and cross-examine adverse witnesses, indicated that it had taken Thompson's arguments under advisement, and made factual findings that were largely corroborated by Thompson's own testimony, we conclude that the district court

4

afforded Thompson adequate due process, and its factual and credibility determinations were not clearly erroneous.

Thompson next argues that his revocation sentence was unreasonable because the district court made no explicit statement indicating that it considered any of the factors set forth in 18 U.S.C. § 3553, and there was nothing in the record to imply that the district court considered them.

Sentences imposed for a violation of supervised release under an advisory guidelines system are reviewed for "reasonableness." *United States v. Sweeting*, 437 F.3d 1105, 1107 (11th Cir. 2006). Section 3583 of Title 18 provides that the district court may:

> revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony[.]

18 U.S.C. § 3583(e)(3).

Further, Chapter 7 of the Sentencing Guidelines, which governs violations of supervised release, contains policy statements, one of which, § 7B1.4, provides

5

recommended ranges of imprisonment applicable upon revocation. *See* U.S.S.G.
§ 7B1.4. The applicable range in Thompson's case, where he committed a Grade
A violation of his supervised release, had a criminal history category of IV, and
was on supervised release as a result of a sentence for a Class A felony, was 37 to
46 months imprisonment. *See id.* We consistently have held that the policy
statements of Chapter 7 are merely advisory and not binding. *United States v.
Aguillard*, 217 F.3d 1319, 1320 (11th Cir. 2000).

In sentencing a defendant, the factors that a district court should consider
include: (1) the nature and circumstances of the offense; (2) the history and
characteristics of the defendant; (3) the applicable guideline range; (4) the pertinent
Sentencing Commission policy statements; and (5) the need to avoid unwarranted
sentencing disparities. *See* 18 U.S.C. § 3553(a)(1), (2)(B)-(D), (4)-(7). The
district court is not required to discuss each of the § 3553(a) factors. *United States
v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

Because the imposition of Thompson's sentence reflected consideration of
several of the relevant factors under § 3553(a), the sentence was not unreasonable.
Accordingly, we affirm the district court's order revoking Thompson's supervised
release and Thompson's sentence.

**AFFIRMED.**