IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

MARVIN C. THOMPSON,  )
                     )
        Petitioner,  )
                     )
    v                )        Civil Action No. 3:07cv915-ID
                     )
UNITED STATES OF AMERICA,  )
                     )
        Respondent.  )

MEMORANDUM OF POINTS
BRIEF IN SUPPORT OF FACTS
FOR 28 U.S.C. § 2255 MOTION

The Petitioner, Marvin C. Thompson, has submitted to this court
a Motion under 28 U.S.C. § 2255 to vacate the conviction/sentence
imposed upon him by the court. In support of this Motion, the Petit-
ioner respectfully submits the following facts for the court's con-
sideration, in support of his motion.

A primary ground for said motion is the ineffective assistance
of counsel, Don Bethel. Counsel's methods of investigation were
sorely lacking wherein he failed to pursue adequate probative evid-
ence that would have refuted the Government's flimsy preponderence
standard of constructive possession, which was based solely upon the
testimony of the Government's only witness, Lt. Steven Wood. The al-
legations supporting the three (3) charges of obstruction of govern-
ment operations, possession of controlled substances, and possession
of a firearm were presented by a witness in whom even the Government
had no confidence; but because the charges had been lodged against
this Petitioner, the Government and U.S. Probation were compelled to
proceed at least to the level of Revocation proceedings. Attorney

Don Bethel, having access to the Government's full arsenal of re-
sources for discovery and the backing of the Federal magistrates and
judges through the Defender's Office to secure the rights to due pro-
cess afforded to the Petitioner by the U.S. Constitution, _failed_ to
pursue or obtain Petitioner's rights and access and did prejudice
Petitioner's defense. The court also abused its discretion by allow-
ing one area of the Federal Criminal Rules of Procedure, Rule 40(b),
to cloud the issues and diminished the minimal evidence that attorney
Bethel did submit by its statement "We'll let it in for what it's worth."
These and many other issues make up the _facts_ behind Petitioner's
denial of due process and effective assistance of counsel at every
stage of the proceedings, up to and including his appeal.

The issues before this court are fact-based and supported by
the judicial maxims rooted in fair and unbiased jurisprudence. The
Founding Fathers, by and through the Constitution and later by its
Amendments, gave strict instructions regarding the protection of the
rights of the People. Marvin Crawford Thompson, the Petitioner, is
no less deserving of this protection than any other citizen. On
November 17, 2005, he was deprived of his fundamental right to pro-
tection from unlawful search and seizure without probable cause or
reasonable suspicion by the actions of Lt. Steven Wood and Larry
Clark, who were acting in their capacity as agents of the Government.
Petitioner's rights were further violated when U.S. Probation Officer
James Chappel pursued a warrant for Petitioner's arrest without even
investigating the facts of the matter and after allowing Petitioner's
release on bond from the Chambers County Jail.

Petitioner also draws notice to the issue of the Petition of
Revocation, which was initially based on charges of obstruction of

Government operations and possession of controlled substances in connection with the November 17, 2005 arrest, but later grew to include an additional uncharged charge of possession of a firearm by a convicted felon which appeared approximately one month later by amended petition, after the appointment of attorney Don Bethel. No objections were offered by Mr. Bethel to this amended charge despite the specific request by the Petitioner.

Mr. Bethel began what he refers to as his investigation of the case and months passed during which he had ample opportunity to obtain evidence and witness testimony, both written and by submission via subpoena. Petitioner's case was set for hearing by the court for April 4, 2006. Prior to that time, Mr. Bethel and his investigator spoke with Petitioner's girlfriend and passenger at the time of his arrest, Sylvia Lynch on several occasions; once at her job site, at least twice at Petitioner's home, at least twice at the Federal Court House, and once at the office of the Federal Defender. He also spoke with Petitioner and his sister, Barbara Thompson. Throughout these interviews it was established and understood that the testimony of Ms. Lynch and Ms. Thompson would be brought in as witness testimony at the Federal Revocation hearing. Attorney Bethel and his investigator made it clear that the testimony of these two witnesses was essential to Petitioner's defense, both as eyewitness testimony and character reference. (Please see Affidavits of Sylvia Lynch Banks and Barbara Thompson.) In addition, Mr. Bethel spoke with Andreena Lynch, daughter of Sylvia Lynch, while visiting the alleged crime scene with his investigator to take photographs. Adreena Lynch supplied details that would have been of significant benefit to Petitioner's defense, In an affidavit, Petitioner

submitted the affidavit of Adreena Lynch,this affidavit detailed the constitution-
al violations of lieutenant Steven Wood,where he without warrant or probable cause
did enter petitioners vehicle using a device known as a (jimmy device) and afterwards
claimed to have found a fanny pack/black bag on petitioners drivers seat.In support of
petitioners claim that counsel was ineffective at every stage of the proceedings see
Holsclaw v. Smith 822 F2d 1041 (11th Cir) 1981,failure to challenge the sufficiency of
the evidence,Counsels failure to further investigate the information provided to him
at the scene where he met the witness and heard her statement; that she was the daugh-
ter of the passenger Sylvia lynch(Banks)and that she was at the scene on 11/17/05,
thus denying petitioner the meaningful adversarial challenge available to him by
this witnesses statement and testimony.Counsel has denied knowing that this witness
existed and stated that the petitioner did not request she be subpoenaed to testify,
counsels memory fails with regard to his visit to the crime scene and further failed,
to check at any of the houses he mentioned in the record(see pages 20,21) of the
revocation hearing transcript.Counsels trip to the crime scene along with his inves-
tigator served only to take a few pictures of the area and briefly talk to witness
Andreena Lynch and her boyfriend,when they walked up on us at the scene.the great
opportunity to gather information and potential witnesses on behalf of petitioner
was lost due to failure of counsel,to adequately investigate,yet he makes distinct
reference to the crime scene throughout the proceeding on April 4,2006 in his ques-
tions to LT.Steven Wood about"arresting everybody on that street for drug use"see,
page 20@L-14-16 yet leaves himself nothing to support impeachment of the credibility
of LT.Wood.This failure along with the numerous other deficiencies have more than
supported petitioners claims and warrants remand and vacating petitioners conviction
and sentence,though ultimately for allowing the petition to proceed without challeng-
ing the constitutional violations of petitioners rights and the lack of jurisdiction
on the part of the government was much more damaging.

STATEMENT OF THE ISSUES

(1.) WHETHER COUNSELS PERFORMANCE FAILED TO MEET THE STANDARS OF ADEQUATE,
EFFECTIVE,MEANINGFUL,IN COMPLIANCE WITH STRICKLAND;§3006A,(1)(e)(h)&
(i);DURING INVETIGATIVE ASSESSMENT OF EVIDENCE,WITNESSES,DISCOVERY
DOCUMENTS AND CONSTITUTIONAL PROTECTION OF PETITIONERS DUE PROCESS
RIGHTS ACCORDING TO THE 4th,6th AMENDMENTS.

(2) WHETHER NEW EVIDENCE SUPPORTS PETITIONERS ASSERTION THAT WITHOUT,
THE ERRORS OF COUNSEL ANY COURT WOULD FEEL COMPELLED BY THEIR OATH
OF OFFICE TO REMAND AND VACATE PETITIONERS SENTENCE DUE TO THE FACTS
THAT OTHERS SIMILARLY SITUATED HAVE HAD ENTIRE ARREST RECORDS AND,
CASES OF ROGUE OFFICERS DISMISSED.

(3) WHETHER PETITTONERS DUE PROCESS WAS VIOLATED UNDER CAMPBELL,JONES,
AND OTHERS SIMILARLY SITUATED BY NEW LAW CASE OR PRIOR LAW THAT
SUPPORTS THIS NEW LAW CASE WHERE THE COURT FAILED TO ELICIT FULLY
ARTICULATED OBJECTIONS FROM COUNSEL FOLLOWING SENTENCING PETITIONER.

(4) WHETHER COUNSELS FAILURE TO EVEN SUBPOENA/CALL WITNESSES THAT WOULD
HAVE CORROBORATED PETITIONERS DEFENSE AGAINST COUNTS (1)(2)(3) OF
THE PETITION COMPLAINT AMOUNTED TO INEFFECTIVE ASSISTANCE WHEN, VIEWED
WITH COUNSELS MIS-UNDERSTANDING OF THE LAW OF THE CASE.

**CASE SUMMARY**

On **November 17th 2005** The Defendant now referred to as petitioner, had been stopped by his cousin earnest lyman,after pulling over just a few feet short of the front door of his cousin **Edward hughley** home, a place where he had parked for over 20 Years,after telling his pass-enger sylvia banks he was stepping out of the vehicle to see what lyman wanted,he did;after a short exchange of words petitioner loan-ed lyman $23 and prior to re-entering his vehicle he noticed car lights coming toward him and lyman,petitioner stated to lyman it looks like the police,its cool though we ain't doing nothing wrong. as petitioner and lyman stood LT.steven Wood activated his blue lights and he and officer clark both excited the police car weapons drawn yelling put your hand where we can see them.petitioner asked whats going on as he and lyman complied,we ain't done nothing wrong,LT Steven Wood stated yes you have you're parked here illegally on the wrong side of the road facing the wrong direction.petitioner then stated isn't that a ticketing offense,why yall jump out with your guns drawn like that,write me a ticket then or let me leave,Lt.Wood stated naw we gonna wait for the drug dog to come,petitioner stated drug dog for what we ain't got no drugs.form this point LT.Wood went pass the passenger and passenger side of the vehicle strait to the rear of my vehicle and told lyman to step back there where he was officer clark had grabbed my arm and asked me if i had any weapons or drugs on me,i stated no he then stated he was going to do a pat down for weapons (TERRY FRISK)  petitioner was searched (T.F.) then while being held at gun point officer larry clark rifled through his pockets,finding only his Wallet Money,Gum and Check Stub.After

(6)

this period LT.Wood and Earnest Lyman Were Struggling at the rear of
the vehicle officer clark was leaving me to go and assist Wood,wood
instructed him to stay up front with me,he did thats when officer cox
arrived and by then wood had hand cuffed earnest,LT.Wood instructed
officer cox to put lyman in his patrol car.LT Wood during the entire
time he had been at the scene had no direct contact with petitioner,
and had no knowledge who petitioner was,if he possesed any I.D or,
Drivers licence,Proof of Insurance or Registration,LT.Wood proceeded
to the passenger side of petitioners car and told his passenger to
roll down the window,petitioner had remained seized by officer clark.
after LT.Wood ordered the passenger **Sylvia Banks** out of the car she
looked at petitioner through the windshield in an inquiring way and
in fear;petitioner then informed her that she did not have to get out
if she didn't want to,she had done nothing wrong.after being asked
by LT.Wood if he was an Attorney and told to shut up,LT.Wood again
told petitioners passenger to exit the car,again she looked at petit-
ioner and he informed his passenger in the same way.petitioner was
told he was under arrest by LT.Steven Wood and placed in handcuffs by
officer Clark,prior to being put in officer cox's police vehicle the
petitioner requested to have his fiance(Passenger) given his car to
remove and drive home,this request went un-heeded by LT.Wood and
subsequent to the removal and search of his passenger,petioner was
not read his Miranda warning and he was asked if he would consent
to the search of his vehicle which he declined.from this stage LT.
Wood set out to **retaliate against petitioner** and set in motion the
violation chain of events that has brought about the violation of
petitioner his cousin and passengers state and constitutional rights,

**and so undermined petitioners defense that counsels representation amounted to no representation.**petitioner refers the court to the record see Revocation Hearing Transcript Pages 25-26 where counsel subsequently supports the governments case and states @ 27 L-12 also that LT Wood had found a fanny pack on petitioners seat,suborning perjury and instead of challenging the governments case and the petitioners not guilty plea,didestablish the equivalent to admission. **The stage was set for failure** counsel had painted himself;its a defeated effort to argue anything further on behalf of petitioner. counsel established the governments case of preponderance by arguing the reasonsble doubt argument even in the face of continued correction by the court and the challenges of the government.The petitioner need not meet the burden set out in strickland,the error is so plain and prejudical that the court saw it throughout the proceedings.yet dispite the courts allowances of frivilous evidence and un-supported alledged stratedgy,counsels grandiose attitude and attempts to dissuade the court against its clear understanding of the law of preponderance;clearly defense counsel was not only confused about the law of the case but he was so arrogant about his failings that he was willing to offer the petitioner up for the sacrifice;counsel continued this same approach into the appellate brief and destroyed petitioners due process at this most crucial stage as well. This petitioner further asserts that the court was not required to inform the defense counsel of his errors,but did in some cases against the objections of the government,evidence offerred that was and still is relevant was given no weight due to violations of the defense counsels ineffective defense and admissions,that petitioner never admitted nor suborned.

(1)

WHETHER THE PETITIONERS COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN VIOLATION OF PETITIONERS SIXTH AMENDMENT RIGHT WHEN COUNSEL FAILED TO INVESTIGATE THE EVIDENCE,WITNESSES,DISCOVERABLE DOCUMENTS,AND PRETRIAL BRADY MATERIAL WITH ANY PROBATIVE PURPOSE, AND THE EVIDENCE AND ARREST OBTAINED ILLEGALLY.

Petitioners conviction and sentence is unconstitutional,because the petitioner recieved ineffective assistance of counsel as guaranteed by the Sixth Amendment and because the probation officer's use of tainted testimony and evidence,caused an unconstitutional  proceeding,where an unlawful search,seizure,arrest,impound, forgery,and subsequent evidence planting act apparently occured.

Ineffective assistance of counsel claims are reviewed to determine whether counsels performance was both deficient and prejudicial to the defendant.United states v. gipson,985 F.2d 112, 115 (5th Cir.1993).To establish prejudice the petitioner is required to show that,but for connsel's unprofessional errors, acts and omissions there is a reasonable probability that the result of the proceeding would have been different.**Strickland v. Washington,466 U.S. 668,694 (1984),**requires -the exact same standard without the launguage of acts and omissions,.To show deficient performance the petitioner must overcome the strong presumption that the attorney's  conduct falls within a wide range of reasonable

professional assistance.**Id. at 689. IF the petitioner makes a sufficient showing on either of the two components of the requirements, Cause or Prejudice the court need not address the other. Id at 697." The essence of an ineffective assistance of counsel claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.**kimmelman v. morrison,477 U.S. 365 (1986) .

(A)

(A)

In the non-capital sentencing context the petitioner is required to show counsel rendered a deficient performance and such deficient performance resulted in the petitioner recieving a stiffer sentence. see Glover v. United States 148 L.ed 2d 604 (2001).

(1)

In Sub Judice the petitioner was charged,arrested ,convicted and sentenced for violation conduct that was unlawfully before the court,a 4th amendment violation.

(2) counsel failed to challenge the amended petition of U.S. probation for the charge of felon in possesion of a firearm several week following original petition,a 6th amendment violation. All other 6th amendment violations within A-F bf the addendum #1 grounds are subsequent.

In helton v. Secretary of the dept of corrections  233 F3d 1322[11th Cir 2000] counsel failed to developed the evidence that refuted the states circumstantial theory of defedants guilt. Holsomback V. White 133 F3d 1382 11th Cir [1998]

Holsomback's counsel could not have made an informed tactical decision that the doctors might equivocate on the stand outweighed " **what potential benefit might come from their testimony**" In petitioners case and by counsels own admissions evidence and witnesses were never subpoened nor prosecution case challenged by discoverable brady motion.Like in holsomback the court of appeals found that assertions of un-supported tactical excuse did not remove counsel's liability and the failure of counsel to conduct an adequate pre-trial investigation[&] satis-fies the prejudice prong of strickland.Affidavits submitted to this court support petitioners position that counsel's failures amounted to ineffective and satis-fies the prejudice prong of strickland,and the failure to investigate the charges for unconstitutional conduct by the governments only witness serves to establish that, had counsel pursued petitioners requests for proof of unlawful search, and seizure ,right to inform his passenger of her rights,and all other stated viol-ations petitioner would not have been even subject to the charges or never,.

(B)

Violated from his supervised release.petitioner challenged the destruction of the
**Video/Audio** tape of the stop,counsel refused to have the tape analyzed by an ex-
pert for reliability and offered the excuse that the court would't pay for that,
the court ordered the government to turn over a copy of the video tape for the
very purpose of petitioner's and counsels attempt to determine its probative value,
counsel never made the tape available for petitioner or an expert to examine.
Counsel has no rationale for this error and did deny petitioner access to essen-
tial probative evidence that would have exonarated him.**See** U.S. v.Boone 62 F3d 323
[11th Cir 1995] "Evidence aquired because of prior illegal police activity generally
must be excluded as fruit of that illegality.**Hamilton v. Lyons 74 F3d 99,5thCir1996**
conviction tainted by destruction or alteration of material evidence violate defen-
dant's due process.**See Riley v. City Of Montgomery Ala 104 F3d 1247(11th Cir 1997).**
Petitioner did not bare the burden at the revocation hearing of proving his innoc-
ence,counsels duty was to present the case on behalf of petitioners plea of not
guilty;the fact that petitioner was not aware of events that took place while he
was handcuffed inside the patrol vehicle,and where his vehicle was unlawfully seized
searched and evidence presumably planted by LT.Steven Wood,does not support the
conviction by preponderance standards for constructive possession.petitioner had
no input in the courtroom phase of his revocation hearing outside of his testimony,
where he continuously denied the presence of a bag anywhere in his vehicle,the
prejudice by petitioners counsel was,due to his own errors and alleged stratedgy
for admissions he made through direct statement or insinuations to questions posed
to the governments witness.the governments burden was never challenged under def-
ense counsels methods primarily due to his failure to challenge the sufficiency,
and legality of the evidence,but moreover by agreement that the bag was present
in his statements and rhetorical questions,counsel denied petitioner even the basic
sixth amendment representation and the course that led to petitioners revocation
was imminent thereby.

(C)

Due to the numerous failings attributed to petitioners court appointed counsel,and the constitutional violations that have prejudiced this petitioner,along with new supporting evidence that the district court did error in its credibility assessment of the governments only witness against petitioner due primarily to the failure of counsel's pre-trial investigatory methods. Petitioner has been subjected to the most cruelest form of due process violation,where he has been forced to endure the loss of his liberty due to obvious 1st,4th,5th,8th,& 14th amendment, rights.These rights were in full force and effect from the night of **NOVEMBER,17 2005**,throughout the entire process of petitioners proceedings and are the grounds that support this motion. Petitioner was denied his basic due process during the stop, terry frisk interrogation,creation and violative presumption against petitioner and the preceeding violations created by Lt. Steven Wood.**Moore v. Kemp,824 F.2d 847 (11th Cir.1987)** Also SEE; **Alcorn v. Smith 647 F.supp. 1402(E.D. KY. 1986)** **Martire v. Wainwright, 811 F2d 1430 (11th CIR 1987),**Establishing counsels representation fell below an objective standard from the earliest stages of his representation and the failures to follow the basic steps in Brady Discovery; proper taking of witness statements,subpoena processes;this including multiple errors at revocation hearing and at the appellate level.Counsels affidavit has re-enforced petitioners claims of ineffective in several points and has supported petitioners burden under the strikland test.Attorney Bethel admits that he did not subpoena **Sylvia Banks** and his assertion of not suborning purjury is with-out merit and unsupported,further counsel fails to establish how he defeats her affidavit's where she verifies her probative value,certified.

**WHETHER THE SUBSEQUENT TERMINATION FROM THE LANETT POLICE DEPARTMENT AND THE REASONS FOR THIS TERMINATION,CONFIRMS THAT THE DISTRICT COURT DID COMMIT CLEAR ERROR SUPPORTED BY THE NEW EVIDENCE IN THE NOVEMBER,06 VALLEY TIMES NEWS ARTICLE, CONTAINING STATEMENTS FROM UN-SUBPOENAED WITNESS TONY MALONE AND CITY COUNCILMAN MIKE YARBOUGH.**

The petitioner gave counsel all the nescessary information that he presented at the revocation hearing counsel had every opportunity to present this evidence and have offered it opposition to the petition and pursued the petitioners due process for jurisdiction or constitutional violations,the failure of counsel to represent the facts allowed the testimony of the governments only witness to proceed unchallenged,the court had before it several discrepancies and contradictions and chose to ignore them.Counsel was primarily to blame due to the his errors that amounted to admission and left the court under nescessity to disregard rules405(a)(b),607,608,609(2),and 611,counsel's failure to object caused petitioner the loss of his liberty,nevertheless as justice would have her balance the governments witness true to form displayed his incredible character and established the incredible acts and false testimony he displayed under oath at every stage from his initial contact with petitioner,at the state pretrial hearing,and at every appearance before the federal court.The new evidence has within it the cornerstone that exhibits a behavior that the constitution was set in motion to protect,the first and fourth amendments along with the fifth,eighth,and four- teenth,encompass the ideals spoken of in the November 10,2006 valley times news featured article of the termination of this police Lieutenant by members of his own city council,stating that he was a retaliatory,vindictive incredible officer so dishonest that he had been allowed for years to escape punishment and ,**that numerous complaints had been made against him by blacks** "Malone stated

(E)

as long as blacks were the targets this officer was a good cop""said malone
I have never forgotten about the many people i have talked to about their issues
with this officer,but i feel that when the employee breaks a policy some form
of discipline should take place.When blacks are involved,this seems to fall upon
deaf ear's"Malone said that the officer was protected and "they have even stated
that if it were a black they would have never been firing him.In the last two
two years,it's obvious,as long as blacks complain,nothing is done,Malone
said."There seems to be deaf ears at city hall.Petitioners complaint is primarily
premised upon these facts he has diligently maintained that he was not
responsible for the bag alledgedly found on his seat,he has supported this
claim with eye witness affidavits only because his sixth amendment right to
due process has been denied,the new evidence has the sufficient probative value
that support his claims that were cloaked by counsels errors,and denied
adequate consideration.Federal R Civ P,Rule (405)**and 701 places the court in
the unique position to set right the wrong and temper justice with mercy on
behalf of petitioner.The new evidence is based upon fact by not one but two
ranking officials at the city government level,having first hand knowledge of
this witness.**councilman Mike Yarbrough head over the councils police committee
stated in the new evidence article **"This about being critical and holding
officers responsible and accountable for their actions." "The city belongs to
the community,and the community should be more outgoing and outspoken for what
is going on and hold people accountable,when people are treated wrong they need
to file a complaint and stand up for themselves."**Petitioner tried to stand up
for himself at the city level where he filed a complaint twice,without
response,the state has denied petitioner all his due process by ,refusing to
suppress evidence hear pro'se motions for brady discovery petitioner has been
denied his speedy trial right in the state for these charges that he has been
violated for,every effort petitioner has made in his attempts to access his
due process right to effective legal representation,to present evidence in favor

(14)

(F)

of his innocence has failed.Petitioner is numbered with the many blacks that were victims of the racial profiling and unlawful violations by LT.Wood.The record supports this assertion as well where the totality of circumstances are weighed against the preponderance test of this witness(LT.WOOD.The court could not support its findings had the petitioners court appointed counsel met his burden under the sixth amendment according to the evidence presented by petitioner and coupled with the states refusal to prosecute petitioner,the new evidence and the totality of the... **circumstances.The mayor also voted to terminate LT.wood indicating the highest level of the city officials dissatisfaction with this officer.U.S. Probation clearly testified that petitioner had maintained clear conduct for over (46) months. The evidence submitted to the court regarding petitioners work history and tax paying status for the entire time.The area under patrol by this officer was one street over from petitioners home where petitioner had resided for (46) months yet counsel never emphasized that LT.Wood stated he did'nt know petitioner,and with the emphasis being placed upon Lanett being such a high drug crime area the petitioner had never been stopped or confronted once by this officer who patrolled this area almost daily.**The new evidence suggests that the governments witness had been terrorizing this predominantly black neighborhood for several years,coincidently this same neighborhood two streets down in the opposite direction lives city councilman Jamie heard,one of the councilman that voted to terminate Wood.The relevance of this new evidence and the named members of the city officials and their statements and actions against LT.Wood supports grounds for immediate release of petitioner pending any other decisions regarding any equitable relief that petitioner may be due.Lastly petitioner states that had it not been for him speaking with X-councilman Callie Davis and him giving petitioner the work number to councilman Malone defense counsel would not have even known of him,or about the personnel file he presented at petitioners revocation hearing.Tony Malone made this information known to me

(15)

(G)

and informed me to have counsel to contact him,yet counsel falsely stated that councilman Malone became hostile when asked about testifying,and then less (8) months later appears in the article submitted in with complaint.

**Sanders v. United states,**373 U.S. 1,19-21 (1963) **United States v. Bartholomew,** 974 F.2d 39, 41 (5th Cir 1992) (a motion brought under §2255 can be denied without a hearing <u>only</u> if the motion <u>files</u> and <u>records</u> of the case conclusively show that the prisoner is entitled to no relief;**Anderson v. United States,948 F 2d 704 (11th Cir. 1991)**( MOVANT ENTITLED TO EVIDENTIARY HEARING BECAUSE "
<u>RECORD DOES NOT CONCLUSIVELY SHOW THAT THE PRISONER'S CONTENTIONS ARE WITHOUT MERIT.)</u>

(3)

**WHETHER THE DISTRICT COURT FAILED TO ELICIT FULLY ARTICULATED OBJECTIONS BY NOT CONSIDERING THE SENTENCING GUIDELINE RANGES AND ARTICULATING FOR CONSIDERATION FOR VARIATION FROM 37-46 MONTHS.U.S. V CAMPBELL 473 F3D 1345 (11TH CIR 2007).**

NOTHING IN THE RECORD SUPPORTED THE SENTENCE HANDED TO THE PETITIONER ON APRIL 4,2006 COUNSELS REPRESENTATION FELL BELOW AN OBJECTIVE STANDARD WHERE NOT ONLY DID HE ALLOW PROBATION TO RECOMMEND OUT OF PERSONAL BIAS PETITIONERS SENTENCE,BUT ALSO WITHOUT MERIT ACCORDING TO PETITIONERS SUPERVISION HISTORY. FAILURE TO ELICIT FULLY ARTICULATED OBJECTIONS ADDED INSULT TO INJURY AND THIS NEW LAW CASE SENDS CLEAR CONVINCING SUPPORT TO THE NEED FOR SUCH OBJECTIONS. PETITIONERS CASE WARRANTS REMAND,BUT MOREOVER WARRANTS VACATING AND IMMEDIATE RELEASE WHEN VIEWED IN TOTALITY OF THE CIRCUMSTANCES,AND THE CRIMINALIZING OF PETITIONERS INFORMING HIS PASSENGER OF HER RIGHTS,DUE TO THEM NOT BEING UNDER ARREST.CREATING A CRIME THROUGH FALSE ARREST FOR OBSTRUCTION OF GOVERNMENT OPERATIONS.PETITIONER WAS WITHOUT REPRESENTATION AT THIS CRUCIAL STAGE OF THE PROCEEDING AND BEING DENIED THIS RIGHT UNDER CAMPBELL , COUNSEL WAS STILL UNPREPARED TO RESPOND AND LEFT THE COURT TO DENY THIS DUE PROCESS RIGHT.

(16)

In the new law case in the petition where **United States v,Mark Anthony Campbell 473 F3d 1345 (11th Cir. 2007** Sentencing and punishment (2026)[1] states "In super-viseed release revocation proceedings, court failed to elicit fully articulated objections to court's findings of fact,conclusions of law, and manner in which sentence was imposed[2] After imposing sentence in supervised release revocation proceeding,court failed to elicit fully articulated objections by merely asking defendant"is there anything further"there was no indication that defense counsel understood the court to be eliciting objections.(1042)[3]Defendant did not waive claim that district court failed to consider sentencing guidelines and his advisory sentencing range by failing to raise argument in supervised release revocation proceedings,where district court had failed to elicit objections,after imposing sentence.U.S.S.G. § 1B1.1 et seq, 18 U.S.C.A. With regards to the sentencing phase of petitioners supervised release revocation proceeding,counsels errors were much more apparent at this stage of the proceeding,counsel@ 117 of the hearing transcript never suggested a reasonable recommendation anywhere between the advisory guideline range,and gave no supporting argument for the court to consider,furthermore counsel made no direct objections to the mandatory statement made by Mr James Chappell U.S. Probation officer and his supervisor.counsel was silent when it came to the language by probation when asked by the court @118 L-14"How does this recommendation compare to others of similar circumstances"?Probations response was in total opposition to the ruling in Booker where the guidelines are advisory.Probations position was based upon stringent mandatory views and this position was supported by the court when it concurred @ 120 L-18.U.S. Probation stated@ 188 L-16-18 "your honor,my personal recommendation if they are are such an offense **i always** recommend the high end of the guideline range".

The government made no recommendation and counsel failed to or object,the sixth amendment error on the part of defense counsel weighs just as heavily in prejudice as probation and the court.nothing in the record

**WHETHER THE COUNSEL WAS INEFFECTIVE AND HIS FAILURE TO CALL WITNESSES,OR EVEN SUBPOENA THEM CAUSED PETITIONERS DUE PROCESS TO BE DENIED AND FAILED TO RENDER ADVERSARIAL CHALLENGE TO THE GOVERNMENTS CASE.**

In the pretrial stage  petitioner was denied effective assistance of counsel where counsel failed to interview or call witnesses,Attorney Jim Ingram agreed to testify for the petitioner on April Fourth 2006 at petitioners revocation hearing,defense counsel alleges that he spoke with Mr Ingram at some point that,he leaves unclear,yet attempts to pass off as supportive of reason that petitioner was denied this witnesses testimony,in his affidavit response.

Mr Ingram informed petitioner in a phone conversation in October 2007 that he was wondering why he never was told about his need to appear in April 2006 at petitioner's supervised release revocation hearing as he had been ordered to do,and had been told he was needed for by defense counsel.Mr Ingram had no idea why he was not notified by the district court clerk as to the change in dates scheduling him to appear.Mr ingram cross examined LT,Wood at petitioner's state preliminary hearing January 6,2006 @ page 24L-15 thru page 25L-19,during this cross examination made under oath it is clear that lieutenant Wood had(1)no probable cause or reasonable suspicion to detain petitioner and his passenger beyond citing for parking violation,or(2)Warning petitioner to remove vehicle once positive identification and proof of insurance and registration were obtained.Herein lies the first constitutional violation,where petitioner was not asked for drivers license and proof of insurance.Mr Ingram exposed lieutenant Wood and where the question was posed to wood @Page 25L-1-3"would you do that to somebody that was parked illegally in a roadway; separate them,pat them down,or would you write them a ticket for parking on the wrong side of the roadway or".Lieutenants wood response to this direct question under oath before state court judge Calvin Milford, was @page 25L-5-7"I'm going to seperate two people standing together ,if I'm going to talk to one of them.I'm

**not going to let one stand beside me."**The lieutenant speaks here as if he is at the scene alone,and he made a clear statement that at this point he had not and did not write a ticket,furthermore the court must explore the remainder of his sworn testimony on page(25)which supports petitioners claims that his first and fourth amendment rights were also violated during & also after this stage.Mr Ingram's witness testimony on behalf of petitioner was probative and relevant beyond mere impeachment and credibility issues,this witness provided support for petitioners defense regarding jurisdiction of petition for supervised release revocation,due to the legality of the seizure,search unlawful detainer beyond issuance of citation,fraud and several additional violations committed by lieutenant Wood.Counsel failed to attest truthfully in his affidavit where he stated he had spoken with Mr Ingram,and determined that his testimony wasn't relevant.Mr Ingram was still wondering why he hadn't been notified by the clerk of court nor defense counsel,about the April fourth 2006 federal revocation hearing;when he talked to petitioner on counselor's phone here at Yazoo City Low,in October of this year.Counsel's failures to insure the presence of Jim Ingram violated petitioners due process and commits perjury in his Affidavit where he denied the witness testimony on the record established by this witness where @page 28L9-13 establishes that ,Mr Ingram while questioning LT.Wood verified that Andreena Lynch was at the scene,and that had he actually had the transcript&researched it to ascertain the probative value and relevance of it,counsel would have known that both these witnesses had relevant testimony to provide.There was only one kinfolk of Sylvia Lynch(Banks) at that scene on November 17,2005 and that person was Andreena Lynch.The petitioner has supported his claim in the record as to the ineffective representation of Attorney Bethel where this witnesses is concerned the court has only to refer to the record and the documents submitted,certified in accordance with the F.Rules Civ P.to validate petitioners claims.

**(b)Relevancy conditioned on fact,when the relevancy of evidence depends upon the fulfillment of a condition,or fact the court shall admit it upon or,subject to The introduction of evidence of evidence sufficient to support a finding of the fulfillment of the condition.**SEE;ALSO RULE 1008,AND 801 REFERENCING CREDIBILITY WHERE,prior inconsistent statements of a witness are supported for impeachment only."A prior inconsistent statement of a witness at trial **OR HEARING,**which is inconsistent with his testimony is of course always admissible for the purpose of impeaching the witness credibility.**As submitted by the supreme court subdivision (d)(1)(A) made admissible as substantive evidence the prior statement of a witness inconsistent with his present testimony. clearly counsel failed to provide petitioner with his even minimal guaranteed sixth amendment right where denying all named witnesses the opportunity to support petitioners claims,counsel's representation was deficient and denied petitioner the constitutional guarantees by the first, fourth, fifth, eighth, and fourteenth amendments. The petitioner finds it very odd that no other officer present on November 17,2005 has ever testified at any proceeding state or federal,counsel was in a unique position to support the petitioners case where these officers,would have been placed under oath before the fact finder and would have been able to establish for the record the inconsistencies in the state and the governments case's,destruction,or failure to record the stop,and arrest amounted to evidence tampering ,and destruction of evidence,.**counsel failed to support petitioner's defense where he neglected to subpoena evidence,expert examination of video/audio tape,forensic evidence,determining the illegality of the alleged controlled substance,handwriting expert to verify petitioner's signature on traffic citation in dispute.the officers would have provided at least substantive information regarding the events,as well as the witness Sylvia Lynch(Banks),but were denied the opportunity .

(J)

"As a matter of due process an offender may not be sentenced on the basis of mistaken facts or unfounded assumptions "**Towsend v. Burke,334 U,S. 736,740- 741(1948)** "An officer who acts in violation of the constitution ceases to represent the government"."Ignorance of the law does not excuse misconduct in anyone,least of all in a sworn officer of the law".**In re McCowan, 177 C.93, 170 p.100 (1917)).Defen**se counsel suborned perjury by denying petitioners witness **Tony Malone**,officer Larry Clark and officer Cox;Petitioner again specifies for the court that counsel had no knowledge of the probative value and relevancy of Tony Malone as a witness, until notified by petitioner.petitioner had spoken extensively with Mr Malone and had been informed by him about the behavior of this officer,and the position he had been in along with the Mayor and other council members,and their efforts to remove him from the Lanett police force.Malones concern's seemed to be based upon the racial defense the officer had used in times past regarding disciplining him, Malone was willing to assist petitioner due to his knowledge about LT. Wood and the numerous other black citizens in the city of lanett, that had complained to him and the chief of police about Wood.counsels **mis**understanding about the hostility towards testifying on behalf of petitioner was without merit, and the fact that Malone provided counsel with the nescessary information needed to obtain Woods personnel file proved his willingness to help. this alone supports petitioners claim that counsel denied petitioner effective assistance,but to further support his claim see;**Rule 104 Fed R.Civ Proc(a) Preliminary questions concerning the qualification of a person to be a witness the existence of a privilege, or the admissibility of evidence SHALL BE DETERMINED BY THE COURT,subject to the provisions of subdivision (b) in making its determination it is not bound by the rules of evidence except those with respect to privileges.(DECISION SOLELY FOR FACTFINDER.)**

**Supporting Cases; <u>Ineffective Assistance Claim.</u>**

**House v. Balkcom, 725 F2d 608**(11th Cir.1984)Pretrial investigation.

Code v. Montgomery, 799 F2d 1481 (11th Cir 1986)"
*
Nell v. James, 811 F.2d 100 (2nd Cir. 1987)failure to investigate and consult

**Goodwin v. Balkom, 684 F.2d 794 (11th Cir. 1982)potential defense denied.**

Young v. Zant, 677 f.2d 792,798 (11th Cir. 1982)failure to understand facts.
**
<u>**Steven v. Kemp, 846 F.2d 642 (11th Cir. 1988) trial counsel has a duty to familiarize himself with regard to the specific scientific area in which an expert is needed;however,he need not become an expert himself,BUT HE MUST conduct a minimal amount of background work in order that he may INTELLIGENTLY move the court for the need of an expert.**</u>

**UNITED STATES V. BURTON,575F.SUPP. 1320 (E.D. texas 1983),defense counsel must be familiar with the <u>laws</u> and <u>facts</u> of the case in order to provide effective assistance of counsel.**

**Failure of trial counsel to  confer with him or to prepare and investigate adequately possible defenses prior to trial,Gaines v. hopper,575 F.2d 1147 (5th Cir 1978),Fitzgerald v.Estelle 505 F.2d 1334,(5th Cir. 1974)(45 LEd2d 1975) <u>Dixon v. Balkom 614 F.2d 1067(5th Cir 1980),Totality and entire record not speculative </u>and inconcrete claims of what might have been;if appellant can point to specific examples of ineffectiveness(<u>NOT HESITATED  TO GRANT A NEW TRIAL OR HEARING).</u>**

**BOND V. U.S. 1F.3D 631 (7TH CIR.1993),<u>Trial Counsel's Failure to file motion to suppress evidence is properly raised on petition for habeas relief instead of direct appeal.</u> SEE MEEKS V. SINGLETARY 963 F.2D 316 (11TH CIR. 1992).**

IN THE FOREGOING MATTER PETITIONER FEELS HE HAS MET HIS BURDEN AND HAS ESTABLISHED CLEAR AND CONVINCING EVIDENCE THAT BUT FOR COUNSELS ERRORS NO REASONABLE FACTFINDER WOULD HAVE FOUND HIM GUILTY OF THE CHARGED VIOLATIONS.

In conclusion petitioner's motion warrants the court immediate attention, respectfully he requests that he be considered for immediate release by order to the F.B.O.P. Yazoo City Mississippi.In light of the facts that petitioner is actually innocent and by preponderance of the evidence deserves the courts due consideration.Nevertheless vacating and remand for evidentiary hearing burden has also been challenged and met,and considering that petitioner has completed over(70%) of the sentence and has moved to amend his motion for consideration for the reduction pursuant to the amendment changes concerning crack cocaine,petitioner seeks further consideration for his continued clear conduct and most of all,asks that the court take into consideration petitioners **(87) year old mother also blind with Alzheimers,verifiable in the revocation transcript record,and will temper justice with mercy ,that petitioner can return to assist in making her last days more plesant.**

## CERTIFICATION

**Petitioner does hereby certify that the information contained herein is given under penalty of perjury to the best of his ability knowledge and belief.**

Done this 27th Day of December 2007

## CERTIFICATION

MARVIN C. THOMPSON                    )
                                      )            Civil Action No 3:07cv915-ID
V.                                    )
                                      )
UNITED STATES OF AMERICA              )
                                      )

Petitioner does in accordance with the federal rules of civil procedure certify all submitted documents to the court and states that they are sent without the intention to defraud,delay,or hinder the administration of justice. petitioner is a pro'se  litigant and requests  the  courts  consideration  when  viewing  his submissions.

Petitioner does certify under penalty of perjury all documents submitted whether articles or statements were submitted in good faith.

Done this 27th day of December 2007.

Marvin C Thompson

11-8-06

Article #1

# Wood hearing Thursday

**By PATRICK SANDS**
VT-N Staff Writer 11-8-06

LANETT — There will be a hearing at Lanett City Hall Thursday at 6 p.m. to determine whether to uphold the recommended termination of police officer Steven Wood and to discuss economic incentives for a call center expected to bring around 50 jobs to Lanett.

City policy states that an employee should be first recommended for termination by the department head. In the case of Wood that would be Police Chief Ron Docimo. The next step is for it to be presented to the city manager, in this case Joel Holley, who would then need to recommend the termination to the council. The council would then have a meeting with the employee and if the employee did not agree with the **•See WOOD, page 13.**

This is the first Article about the Hearing at Lanett City Hall.

*11-28-04*
*Mail 11-29-04*

*11-8-04*

# WOOD

**Continued from page 1**

decision of the council, they could request a full hearing with an audience present. According to reports, Wood waived his right to the first meeting with the council in order to go straight to the hearing.

Usually in matters such as this, there would be six votes with the five councilmen and mayor all voting. In this instance, there will only be five votes as Councilman Mike Yarbrough is expected to abstain.

Wood arrested Yarbrough on Sept. 30 on the charge of posting advertising material on a utility pole for allegedly having Alabama and Auburn signs displayed on the pole at the front yard of his home.

In the report on file at the Lanett Police Department, it stated that Yarbrough had been drinking at the time of his arrest. Yarbrough has vehemently denied the drinking allegation.

On Oct. 2, Yarbrough told The VT-N that he was upset about the accusation and that it was "abso-

lutely absurd." His account was backed up by former Lanett Councilman Carl Bullard, who says he was with Yarbrough before and after the arrest that evening.

Some citizens have noted that they believe Yarbrough was singled out and pointed out a number of similar signs on utility poles around the city. Yarbrough has stated that the signs have been up for years.

The ordinance which resulted in Yarbrough's arrest states:

It shall be unlawful for any person to attach any poster, placard, advertising sign, political poster or any other type of sign to any telephone pole, electric power pole or any other utility pole in the city. This section shall not prevent or be deemed to exclude any authorized police officer of the city from attaching traffic-control signs to such poles when authorized by the police committee of the city council.

Yarbrough, who represents District 5 on the council and serves as

chairman of the council's Police Committee, recently told The VT-N that he had asked the Federal Bureau of Investigation (FBI) to come in and check on a few things in the (Lanett) Police Department."

He also told The VT-N that along with his case, he has asked that the FBI look into other matters at the police department as well.

For anyone planning to attend Thursday's hearing, the council can decide to make it closed if they feel the "good name and character" of someone could be brought up. In a similar hearing several months ago, the council voted to close the meeting.

In the other agenda item for Thursday's hearing, the council will be discussing a joint action with the Chambers County Commission and Industrial Development Authority on incentives for the call center which has committed to locating in Lanett. This portion of the hearing could end up being closed as well.

RECEIVED
CLERK
DEC 2 8 2006
ATLANTA GA

12/26/06

US. of America
Plaintiff Appellee
J.

Marvin. C. Thompson
Defendant - Appellant,

Ref. CA NO.
06-12309-J J

CASE NO. 3:92-CR-162-JDM

Please accept This article as support for The
above styled appellate action filed by my
court appointed counsel Donnie W. Bethel
This article contains overwhelming evidence
in support of The appeal presently being reviewed
by This most Honorable Court, and The defendant
is requesting That The Court recieve it as,
sufficient To establish The Bias, racially prejudice
retalitory, discredible acts of Lt. Steven wood
and partener larry Clark and Consider remand of
This Case To The District Court for failure to
adequately Consider The distrustful, Harassing,
bias un professional acts of This officer and partner
or review and release defendant for Plain Error purposes.

Sencerely Submitted
Marvin Thompson.

Donnie Wayne Bethel
    Federal Defenders Office
    ·201 MONROE ST STE 407
    MONTGOMERY  AL  36104-3727

---

January 04, 2007

**Appeal Number: 06-12309-JJ**
Case Style: USA v. Marvin C. Thompson
District Court Number:  92-00162 CR-E

TO:    Marvin C. Thompson (84302-020)

CC:    Donnie Wayne Bethel

CC:    Tommie Brown Hardwick

CC:    Administrative File



RECEIVED
JAN 0 8 2007
CH
By

# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

January 04, 2007

Marvin C. Thompson (84302-020)
Oakdale FCI
PO BOX 5000
OAKDALE  LA  71463-5000

**Appeal Number: 06-12309-JJ**
Case Style: USA v. Marvin C. Thompson
District Court Number:  92-00162 CR-E

I am returning to you unfiled the pro se papers which you have submitted. Because you are represented by counsel, the rules of this court do not allow us to accept these papers from you. <u>See</u> 11th Cir. R. 25-1 and 11th Cir. R. 28-3. We suggest that you communicate with your attorney concerning issues or arguments which you believe should be presented to the court.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Carol P. Lewis (404) 335-6179

A copy of your letter along with the attachments will be forwarded to your attorney.

Encl.

PRO-3 (3-2004)

# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Thomas K. Kahn
Clerk

For rules and forms visit
www.ca11.uscourts.gov

January 04, 2007

Marvin C. Thompson (84302-020)
Oakdale FCI
PO BOX 5000
OAKDALE LA 71463-5000

**Appeal Number: 06-12309-JJ**
Case Style: USA v. Marvin C. Thompson
District Court Number: 92-00162 CR-E

I am returning to you unfiled the pro se papers which you have submitted. Because you are represented by counsel, the rules of this court do not allow us to accept these papers from you. See 11th Cir. R. 25-1 and 11th Cir. R. 28-3. We suggest that you communicate with your attorney concerning issues or arguments which you believe should be presented to the court.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Carol P. Lewis (404) 335-6179

A copy of your letter along with the attachments will be forwarded to your attorney.

Encl.

PRO-3 (3-2004)

TABLE OF CASES

REFERENCING GROUNDS FOR 2255 COMPLAINT AND
SUPPORTING FACTS

**U.S. V. JONES, 111 F3d 597(8th Cir.1977)**
When the type of drugs attributable to the defendant is at issue,government bears
burden of proving the type of drugs by preponderance of the evidence.


**RILEY V. CITY OF MONTGOMERY,ALA.104 fF3d 1247 (11th Cir. 1997)**
Planting of false evidence by police officer would violation of arrestee's rights
and could give rise to civil rights liability.


**U.S. V. BOONE,  62 F3d 323 (10th Cir. 1995)**
Evidence that is aquired because of prior illegal police activity generally must
be excluded as fruit of that illegality.


**HAMILTON V.  LYONS, 74 F3d 99 (5th Cir. 19996)**
Convictions tainted by suppression,destruction,or alteration of material evidence
violate defendants right to due process.


**U.S. V. GAY, 774 F2d 368 (10th Cir. 1985)**
Abuse of discretion ,deficiencies in a chain of custody go to the weight  of evidence.


**U.S. DOANE, 975 F2d 8/(1st Cir 1992)**
1) "Exclusionary rule" provides that illegally obtained evidence to which timely
objection was made,cannot be admitted into evidence.
2) Exclusionary rule reflects not personal constitutional right of person aggrieved
but,instead judicially created remedy designed primarily to deter improper conduct
by law enforcement officials.


**EDMONDS V. COLLINS, 8 F3d 290 (5th Cir 1993).**
brady doctrine requires prosecuition to produce exculpatory evidence and evidence
useful for impeachment when requested to do so by defendant.


**BOYLE V. JOHNSON,F3d 1440 (8th cir.1996)**
Court of appeals will reverse conviction obtained through use of tainted testimony.

from the "worker in O'Connor [who] had . . . his own private office."

In his dissenting opinion, Michael disagreed not only with the court's decision to rely on the facts developed at sentencing but also with the court's decision on the merits. He said the court misread Carter as "categorically remov[ing] business guests in another from the protections of the Fourth A contended that the "busi presence i

from the "worker in O'Connor [who] had . . . his own private office."

In his dissenting opinion, Michael disagreed not only with the court's decision to rely on the facts developed at sentencing but also with the court's decision on the merits. He said the court misread *Carter* as "categorically remov[ing] business guests in another's home from the protections of the Fourth Amendment," and he contended that the "business aspect" of the defendant's presence in the apartment was just one factor to be weighed in determining whether he had a legitimate expectation of privacy there.

Jonathan David Byrne, of the Federal Public Defender's Office, Charleston, W.Va., and Mark Lawrence French, of Criswell & French, Charleston, argued for the defendants. Richard Gregory McVey, of the U.S. Attorney's Office, Huntington, W.Va., argued for the government.

*Full text at http://pub.bna.com/cl/054397.pdf*

## Search and Seizure

## Police's Reputation Among African-Americans Helped Turn Encounter Into Investigative Stop

The totality of the circumstances surrounding two white police officers' encounter with an African-American suspect, including recent police shootings of African-American motorists, would have led a reasonable person in the suspect's position to believe he was not free to ignore the officers' requests and go about his business, the U.S. Court of Appeals for the Ninth Circuit concluded June 19. Accordingly, the court held that the encounter constituted an investigative detention for which the Fourth Amendment required reasonable suspicion. (*United States v. Washington*, 9th Cir., No. 06-30386, 6/19/07)

The defendant was seated in his lawfully parked car around midnight when two police officers approached to see what he was doing. The defendant denied having anything in his car that he was not supposed to have, and he voluntarily consented to a search of his person.

For the frisk, an officer directed the defendant to exit his car, had him place his hands on the hood of the officer's vehicle, and patted him down. The officer then asked for permission to search the car. The defendant said "go ahead," and the officer found a handgun used to convict the defendant of being a felon in possession of a firearm.

**Bad Blood.** In an opinion by Judge Ronald M. Gould, the Ninth Circuit held that the initially consensual encounter had escalated into an unlawful, suspicionless detention by the time the officer asked the defendant for consent to search his car.

A person is "seized" for Fourth Amendment purposes when, taking into account all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. "Despite [the district court's finding that the officer was courteous and cordial when questioning defendant Washington], . . . several facts support our conclusion that in the total circumstances a reasonable person in Washington's shoes would not have felt at liberty to terminate the encounter with the police and leave," the court said.

Among the circumstances relied upon by the court was the fact that the events in this case took place in Portland, Ore., subsequent to an 18-month period during which two incidents occurred in which white police officers in the city had shot unarmed African-American motorists during traffic stops. The court also pointed out that, in the aftermath of these shootings, the police department had published and distributed pamphlets instructing people to comply with officers' directions during traffic stops and searches.

Most important to the court's seizure determination, however, was the "authoritative manner" in which the officers conducted the frisk to which the defendant had consented. Ordering a vehicle occupant to exit would not, by itself, necessarily exceed the scope of the occupant's consent for a search of his person, the court made clear. However, it stressed that the officers in this case directed the defendant where to stand, stood behind him during the frisk, and blocked his path back to his car. It concluded:

> In sum, under the totality of the circumstances—[Officer] Shaw's authoritative manner and direction of Washington away from Washington's car to another location, the publicized shootings by white Portland police officers of African Americans, the widely distributed pamphlet with which Washington was familiar, instructing the public to comply with an officer's instructions, that [Officers] Shaw and Pahlke outnumbered Washington two to one, the time of night and lighting in the area, that Pahlke was blocking Washington's entrance back into his car, and that neither Pahlke, nor Shaw, informed Washington he could terminate the encounter and leave—we conclude that a reasonable person would not have felt free to disregard Shaw's directions, end the encounter with Shaw and Pahlke, and leave the scene.

The court went on to conclude that the firearm found in the defendant's car was the fruit of the unconstitutional detention and should have been suppressed.

Lisa Hay, of the Federal Public Defender's Office, Portland, Ore., represented the defendant. Stephen F. Peifer, of the U.S. Attorney's Office, Portland, represented the government.

*Full text at http://pub.bna.com/cl/0630386.pdf*

## Confrontation

## Report of DNA Analysis Results Is Not 'Testimonial' Under *Crawford*

A scientific report that provides the results of DNA laboratory analysis is not "testimonial" for purposes of the Sixth Amendment confrontation clause, and therefore it may be introduced at trial through a witness other than the author, the California Supreme Court held July 2. The court based its ruling on the fact that such reports are contemporaneous ac-

ly, except the second Wednesday in July, the Wednesday following by The Bureau of National Affairs, Inc., 1231 25th St., N.W., at Washington D.C. POSTMASTER: Send address changes to P.O. Box 40949, Washington, D.C. 20016-0949.

Unconvinced, the court rejected this interpretation of the factual record. It concluded that the fire had been suppressed at the time of the third entry, and it suggested that a reasonable officer would not have waited 17 minutes before going back into the house if he were truly concerned about preventing the destruction of evidence.

The state also contended that the deputy's third entry was, like the second entry, merely a lawful continuation of the initial arson investigation. Prosecutors stressed that the deputy was on the scene only for a couple of hours and asserted that this was an objectively reasonable time in which to conduct a fire investigation in the circumstances presented.

The court, however, stressed that the second entry was not justified because it was a fire investigation but because it was necessary to accomplish the seizure of the evidence seen in plain view when the deputy initially entered to confirm that the fire had been extinguished. It said that, at the time of the deputy's third entry, "the fire had been suppressed and the cause and location of the fire had been determined. Thus, [Deputy] McCord's search of the kitchen area could only have been a search to gather evidence of criminal activity."

Accordingly, the court held that the evidence found in the kitchen was properly suppressed, but the evidence of the fuses in the other parts of the house can come in at the defendant's trial.

Dissenting in part, Justice Jim Rice argued, among other things, that all the warrantless entries in this case are distinguishable from the one in *Bassett* because the deputy was conducting an arson investigation, not fishing for evidence of some unrelated crime. "The result the Court reaches today creates an unrealistic, unworkable standard by drawing an ambiguous line as to when law enforcement's preliminary investigation at the scene of a possible arson must cease," Rice said.

The state was represented by Mike McGrath and Mark W. Mattioli, of the Montana Attorney General's Office, Helena, Mont., and Thomas P. Meissner of the Fergus County Attorney's Office, Lewistown, Mont. The defendant was represented by Jeremy S. Yellin, Havre, Mont.

*Full text at http://pub.bna.com/cl/2007MT295.pdf*

## Investigative Detentions

## Officer Stopped Suspect by Shining Light, Rushing Up With Question About His Status

A police officer seized a pedestrian within the meaning of the Fourth Amendment when he illuminated him with a patrol car spotlight and exited the car, briskly walked toward him, and asked him if he was on probation or parole, the California Court of Appeal, First District, held Nov. 13. Because the officer had no basis at that point to reasonably suspect that the pedestrian was involved in criminal activity, evidence that he discovered on the man following the detention must be

suppressed, the court ruled. (*People v. Garry*, Cal. Ct. App., No. A114235, 11/13/07)

The officer was driving through a high-crime area when he spotted the defendant standing next to a parked car. He testified that he exited the patrol car and reached the defendant just a few seconds later, during which time the defendant volunteered that he lived "right here." The defendant also took three or four steps back, which was when the officer asked him if he was on probation or parole. The defendant answered affirmatively, and a brief struggle ensued. The struggle culminated in the defendant's arrest, and search incident to the arrest turned up drugs. The defendant argued the drugs were obtained in violation of the Fourth Amendment because the officer's initial approach amounted to an investigative detention without the requisite reasonable suspicion, not a consensual encounter.

**Indicia of Detention.** Whether interaction between a police officer and a citizen constitutes an investigative stop, for which reasonable suspicion is required, or merely a consensual encounter, which requires no justification, turns on whether a reasonable person would have felt free to leave.

In an opinion by Justice James R. Lambden, the intermediate appellate court agreed with the defendant that the officer's initial encounter with him amounted to a seizure despite the fact that the officer uttered no verbal commands.

---

**"No matter how politely [the officer] may have stated his probation/parole question, any reasonable person who found himself in defendant's circumstances, suddenly illuminated by a police spotlight with a uniformed, armed officer rushing directly at him asking about his legal status, would believe themselves to be 'under compulsion of a direct command by the officer.' "**

JUSTICE JAMES R. LAMBDEN

---

After canvassing the caselaw on investigative detentions, the court concluded that the manner in which an officer approaches a person can carry greater weight in determining whether a detention has occurred than the nature of any questions or requests verbalized by the officer. Employing that standard, it observed that "[n]o matter how politely [the officer] may have stated his probation/parole question, any reasonable person who found himself in defendant's circumstances, suddenly illuminated by a police spotlight with a uniformed, armed officer rushing directly at him asking about his legal status, would believe themselves to be 'under compulsion of a direct command by the officer.' "

The court explained that the officer's actions of bathing the defendant in light and practically running to him—the officer testified that he covered 35 feet in two

to three seconds—were "aggressive, and intimidating actions." Although it acknowledged that an officer's words must always be considered in the detention analysis, the court added that the officer's physical approach was so overwhelming in this case that it set an unmistakable tone—that the defendant was not free to leave. This was true, the court said, despite the fact that the officer parked a considerable distance away from the defendant, was alone, did not use emergency lights, did not draw a weapon, made no verbal commands, went to the defendant rather than asking the defendant to come to him, did nothing to prevent defendant from leaving, and did not touch the defendant prior to learning that he was on parole.

The overwhelming character of the officer's actions was only heightened by his initial remark to the defendant, the court added. The officer's immediate question regarding the defendant's legal status, and his disregard of the defendant's assertion that he was merely standing outside his own home, clearly conveyed to the defendant that the officer was not seeking mere conversation, it said. The court said that only one conclusion was possible from viewing the evidence from the point of view of the defendant—that the officer made a show of authority so intimidating as to communicate to any reasonable person that he was not free to decline the officer's requests or otherwise terminate the encounter.

The defendant was represented by Jennifer A. Mannix, Cambria, Calif. The state was represented by Allen R. Crown, of the Attorney General's Office, San Francisco.

*Full text at http://pub.bna.com/cl/a114235.pdf*

---

# In Brief

## Civil Rights Actions—Standing to Challenge Change in Procedures for Pardons and Commutations

Neither a group of Pennsylvania prisoners, nor several nonprofit advocacy and prisoner rights groups, nor ordinary Pennsylvania voters and taxpayers appear to have standing to challenge amendments to the Pennsylvania Constitution that made it more difficult for prisoners to obtain a pardon or commutation of sentence, the U.S. Court of Appeals for the Third Circuit held Nov. 5. (*Pennsylvania Prison Society v. Cortes*, 3d Cir., No. 06-3354, 11/5/07)

The amendments changed the composition of the Pennsylvania Board of Pardons and the voting requirements for obtaining a pardon or commutation of sentence from a majority vote of the Board of Pardons to a unanimous vote. The plaintiffs sued in federal court, arguing that the changes violate the ex post facto and due process clauses of the federal Constitution.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the U.S. Supreme Court said that the "irreducible constitutional minimum" of standing under Article III requires a plaintiff to establish three elements: (1) an injury in fact, i.e., an invasion of a legally protected interest which is actual or imminent, and concrete and particularized, as contrasted with a conjectural or hypothetical injury; (2) a causal connection between the injury and the conduct complained of; and (3) a substan-

     COPYRIGHT © 2007 BY THE BUREAU OF NATIONAL AFFAIRS, INC.    CRL    ISSN 0011-1341

## FACTS IN SUPPORT OF CONSTITUTIONAL VIOLATION
## AND SUPPRESSION MOTION

Lt. Wood, and officer Clark acting without lawfulness to justify their actions, other than the mere harrassment of the Defendant, and his passengers, did use their position as law enforcement officals, drew their weapons and proceeded to intimidate the defendant and his passengers for a "traffic - violation". Common knowledge of law enforcement policies and procedures state that the only time a service weapon is to be drawn is when the officer feels his life or the life of another person is directly in jeopardy, or on any felony traffic stop, with the assistance of additional resources [i.e. backup].

After using unnecessary force to intimidate the defendant and his passenger the officers proceeded to search the defendants vehicle unlawfully, without consent, and without probable cause that it would contain contraban.

Before searching the vehicle the officers violated the rights of the Defendant and his passenger by using their position of authority to insure that the Defendant could not inform his passenger of her right to remain silent, and not to say anything to either of the officers, and was actually free to get out and leave the vehicle if she so chose to.

After violating the defendants rights to inform his passenger of her rights, by telling him to "shut up" and to "not say anything to his passenger" when he was exercising his First Amendment right to Freedom of Speech, to inform the other person in the vehicle that she was not required to say anything or to even speak to the officers, Lt. Wood, did retaliate also & charge Defendant with "Interference with Government Operations" as a precursor to

arrest unlawfully, and searched the Defendants vehicle, without merit.

A seizure occurrs when a person is detained against his or her will and is unable to freely move about with some undue restriction to their movement, From the initial contact with these officers, the Defendant and his passengers were seized within the meaning of the Fourth Amendment and as such this seizure is unlawful as it was and is based on a government created crime, "Interference with Government Operations," which in no way relates to the initial reason given for approaching the Defendant and his vehicle, and is misfeasance of the law.

The prohibition of the Fourth Amendment against searches and seizures not supported by some objective justification governs all seizures of the person including seizures involving only a brief detention short of a traditional arrest. Smith v. Ohio, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed. 464 (1990); U.S. v. Willis, 37 F.3d 313, (7th Cir. 1994).

Probable cause to justify a search must be determined by the existence of facts known to the officer before, not after the search, i.e. events leading up to the search to give one a reasonable suspicion that contraband of some kind might be found.

Even if the court found that the officers actions were not against the course of the common law and that a nexus did exist, their seizure of any evidence would fall under the fruit of a poisinous tree doctrine, as there was only probable cause to cite the Defendant for illegally parking his vehicle, not what the

officers would use to pat search the Defendant, or for
"Interference with Government Operations." These officers when
'arresting' the Defendant for his "interference" conducted a pat
frisk search and recovered no illegal items, nor any objects of
any kind from the Defendants person.

Before the Defendant refused to grant permission to search
his vehicle, while his passenger was still at the scene, Lt. Woods
again called in for a K-9 unit, to conduct a sniff search, without
probable cause, this alone is outside the scope of their initial
investigatory stop for an illegally parked vehicle, and represents
unlawful detainer & seizure of the Defendant, and his passenger.

The court must on de novo search review & consider the reason-
ableness and the time sequence of the initial stop to when the
officers arrested the Defendant on an "obstruction" charge, when
they were only within the scope of their initial investigatory
probable cause & allowed to cite the Defendant for illegally
parking his vehicle. "A seizure occurrs when luggage is detained
in order for such a sniff to be conducted, thus a law enforcement
officer who detains luggage, or a vehicle while locating a
narcotics detection dog, must at least have reasonable suspicion
based on specific and articulable facts that the bag, vehicle, or
person contains the contraband." Furthermore, the detention of a
passengers bags without a warrant constituttes an unreasonable
search, when the government fails to act diligently in obtaining
a dog. (Amer. Juris. § 8)

There being no nexus to criminal activity,

CERTIFICATE OF SERVICE AND OR MAILING

CASE NAME: *MARVIN THOMPSON* v. *UNITED STATES OF AMERICA*

CASE NUMBER: *Civil Action No. 3:07 CV 915-ID*

I, the undersigned, hereby **affirm** that on this *27th* day of *DECEMBER*, 2007. I deposited in the receptacle for the United States mail, provided for inmates at this Institution, first class postage prepaid, in a sealed envelope to; *U.S. District Court Office of the Clerk. (Clerk) P.O. Box 711, Montgomery AL. 36101-0711*

A true and correct copy of the attached documents identified as follows: *① Permission Motion for Summary Judgement ② Memorandum of Points (Brief in support of facts ③ News Article of The Hearing/Termination of Lt. Steven Weed ④ Letter To The 11th Cir Court of Appeals (by petitioner) ⑤ 3-copies of CLR relevant cases. ⑥ Letter of facts supporting, Suppression/Constitutional Violations. ⑦ Copy of preliminary hearing Transcript (State proceedings) ⑧ Motion for discovery. Subpoena.*

In accordance with **Houston v. Lack** 487 U.S. 266 (1988) these documents are deemed filed and served as of this date. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury under the laws of United States of America that the foregoing is true and correct and this declaration was executed on *DECEMBER 27*, 2007.

AT YAZOO City, Mississippi.

*Marvin C. Thompson (up)*

only these are the
copies
Please copy the
U.S. Atty. petitioner
without known
copies

1              IN THE DISTRICT COURT OF

2              CHAMBERS COUNTY, ALABAMA

3

4    STATE OF ALABAMA

5                   VS.

6    MARVIN THOMPSON &

7    EARNEST LYMAN

8    CASE NOS. DC-2005-200-685

9              DC-2005-200-686

10             DC-2005-200-687

11             DC-2005-200-688

12         *   *   *   *   *   *   *   *   *

13                  APPEARANCES

14

15   FOR THE STATE:

16             JULIA SHEPPARD THOMAS

17             DISTRICT  ATTORNEY

18             2 LaFayette Street

19             LaFayette, Alabama  36862-2088

20

21   FOR THE DEFENDANT THOMPSON:

22             BRENT L. DEAN

23             ATTORNEY AT LAW

```
 1              THE LAW CENTER

 2              9 LaFayette Street North

 3              LaFayette, Alabama   36862

 4

 5   FOR THE DEFENDANT LYMAN:

 6              JAMES C. INGRAM, JR.

 7              ATTORNEY AT LAW

 8              SMITH & INGRAM

 9              308 N. Lanier Avenue

10              P.O. Box 484

11              Lanett, Alabama   36863-20

12

13

14              *   *   *   *   *   *   *   *

15

16

17

18

19

20

21

22

23
```

1                           INDEX

2    DIRECT EXAMINATION BY MS. THOMAS:         6-12

3    CROSS-EXAMINATION BY MR. DEAN:            12-22

4    CROSS-EXAMINATION BY MR. INGRAM:          22-32

5    REDIRECT EXAMINATION BY MS. THOMAS:       32-33

6    RE-CROSS EXAMINATION BY MR. DEAN:         33-35

7    RE-CROSS EXAMINATION BY MR. INGRAM:       35-36

8

9

10

11

12

13

14

15

16

17

18

19                at a Preliminary Hearing, held on

20    Friday, the 6th of January 2006, in Chambers

21    County, Alabama, before the Honorable Calvin

22    Milford, District Court Judge, the following

23    proceedings were had and testimony adduced:

1          THE COURT:   This is the District Court of

2    Chambers County, Alabama.   Today is Friday,

3    January 6, 2006.   Before the Court for preliminary

4    hearing are these cases:   Case

5    No. DC-2005-200-687, State of Alabama versus

6    Earnest Lyman.

7          Mr. Lyman is charged with attempting

8    to commit a controlled-substance crime.   The

9    warrant alleges that he did attempt to commit a

10   controlled-substance crime by stating that he was

11   trying to buy some crack from a police officer.

12   The defendant is present in the court with

13   counsel, the Honorable Jim Ingram.

14          Also, in front of the Court, case

15   DC-2005-200-685, State of Alabama versus Marvin

16   Thompson.   Mr. Thompson is charged with possession

17   of cocaine in violation of the controlled

18   substances act.   He is also present in court with

19   his attorney, the Honorable Brent Dean.

20          The State is represented by the

21   Honorable Julia Thomas.

22          Ms. Thomas, you can call your first

23   witness.

1          MR. DEAN:   Your Honor, before we get

2     started, I think he was also charged with a

3     misdemeanor of obstructing governmental

4     operations.

5          THE COURT:  That's correct.

6          MR. DEAN:  And I filed a motion to have

7     it transferred.

8          THE COURT:  It has been.  For the Record,

9     DC-2005-200-686, which is a misdemeanor charge of

10    obstructing governmental operations, an arrest

11    that occurred on the same date and time involving

12    the same offense, has been transferred.  And part

13    of this file has been transferred to Circuit Court

14    to be contingent with this case.

15          Mr. Lyman also has a misdemeanor

16    charge for DC-2005-200-688, possession of drug

17    paraphernalia, which has likewise been transferred

18    to Circuit Court to be disposed of and contingent

19    with the other charge.

20          So, Ms. Thomas, if you'll call your

21    first witness.

22          MS. THOMAS:  I'd like to call Officer

23    Wood.

```
 1                          STEPHEN WOOD,
 2                was sworn and testified as follows:
 3                         DIRECT EXAMINATION
 4       BY MS. THOMAS:
 5    Q.  Would you state your name for the Record.
 6    A.  Steven Wood.
 7    Q.  And where are you employed, Mr. Wood?
 8    A.  Lanett Police Department.
 9    Q.  And what is your position with the police
10        department?
11    A.  Lieutenant.
12    Q.  Okay.  On or about November 17, 2005, were you
13        conducting a patrol in West Shawmut area?
14    A.  I was.
15    Q.  Okay.  And did you observe any kind of vehicles
16        parked in an irregular fashion?
17    A.  I did.
18    Q.  Okay.  Was there anybody standing outside those
19        vehicles?
20    A.  Yes.
21    Q.  Okay.  Tell me what happened when you saw that.
22    A.  Myself and officer Clark were in my vehicle, my
23        patrol unit.  We noticed a red car parked on the
```

1    wrong side of the road right at the intersection

2    of 16th Court Southwest and 24th Street Southwest.

3    There were two subjects standing just outside the

4    driver's side of the car.

5            We pulled up and I activated my blue

6    lights and exited my vehicle.  Officer Clark also

7    exited my vehicle as well.  I approached Earnest

8    Lyman, which was standing more towards the back of

9    the car, and Officer Clark approached Marvin

10   Thompson.  As I approached Earnest, he had a

11   twenty-dollar bill and some other currency in his

12   hand, which was later determined to be a total of

13   twenty-three dollars balled up in his hand, his

14   right hand.

15           He was acting very nervous, so I asked

16   for consent to search his person.  Lyman stated I

17   cannot search him.  I advised him I was going to

18   pat him down for weapons.  I've know him as a

19   crack-smoker in the past.  During the pat-down, I

20   felt what I believed to be a crack pipe in the --

21   his toboggan or doobie, whatever they call it,

22   rolled up.  And that -- as I went to receive it --

23   retrieve it, Lyman attempted to grab it hisself.

```
 1            That's when I forced him on the back of the car

 2            and held him there until another officer could

 3            arrive, because he's also known for running.

 4    Q.      Okay.  At that point did you -- did you tell

 5            Mr. Lyman that he was under arrest?

 6    A.      I advised him he was under arrest for possession

 7            of drug paraphernalia at that time while I was

 8            still holding him down.  I hadn't placed handcuffs

 9            on him yet.

10    Q.      Okay.  Now, you say that there were two men.  Who

11            was the other --

12    A.      Marvin Thompson.

13    Q.      Okay.  Did you handle the investigations on

14            Mr. Thompson?

15    A.      Well, Officer Clark met with him to begin with,

16            but I did end up placing him under arrest for two

17            charges.

18    Q.      Now, was there anybody inside the vehicle?

19    A.      Yes, ma'am.

20    Q.      And who was that?

21    A.      Sylvia Lynch.

22    Q.      Okay.  Did you ask Ms. Lynch to step out of the

23            car?
```

1    A.   I did.

2    Q.   Okay.  And what happened at that point?

3    A.   When I asked her to step out of the car,

4         Mr. Thompson, who was standing at the front of his

5         car and the front of my car as well, in between,

6         he walked towards me and advised her to stay in

7         the car.  I then asked him, Thompson, to step

8         back, and if he continued to come towards me and

9         tell her not to do as I asked, I was going to

10        place him under arrest for obstruction.

11             I, again, asked Lynch to step out of

12        the car.  Marvin, again, walked towards me,

13        telling her not to do what I said.  I advised him

14        again if he continued to tell her not to do what I

15        said, I was going to arrest him.  Again, I asked

16        her to step out of the car.  Marvin did the same

17        thing.  That's when I advised him he was under

18        arrest for obstruction.

19   Q.   Okay.  But when this was going on, Mr. Lyman was

20        already in the back of the patrol car?

21   A.   Yes.

22   Q.   Now, you stated that you found a substance in

23        Mr. Lyman's hat or toboggan.

1   A.   Yes, ma'am.

2   Q.   And do you know what that was?

3   A.   It was a crack pipe.

4   Q.   Crack?

5   A.   Crack pipe.

6   Q.   Crack pipe.  Okay.  Did you conduct a search of

7        the vehicle --

8   A.   To begin with --

9   Q.   -- of the automobile?

10  A.   -- I got Ms. Lynch to step out.  And I was going

11       to tow the car for being parked on the wrong side

12       of the road and within 30 feet of an intersection.

13                  As we did an inventory of the car, as

14       soon as I opened the driver's side door, there was

15       a fanny pack in the driver's seat.  I reached and

16       grabbed the fanny pack.  When I reached and

17       grabbed the fanny pack, the -- it was heavy, and I

18       could feel the -- like there was firearm in the

19       bag.  At this time I unzipped one of the zippers

20       -- which there were four to five zipped pockets on

21       the fanny pack.  When I unzipped one of the

22       zippers trying to locate the firearm, that's when

23       I located the crack-cocaine and a set of

```
 1       electronic scales.

 2   Q.  Okay.  But he -- did he give you consent to search

 3       the car?

 4   A.  No.

 5   Q.  Okay.

 6   A.  I was towing the vehicle and doing an inventory.

 7   Q.  And you stated that there was crack cocaine?

 8   A.  Yes --

 9   Q.  Was the crack cocaine in it?

10   A.   -- ma'am.

11   Q.  And what other substance was in there?

12   A.  It was crack cocaine and a set of electronic

13       scales.

14   Q.  Okay.  And you also found a firearm?

15   A.  Yes, ma'am.

16   Q.  What kind of firearm was that?

17   A.  High Point .9 millimeter with five rounds in the

18       magazine.

19   Q.  Okay.  So, to recap, what exactly was Mr. Thompson

20       charged with?

21   A.  Mr. Thompson was charged with unlawful possession

22       of a controlled substance, cocaine, and

23       obstructing governmental operations.
```

```
 1   Q.   And Mr. Lyman was charged with --

 2   A.   -- drug paraphernalia and attempt to commit a

 3        controlled-substance crime.

 4   Q.   Okay.  Did Mr. Lyman make any kind of statement to

 5        you?

 6   A.   He did.

 7   Q.   And what did he say?

 8   A.   Lyman called me back to my car.  Officer Cox came

 9        up to me and told me Mr. Lyman wanted to speak

10        with me.  When I went back to my car, he kept

11        asking me to make a deal.  I told him I didn't

12        want to make a deal, that I found some crack in

13        the car.  And he stated to me that he didn't have

14        any crack; he smoked crack, and that he was trying

15        to buy some crack; that's why he had the money in

16        his hand when we pulled up.

17            MS. THOMAS:  Okay.  That's all I have,

18        Judge.

19            THE COURT:  Mr. Dean.

20                 CROSS-EXAMINATION

21   BY MR. DEAN:

22   Q.   What time of night was this, Officer Wood?

23   A.   Around 11:30.
```

1   Q.   It was dark -- that's what I'm asking:  Was it

2         dark?

3   A.   Yes.

4   Q.   When you saw the car, were the headlights on or

5         off?

6   A.   Good question.  I really don't remember, Brent.

7   Q.   Did you approach the car --

8   A.   Head on.

9   Q.   -- head on?

10   A.   Uh-huh.

11   Q.   And how far away were you when you saw the two

12        people standing there?

13   A.   When you first turn on 16th Court and as you get

14        to the top of a slight hill, that's where I

15        noticed two people standing.

16   Q.   Going straight at them?

17   A.   Uh-huh.

18   Q.   And your headlights were on, I would --

19   A.   Yes.

20   Q.   -- assume?

21   A.   That's also a decently lit area.

22   Q.   When did you first realize that you knew

23        Mr. Lyman?

 1  A.   As soon as I saw him.

 2  Q.   In the car or when you walked up to him?

 3  A.   I could see him through my car, him standing

 4       outside of that car.  I recognized him then.

 5  Q.   How did you recognize him?

 6  A.   I just know Earnest.  I've dealt with him in the

 7       past.

 8  Q.   How were they standing by the vehicle?

 9  A.   Earnest was just outside the passenger's side --

10       the driver's side of the car facing the front of

11       the car and Mr. Thompson was facing Earnest,

12       towards the rear of the car.

13  Q.   So Mr. Thompson was standing on this -- he was

14       standing in between you and Mr. Lyman when you saw

15       him standing there?

16  A.   Yes.

17  Q.   But you were still able to --

18  A.   Yes.  I could see both of them.

19  Q.   Huh?

20  A.   I could see both of them.  I mean, Thompson wasn't

21       blocking my complete view of Lyman.

22  Q.   Who was the owner of the car?  Were you able to

23       determine that?

1    A.    It came back to a lady and Mr. Thompson, I

2          believe.

3    Q.    Did you ever ask them who was the owner of the

4          vehicle?

5    A.    I did not.  I spoke with Ms. Sylvia Lynch inside

6          the car.  And she -- I asked her what they were

7          doing parked there, and she said they were just

8          riding around.

9    Q.    She wasn't charged with anything, was she?

10   A.    No.

11   Q.    When you placed Mr. Thompson under arrest for

12         obstructing governmental operations, what did you

13         do next?  Did you place him in the patrol car, or

14         was he still --

15   A.    I advised him he was under arrest and had Officer

16         Clark and Officer Cox place him in handcuffs and

17         place him into my vehicle, into a patrol car.

18   Q.    Did you ever ask him whether you could search the

19         car?

20   A.    I did.

21   Q.    And what did he say?

22   A.    No.  He said he had a 21-year-old daughter; she

23         had been driving the car and that he didn't know

```
 1          if anything was in it, and he didn't want to be

 2          held liable for something she might have left in

 3          the car.

 4    Q.    Tell me again what was the basis -- well, let me

 5          ask you this:  You didn't have a search warrant to

 6          search the car, did you?

 7    A.    No.

 8    Q.    Did you ever call a K-9 unit on the scene --

 9    A.    Did I call one to the scene?

10    Q.    -- prior to you doing an inventory to search?

11    A.    Did I call one to the scene, or did one arrive?

12    Q.    Did you call?

13    A.    Yes.  I called to check and see if we had a K-9

14          working.

15    Q.    And what was your -- and that -- is that before

16          you did an inventory search of the vehicle?

17    A.    It was before I towed the vehicle, yes.

18    Q.    And they didn't come?

19    A.    They were tied up on the north end of the county.

20    Q.    So you'd already had Mr. Thompson arrested --

21          under arrest for obstructing governmental

22          operations?

23    A.    Yes.
```

1    Q.   Did you make the call requesting a K-9 unit after

2         he was under arrest?

3    A.   I called for a K-9 unit.  I can't remember if it

4         was before or after he was arrested.

5    Q.   Was it before or after you received information

6         that a K-9 unit was not available when you did an

7         inventory search of the vehicle?

8    A.   That was after the fact, is when I towed the car.

9    Q.   After you found out that there was not a K-9 unit

10        available?

11   A.   Yes.

12   Q.   What did you find in the car other than -- and

13        I'll ask you about the fanny pack in a minute.

14        Other than the fanny pack, what did you find?

15   A.   There was a pellet gun in the dash, several cell

16        phones.  There was a whole bunch of clothes and

17        junk all in the car.

18   Q.   And when you make a misdemeanor arrest for, you

19        know, obstructing governmental operations or

20        whatever it is, do you make a written inventory of

21        what you find in the car?

22   A.   Yes.

23   Q.   Did you in this case?

| | | |
|---|---|---|
| 1 | A. | I did.  Let me find my impound report.  We |
| 2 | | inventory all the valuables -- or what we believe |
| 3 | | to be valuables inside the car when we tow it. |
| 4 | | Are you ready for me to read off what |
| 5 | | I've got under inventories? |
| 6 | Q. | Please. |
| 7 | A. | Two video cameras, one Sony hand-held and a |
| 8 | | one-sided tape VHS camcorder; a hydraulic jack; |
| 9 | | several CDs; six cell phones.  Five of them were |
| 10 | | Nokias.  One was a Samsung. |
| 11 | | One pellet pistol, one Blaupunkt CD |
| 12 | | player, one radar detector, and one tool box. |
| 13 | Q. | And you didn't list the fanny pack? |
| 14 | A. | No.  I took it into evidence.  This is what's left |
| 15 | | in the car. |
| 16 | Q. | Do you know what type of fanny pack you found? |
| 17 | | Tell me about the fanny pack.  What |
| 18 | | did it look like? |
| 19 | A. | It was a just a black fanny back. |
| 20 | Q. | Where was it in the vehicle? |
| 21 | A. | In the driver's seat. |
| 22 | Q. | In the seat? |
| 23 | A. | Yes. |

```
 1    Q.    And it was -- you said it was zipped up?

 2    A.    Yes.

 3    Q.    Anything sticking out of it --

 4    A.    No.

 5    Q.    -- that you could see?

 6    A.    (Witness shakes head.)

 7    Q.    And did you pick it up personally?

 8    A.    I did.

 9    Q.    And you testified that you noticed that it was

10          heavy?

11    A.    It was heavy.

12    Q.    Was that the first thing you noticed?

13    A.    Uh-huh.  And that -- it was heavy, and I could

14          feel the outline of the firearm by the way I

15          picked it up.

16    Q.    How did you pick it up?

17    A.    By my hand.

18    Q.    Did you grab the strap?

19    A.    No.

20    Q.    You grabbed the whole thing with one hand?

21    A.    Uh-huh.

22    Q.    And then you unzipped it?

23    A.    When I felt the firearm, that's when I unzipped
```

```
 1            it, attempting to locate the firearm.  There was
 2            four or five zippers on the fanny pack.  I didn't
 3            know which one went to what pocket.  As I unzipped
 4            it to try to find the firearm, that's when I found
 5            the crack cocaine and electronic scales.
 6    Q.      Was the alleged cocaine and the scales in the same
 7            zipped-up pocket, or were they in a different
 8            pocket?
 9    A.      Different pocket.
10    Q.      Was the firearm in a different pocket from the
11            cocaine?
12    A.      Yes.
13    Q.      And the scales?
14    A.      Yes.
15    Q.      Three separate pockets?
16    A.      No.  Two.  The scales and the cocaine was in one
17            pocket.
18    Q.      So you unzipped at least two pockets?
19    A.      Yes.  But once I found the cocaine, I unzipped all
20            of the pockets.
21    Q.      All right.  And at that time did you -- did you
22            take custody of it?
23    A.      Uh-huh.
```

1    Q.    And put it in your patrol car?

2    A.    I did.

3    Q.    And the basis of you searching Mr. Thompson's car

4          was that he was placed under arrest for a

5          misdemeanor of obstructing governmental operations

6          and you needed to do an inventory before you had

7          the car towed; is that --

8    A.    The basis of the search was a search incident to

9          an arrest.  To begin with, I wasn't searching the

10         car.  I was doing an inventory in reference to the

11         towing of the vehicle.  And once I located the

12         firearm and the crack cocaine, that's when the

13         search of the vehicle was conducted, because it

14         was incident to an arrest.

15   Q.    So are you testifying that unzipping a zipped-up

16         bag is not a search, in your opinion?

17   A.    Once I determined that there was a firearm,

18         through my training and experience of how they --

19         how the firearm feels and he does not have a

20         pistol license, that gives me the right to

21         retrieve the weapon.

22   Q.    But the fanny pack wasn't around his waist, was

23         it?  It was sitting --

```
 1    A.    No.  It was in the driver's seat.

 2    Q.    -- in the driver's seat?

 3    A.    Uh-huh.

 4    Q.    And when you picked the fanny pack up and noticed

 5          what you thought was a firearm, you didn't obtain

 6          a search warrant to unzip it, did you?

 7    A.    No.

 8                  MR. DEAN:  That's all, Judge.

 9                  THE COURT:  Mr. Ingram.

10                        CROSS-EXAMINATION

11          BY MR. INGRAM:

12    Q.    Lieutenant, clear me up just a little bit.  What I

13          think I heard was that there was a car on the

14          wrong side of the road which brought all this to

15          some sort of conclusion; is that -- you were

16          making a patrol in the area --

17    A.    Uh-huh.

18    Q.    -- when you saw them?

19    A.    Yes.

20    Q.    A car on the wrong side of the road?

21    A.    Parked on the wrong side of the road.

22    Q.    Was this on a roadway, or was it on the right --

23    A.    On the roadway.
```

 1    Q.    It was in the road?

 2    A.    Yes, sir.

 3    Q.    And there was people outside of the car?

 4    A.    Two individuals.

 5    Q.    So those two individuals, I think you said, were

 6          Mr. Thompson and Mr. Lyman?

 7    A.    Correct.

 8    Q.    And they were standing outside the vehicle doing

 9          what?

10    A.    Standing there talking to each other with

11          Mr. Lyman holding currency in his right hand.

12    Q.    Now, where were you when you saw the currency in

13          his hand?

14    A.    Walking around the car.

15    Q.    So you approached these two individuals on the

16          outside of their car at eleven o'clock at night,

17          and you were seeing money in someone's hand?

18    A.    Yes, sir.  My blue lights are on; my headlights

19          are on.  There's also street lights in the area.

20    Q.    So they well know that you're a police officer?

21    A.    Correct.

22    Q.    Did they give you an explanation of why they were

23          standing outside the car on the wrong side of the

```
 1            road at eleven o'clock at night?

 2    A.     Just talking.

 3    Q.     Just talking?

 4    A.     (Witness nods.)

 5    Q.     So if they told you they were just talking, what

 6            was your -- what was your next move?

 7    A.     As I walked up to Mr. Lyman -- I spoke with him

 8            and just told him to step back to the back of the

 9            car to separate him and Marvin Thompson --

10            Mr. Clark spoke with Thompson, took him towards

11            the front of the vehicle.  I spoke with Lyman at

12            the back of the car and completed a pat-down of

13            him for weapons.  That's when I noticed the crack

14            rock in his -- the crack pipe in his toboggan.

15    Q.     Okay.  Let me back you up.  You've approached

16            these two gentlemen at eleven o'clock at night on

17            the wrong side of the road outside the vehicle

18            talking to each other.  And what gave you reason

19            to want to separate and talk to them separately

20            and pat them down?

21    A.     Just --

22    Q.     Were they committing any crime?

23    A.     They were just parked illegally in the roadway.
```

```
 1   Q.   Well, normally, would you do that to somebody that

 2        was parked illegally in a roadway; separate them,

 3        pat them down, or would you write them a ticket

 4        for parking on the wrong side of the roadway or --

 5   A.   I'm going to separate two people standing together

 6        if I'm going to talk to one of them.  I'm not

 7        going to let one stand beside me --

 8   Q.   Well, did they present a threat to you?

 9   A.   I didn't know if they would or not.  It's in a

10        well-known drug area.

11   Q.   Well, now, all of Lanett is a well-known drug

12        area.

13   A.   I would agree with that.

14   Q.   I mean, anybody -- let me ask you this:  If you

15        were going down -- let's say you were going up

16        Cherry Drive and somebody was on the wrong side of

17        the road and there were two individuals talking on

18        the outside, would you do the same thing?

19   A.   I don't know.

20                  MS. THOMAS:  Objection.

21                  THE COURT:  It supports his ambition.

22        Overruled.

23   Q.   (By Mr. Ingram)  Well, let me ask you this,
```

```
 1              Lieutenant:  What -- you -- I think you -- earlier

 2              under cross from Mr. Dean, you told him that you

 3              knew Earnest Lyman well.

 4     A.       Correct.

 5     Q.       You knew him from the past?

 6     A.       Correct.

 7     Q.       Well, why did you perform a Terry search on

 8              somebody you knew real well?

 9     A.       Because he's known to have drugs on him.

10     Q.       Well, that's -- whoa, whoa, whoa.  That ain't a

11              Terry search.  Now, why did you do a Terry search?

12              You said you patted him down for weapons.

13     A.       I did.

14     Q.       But you already knew the individual?

15     A.       Yes.

16     Q.       You didn't ask for any identification?

17     A.       Correct.  I know him.

18     Q.       Well, what gave you the reason to think you needed

19              to pat down a citizen?

20     A.       I don't know.  He could have been high on drugs;

21              could have a weapon on him.

22     Q.       No, no, no.  You tell me why that night you

23              thought it was necessary for you to pat Earnest
```

```
 1          Lyman down.

 2    A.    To check him for weapons.

 3    Q.    Did you find any weapons?

 4    A.    Nope.

 5    Q.    So what did you find?

 6    A.    I found a glass vial known as a crack pipe.

 7    Q.    And where did you find it?

 8    A.    In his toboggan on his head.

 9    Q.    On his head?

10    A.    Uh-huh.

11    Q.    Did it feel like a weapon?

12    A.    No.  It felt like a crack pipe.

13    Q.    Now, you mean to tell me you can tell what a crack

14          pipe is on top of somebody's head under the

15          toboggan?

16    A.    Back of the toboggan.

17    Q.    Back there (indicating)?

18    A.    Uh-huh.

19    Q.    So you patted him all the way down?

20    A.    I did a pat-down --

21    Q.    Up and down and all around?

22    A.    I did a total pat-down for weapons.

23    Q.    Now, there are just three people at this entire
```

1        scene; is that right?

2    A.   Including myself and Officer Clark?

3    Q.   No, no.  I'm talking about people that got

4        searched and whatever.  There was Earnest Lyman,

5        Mr. Thompson, and --

6    A.   And Ms. Sylvia Lynch --

7    Q.   -- a lady?

8    A.   Yes.

9    Q.   Were there any other people in the neighborhood

10       outside the houses?

11   A.   No.  Some more people came up.

12   Q.   Did you pat them down?

*when did Counsel perhaps get copy of this transcript*

13   A.   No.  They were kinfolks of Ms. Lynch.  *(it had need a lynch)*

14   Q.   Oh, okay.  This glass pipe that you said that you

15       found on Mr. Lyman, did it have any residue in it?

16   A.   Yes.

17   Q.   Have you had it tested?

18   A.   No.  It's still in evidence at the station. *Neither did he. Test his drugs in that bag, he allegedly found?*

19   Q.   Are you planning on having it tested?

20   A.   Do I plan on sending it to the lab? *How can possession or drug be illegal*

21   Q.   Uh-huh. *if its not verified as drugs?*

22   A.   Yes.

23   Q.   Is it illegal to own a glass smoking pipe in the

```
 1          State of Alabama that doesn't have any residue in

 2          it?

 3   A.     Is it illegal?

 4   Q.     Uh-huh.

 5   A.     No.  If it's a clean pipe, it's not illegal.  If

 6          you don't use it to smoke.

 7   Q.     Did you field test it?

 8   A.     No.

 9   Q.     You didn't field test it either?

10   A.     (Witness shakes head.)

11   Q.     Did you hear the conversation these two gentlemen

12          were having with each other?

13   A.     I did not.

14   Q.     Are you -- they said nothing to you when you

15          approached them?

16   A.     You asked me if I heard their conversation.

17   Q.     Yeah.

18   A.     No, I didn't.

19   Q.     Did they say anything to you when you approached

20          them?

21   A.     I'm sure they did.  I don't remember the exact

22          words.
            No probable cause or reasonable suspicion

23   Q.     So you didn't hear anybody discussing anything
```

```
 1         about solicitation for anything?

 2   A.    No.

 3   Q.    No?

 4   A.    Not when I approached them.  Mr. Lyman did make

 5         that statement to me, though.

 6   Q.    And what was that statement?  I want to hear it

 7         again.

 8   A.    He called me to my car through Officer Cox --

 9   Q.    Now, wait a minute, now.  You've already got him

10         to the back of your car?

11   A.    Yes.

12   Q.    Okay.  So you've put him inside --

13   A.    Yeah.  He's sitting in my car.

14   Q.    Okay.  You've arrested him for paraphernalia at

15         this point?

16   A.    Correct.

17   Q.    Okay.  All right?

18   A.    He told Officer Cox to tell me to come back to my

19         car; he wanted to make a deal.  When I went back

20         to my car, he kept asking me to make a deal; that

21         he didn't have any crack; that he smoked crack and

22         I knew that; and that he was trying to buy some

23         crack, and that's why he had the money in his hand
```

1        when we pulled up.

2                He also made that statement under oath

3        to the parole board.  Subpoena that statement he

4        made to them as well.

5   Q.   Did you -- since you had already placed him under

6        arrest and he was under custodial arrest, did you

7        inform him of his Miranda rights before he made

8        any statement to you?

9   A.   No, I didn't.  He made a voluntary statement.  It

10       didn't require Miranda.

11  Q.   Was the vehicle blocking any other traffic?

12  A.   It was blocking the flow of traffic in the lane it

13       was in.

14  Q.   Was any other traffic behind it or in front of it

15       that was trying to get around?

16  A.   No.

17  Q.   Was there any drugs found on Earnest?

18  A.   Only the residue in the pipe.

19  Q.   Did you confiscate the twenty-three dollars?

20  A.   I believe I did.

21  Q.   So you based your charges of solicitation to make

22       a controlled buy on the statement that Lyman gave

23       you?  Is that what you based your charges on?

 1   A.   His statement and me seeing him with money in his

 2        hand talking to him and locating crack cocaine in

 3        the driver's seat of the car.

 4             MR. INGRAM:  Thank you, sir.

 5             THE COURT:  Anything further from the

 6        State?

 7             MS. THOMAS:  Yes, sir.

 8                  REDIRECT EXAMINATION

 9   BY MS. THOMAS:

10   Q.   This area that you were in that night is in the

11        West Shawmut area; is that correct?

12   A.   Correct.

13   Q.   Is that area more known -- known more for drug use

14        than most of the other areas --

15   A.   Yes.  It is --

16   Q.   -- in your experience?

17   A.   -- one of the hotter spots for drug sale and drug

18        use in Lanett.

19   Q.   So at eleven o'clock at night, you drive up and

20        see a car parked illegally with people standing

21        outside, and you stopped.  How did these two men

22        behave when you got out of your car?

23   A.   Both of them were nervous --

1    Q.    Okay.

2    A.    -- when I went up to speak with them.

3    Q.    _No_ And it is normal procedure to pat a person down to

4          feel for weapons for your own personal safety; is

5          that correct?

6    A.    Yes.  We have -- we can pat them down for our

7          safety if we fear they might have weapons on them.

8    Q.    Okay.  Now, you call for a wrecker because of the

     _Not The hItw in Linnett- when driver present of Licensed driver._

9          parking violations; is that true?

10   A.    Correct.

11   Q.    And is it normal procedure to conduct an inventory

12         of the vehicle before it's towed?

13   A.    It is.

14   Q.    And that's when you noticed the fanny pack in the

15         driver's side of the car?   _No fanny pack on seat_
                                        _Video tape destroyed To_
16   A.    Yes.                         _remove proof of Lies_

17   Q.    Okay.

18               MS. THOMAS:  Okay.  I have nothing

19         further.

20               THE COURT:  Mr. Dean?

21                    RE-CROSS EXAMINATION

22    BY MR. DEAN:

23   Q.    Officer Wood, once you decided to do an inventory

1      search of this vehicle, how did you gain entry

2      into it?

3   A.  When Ms. Lynch was getting out of the car, she was

4      unable to find the window button.  She was hitting

5      all the buttons on the door in which she ended up

6      locking the door.  So when I went to do an

7      inventory to search, I had to use a slim jim to

8      get the car back open -- unlocked, where I could

9      do an inventory.

10  Q.  Is that because Mr. Thompson refused to give you

11     consent to search?  I mean, who had the keys?

12  A.  They were in the car.

13  Q.  The keys were in the -- locked in the car?

14  A.  Yes.

15  Q.  Did you ever ask Mr. Thompson or Ms. Lynch if they

16     had the keys?
    *He knew where she was, & her daughter was right there in plain sight.*

17  A.  Ms. Lynch had already left the scene, and Thompson

18     was in the back of my car.  The keys that were in

19     the car were his keys.

20  Q.  And one more thing.  When -- the video equipment

21     in your patrol car, was it working this night when

22     you pulled up?

23  A.  It was.

 1   Q.   Have you got a video of --

 2   A.   I do have a video.  I took it to Federal Court in

 3        Montgomery when we had a hearing down there for

 4        Mr. Thompson and the tape malfunctioned, and the

 5        recorder playback clamshell I took down there ate

 6        the tape.

 7   Q.   So the tape is gone?

 8   A.   Yes.

 9              MR. DEAN:  That's all.

10                   RE-CROSS EXAMINATION

11   BY MR. INGRAM:

12   Q.   Well, since your tape is gone, is the audio still

13        available?

14   A.   No.

15   Q.   So if Mr. Lyman is in the -- in your patrol car

16        when he's supposedly wanting to make a deal, that

17        would normally be audiotaped; is that correct?

18   A.   Correct.

19   Q.   Is that gone also?

20   A.   Yes.  That statement he made that night is gone.

21        Yes, it is.  The tape malfunctioned.  But where he

22        was under oath and made the same statement to the

23        parole board, we can get a copy of that statement

2   Q.   Well, it won't have his voice on it, will it?

3   A.   No.  But they do have a recording of it that will

4        have his voice on it.

5             THE COURT:  Do you still have the

6   destroyed tape?

7             THE WITNESS:  I still have the tape.

8   Q.   (By Mr. Ingram)  You still have the tape? *Why after all this time did he have it*

9   A.   Yes.  *Chain of custody.  Evidence Locker Supervisor LT. Richard Carter L.P.O*

10  Q.   Is it chewed up?  *see page (28) Revocation Transcript (28)L.25/see 29,30 Also.*

11  A.   Yes.  It was chewed up.  I managed to get it all

12       back in the tape.

13  Q.   But, I mean, it's still in one piece --

14  A.   Wrinkled.

15  Q.   -- but it's just wrinkled?

16  A.   Yeah.  *No problem reconstructing (Not Erased) Just Wrinkled.*

17  Q.   So it can be reconstructed, then?  *(Lies)*

18  A.   I don't know.

19            MR. INGRAM:  Thank you, Lieutenant.

20            THE COURT:  Call your next witness, if

21       you have any.

22            MS. THOMAS:  We don't have any, Your

23       Honor.

*Left margin (rotated):* Council Deliberately denied this witnesses presence, along with all other credible witnesses

*Right margin:* See Nov. 14 to Jan 6 or ?

1              THE COURT:   Okay.   The State rests?

2              MS. THOMAS:   Uh-huh.

3              THE COURT:   Anything from the defendants?

4              MR. DEAN:   That's all from Mr. Thompson,

5         Your Honor.

6              MR. INGRAM:   That's all.

7              THE COURT:   Okay.   Based upon the

8         testimony adduced at these hearings, it's the

9         opinion of the Court that there is probable cause

10        to believe that each defendant did commit the

11        offenses charged.   These cases are bound over to

12        the grand jury for further consideration.

13              This hearing is adjourned.

14

15

16

17

18

19

20

21

22

23                      (END OF PROCEEDINGS)

1          C E R T I F I C A T E

2

3              STATE OF ALABAMA )

4              COUNTY OF LEE    )

5

6              I hereby certify that the above and

7     foregoing proceeding was taken down by me by

8     stenographic means and that the questions and

9     answers thereto was produced in transcript form by

10    computer aid under my supervision; that the

11    foregoing represents, to the best of my ability, a

12    true and correct transcript of the proceedings

13    occurring on said date at said time.

14              I further certify that I am neither

15    of counsel nor of kin to the parties to the

16    action, nor in any manner interested in the result

17    of said cause.

18

19

20

21    _____

22    Kristen Dykes

23    Court Reporter and Commissioner